1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                 **SOUTHERN DISTRICT OF CALIFORNIA**
10

11   KURT MICHAELS,                          CASE NO. 04cv0122-JAH (JLB)

12                          Petitioner,      **DEATH PENALTY CASE**

13                                           **ORDER:**

14      vs.                                  **(1) DENYING RESPONDENT'S**
                                             **REQUEST TO DISMISS CERTAIN**
15                                           **CLAIMS ON THE BASIS OF STATE**
                                             **PROCEDURAL BARS;**
16
                                             **(2) DENYING EVIDENTIARY**
17                                           **HEARING OR DISCOVERY; AND**

18   KEVIN CHAPPELL, Warden of California    **(3) DENYING HABEAS RELIEF ON**
     State Prison at San Quentin,            **CLAIMS 1, 19, 22, 24, 27-31, 45-53, 55-**
19                          Respondent.      **73, AND 75-77**

20

21

22          On October 24, 2013, Petitioner filed a brief in support of the Group Three Claims (Claims 1,

23   19, 22, 24, 27-31, 45-53, 55-73, and 75 of the First Amended Petition).  (Doc. No. 126.)  On February

24   4, 2014, Respondent filed a brief in response, asserting that the claims at issue were either procedurally

25   barred, not cognizable on federal habeas review, or did not entitle Petitioner to habeas relief under

26   AEDPA, and requesting that the Court deny the First Amended Petition without evidentiary

27   development. (Doc. No. 137.)  On March 7, 2014, Petitioner filed a Reply.  (Doc. No. 139.)  The Court

28   held oral arguments on November 12, 2014.

For the following reasons, and based on the arguments presented in the pleadings and at oral arguments, the Court **DENIES** Respondent's request to dismiss claims on the basis of procedural default, **DENIES** Petitioner's request for relief on the merits and **DENIES** an evidentiary hearing, discovery, or other evidentiary development on the Group Three Claims.

## I. PROCEDURAL HISTORY

By an information filed on February 21, 1989, Petitioner Kurt Michaels was charged with the murder and robbery of JoAnn Clemons and burglary of her home during the early hours of October 2, 1988.  Petitioner was convicted on June 6, 1990 of one count of first-degree murder (Cal. Penal Code § 187), one count of robbery (Cal. Penal Code § 211) and one count of burglary (Cal. Penal Code § 459).  In addition, the jury found Petitioner guilty of four special circumstance allegations- murder for financial gain (Cal. Penal Code § 190.2(a)(1)), murder by lying in wait (Cal. Penal Code § 190.2(a)(15)), murder in the commission of a robbery (Cal. Penal Code § 190.2(a)(17)(i)), and murder in the commission of a burglary (Cal. Penal Code § 190.2(a)(17)(g)).

On June 21, 1990, the jury returned a sentence of death for the murder and six years imprisonment each for the robbery and burglary counts.  The sentence on the enhancements was stayed.  On July 31, 1990, the trial court denied Petitioner's motion for a new trial and motion to modify the sentence.

On automatic appeal (hereinafter "direct appeal") of his conviction and judgment to the California Supreme Court, Petitioner filed an opening brief on February 10, 1997.  Petitioner also filed a reply brief on March 30, 1998 and a supplemental opening brief on June 21, 1999.  The California Supreme Court affirmed the conviction and sentence on July 18, 2002.  People v. Michaels, 28 Cal. 4th 486 (2002).  On September 18, 2002, the California Supreme Court denied Petitioner's request for a rehearing, and on May 27, 2003, the Supreme Court of the United States denied his petition for a writ of certiorari.

On June 22, 1998, Petitioner filed a habeas petition with the California Supreme Court.  Petitioner also filed a reply on April 12, 2001, and a supplemental reply on October 30, 2003.  Petitioner was not granted an evidentiary hearing and his petition was denied on December 23, 2003.

On January 16, 2004, Petitioner filed a request with this Court for appointment of counsel and

to stay the execution of his death sentence.  This Court ordered the execution stayed on February 12, 2004, and appointed counsel on September 17, 2004.  Thereafter, this Court approved a stipulation executed by the parties requiring Petitioner to file his federal habeas petition on or before August 16, 2005.  On August 16, 2005, Petitioner filed his Petition for Writ of Habeas Corpus with this Court, raising seventy-seven (77) claims for relief.  After hearing and adjudicating issues of exhaustion and stay and abeyance, in an order dated September 27, 2006, the Court stayed the federal petition and held the case in abeyance pending the exhaustion of several claims.

On August 19, 2009, the California Supreme Court denied Petitioner's state exhaustion petition.  On October 19, 2009, Petitioner filed his First Amended Petition ["FAP" or "Petition"] in this Court, the operative pleading in this action, raising the same 77 claims presented in the original Petition.  (Doc. No. 71.) On January 19, 2010, Respondent filed an Answer.  (Doc. No. 72.)  On May 4, 2010, the Court issued an Order setting a briefing schedule for Groups One and Two of the claims contained in the federal petition.  (Doc. No. 86.)  After briefing and argument, the Court issued an Order on the Group One Claims on February 4, 2013, and an Order on the Group Two Claims on January 22, 2014.  (Doc. Nos. 119, 135.)  On October 24, 2013, Petitioner filed a brief ["Pet. Brief"] in support of the Group Three Claims, consisting of all of the claims not previously enumerated as part of either Group One or Two.  (Doc. No. 126.)  On February 4, 2014, Respondent filed a brief in Response ["Resp. Brief"] to Petitioner's brief.  (Doc. No. 137.)  On March 7, 2014, Petitioner filed a Reply.  (Doc. No. 139.)

## II. TRIAL PROCEEDINGS

The Court refers the parties to the statement of evidence issued by the California Supreme Court in Michaels, 28 Cal. 4th at 500-08.  The California Supreme Court's factual findings are presumptively reasonable and entitled to deference in these proceedings.  See Sumner v. Mata, 449 U.S. 539, 545-47 (1981).  In order to provide a context for the discussion of Petitioner's habeas claims, the Court previously provided a summary of evidence presented during the guilt and penalty phases in the Group Two Order.  (See Doc. No. 135 at 3-23.)

## III. PROCEDURAL MATTERS

In his Answer, Respondent alleges multiple affirmative defenses to the claims and sub-claims

contained in the Group Three Claims.  The Court addressed several of these defenses[1] in the February 4, 2013 Order on the Group One Claims, will address several of the defenses[2] in this section, and will address the remainder of the defenses[3] in the merits discussion of each claim.

**A.      Procedural Default**

Generally, when a state court's rejection of a federal claim "rests on a state law ground that is independent of the federal question and adequate to support the judgment," a habeas petitioner has procedurally defaulted his claim.  Coleman v. Thompson, 501 U.S. 722, 729 (1991).  To be adequate, the state procedural rule "must have been 'firmly established and regularly followed' by the time as of which it is to be applied."  Fields v. Calderon, 125 F.3d 757, 760 (9th Cir. 1997), quoting Ford v. Georgia, 498 U.S. 411, 424 (1991).  "For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with federal law."  La Crosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001), citing Michigan v. Long, 463 U.S. 1032, 1040-41 (1983) and Harris v. Reed, 489 U.S. 255, 265 (1989).  If found to be both adequate and independent, "federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman, 501 U.S. at 750.

In the first state habeas petition, the California Supreme Court denied Group Three Claims 27 (raised as Claim XV) and 50 (raised as Claim XI) on the merits, and alternately denied those claims with citation to several state procedural bars.  The state court held that "[t]o the extent it repeats an issue raised on appeal, claims [sic] XI is barred pursuant to *In re Harris* (1993) 5 Cal. 4th 813, 826 and *In re Waltreus* (1965) 62 Cal.2d 218, 225."[4]  (Lodgment No. 16.)  The state court also held that "[t]o the

---

[1] These include: Laches and Statute of Limitations (sections E and F under the "Affirmative Defenses" section)

[2] These include: Procedural Default and Non-Retroactivity (sections C and D under the "Affirmative Defenses" section )

[3] These include: Failure to Allege Violation of Federal Law, Lack of Subject Matter Jurisdiction, Harmless Error, and General Denial (sections A, B, G, and H under the "Affirmative Defenses" section).

[4] In the Answer to the First Amended Petition, Respondent concedes that the Ninth Circuit has held that the Waltreus rule "is not sufficient to bar federal relief," and explains that he has cited the procedural bar in order to preserve the issue.  (Ans. at 31, quoting Calderon v. United States District Court (Bean), 96 F.3d 1126, 1131

1    extent that it raises an issue that could have been raised on appeal, but was not, claim XV is denied

2    pursuant to *In re Harris*, *supra*, 5 Cal. 4th 813, 826 and *In re Dixon* (1953) 41 Cal.2d 756." (Id.)

3         In the second state habeas petition, filed for purposes of exhaustion, the state supreme court

4    denied Group Three Claims 22, 30, 49 and 53 on the merits, and alternately denied those claims with

5    citations to several state procedural bars. The California Supreme Court held that these claims were

6    "separately and independently, denied as untimely (*In re Robbins* (1998) 18 Cal.4th 770; *In re Clark*

7    (1993) 5 Cal.4th 750) and successive (*In re Robbins*, *supra*, at p. 788 fn. 9; *In re Clark*, *supra*, at pp.

8    767-768; *In re Horowitz* (1949) 33 Cal.2d 534, 546-547." (Lodgment No. 26.)

9         Additionally, the California Supreme Court stated that Claims 22, 30 and 53 were "separately

10   and independently, denied on the ground that they could have been raised in petitioner's previous

11   petition for writ of habeas corpus. (*In re Clark*, *supra*, 5 Cal.4th at pp. 767-768.)" (Id.) The state

12   supreme court also held that Claim 49 was "separately and independently, denied because it reiterates

13   a claim of error that was raised on appeal. (*In re Waltreus* (1965) 62 Cal.2d 218, 225.)" (Id.) The state

14   supreme court also concluded that to the extent Claim 53 alleged trial court error, it was "separately and

15   independently, denied because it reiterates a claim that was raised in petitioner's previous petition for

16   writ of habeas corpus. (*In re Miller* (1941) 17 Cal.2d 734, 735.)" (Id.)

17        As discussed in greater detail in the Group One and Group Two Orders, the Petition also

18   contains a claim of ineffective assistance of counsel for failure to raise several claims in the prior

19   proceedings, which could conceivably constitute cause for a procedural default, and prejudice, if the

20   claims are found to have merit. Thus, even if each of the procedural bars at issue are found to be

21   adequate and independent, a determination on whether cause and prejudice exists would require the

22   Court to engage in a detailed analysis of each claim.

23        As the Court has noted in prior orders, because it appears clear that adjudicating the merits of

24   these claims will prove more efficient than deciding the procedural issues presented here, the Court will

25   proceed to the merits of these claims. See Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002)

26   ("Procedural bar issues are not infrequently more complex than the merits issues presented by the

27   appeal, so it may well make sense in some instances to proceed to the merits if the result will be the

28   _____

     (9th Cir. 1996).)

1    same."), citing <u>Lambrix v. Singletary</u>, 520 U.S. 518, 525 (1997).[5]

2    **B.    Teague v. Lane**

3         "Unless they fall within an exception to the general rule, new constitutional rules of criminal

4    procedure will not be applicable to those cases which have become final before the new rules are

5    announced." <u>Teague v. Lane</u>, 489 U.S. 288, 316 (1989) (plurality); <u>see also</u> <u>Stringer v. Black</u>, 503 U.S.

6    222, 227 (1992) ("Subject to two exceptions, a case decided after a petitioner's conviction and sentence

7    became final may not be the predicate for federal habeas corpus relief unless the decision was dictated

8    by precedent existing when the judgment in question became final.")  A new rule is one that "breaks

9    new ground or imposes a new obligation on the States or the Federal Government" or one whose "result

10   was not *dictated* by precedent existing at the time defendant's conviction became final." <u>Teague</u>, 489

11   U.S. at 301.  The two exceptions to <u>Teague</u> are if the new rule in question: (1) places "certain kinds of

12   primary, private individual conduct beyond the power of the criminal law-making authority to

13   proscribe," or (2) requires procedures "implicit in the concept of ordered liberty." <u>Id.</u> at 307, quoting

14   <u>Mackey v. United States</u>, 401 U.S. 667, 692, 693 (1971).  "That a new procedural rule is 'fundamental'

15   in some abstract sense is not enough; the rule must be one 'without which the likelihood of an accurate

16   conviction is *seriously* diminished.'" <u>Schriro v. Summerlin</u>, 542 U.S. 348, 352 (2004), quoting <u>Teague</u>,

17   489 U.S. at 313.  When the state properly argues that a "defendant seeks the benefit of a new rule of

18   constitutional law, the court *must* apply <u>Teague v. Lane</u> before considering the merits of the claim."

19   <u>Caspari v. Bohlen</u>, 510 U.S. 383, 389 (1994).

20        In the instant case, except with respect to Claim 69, Respondent offers only a brief and

21   generalized mention of <u>Teague</u> in the Answer to the Petition, consisting of the assertion that "[i]n order

22   for Michaels to be entitled to relief on any claim in his First Amended Petition, it would require the

23   creation of a new rule of criminal procedure, and relief predicated on a new rule of criminal procedure

24   would be foreclosed because retroactive application would be foreclosed on collateral review."  (Ans.

25   _____

26        [5] As previously noted in prior Orders, Petitioner also argues that "California's procedural default rules,
     including its default rules, frustrate the ability to exercise federal rights, particularly ineffective assistance of

27   counsel claims," citing <u>Hoffman v. Arave</u>, 236 F.3d 523 (9th Cir. 2001), and argues that as a result "rules of
     procedural default cannot apply."  (Pet. Brief on PD at 5.)  In <u>Hoffman</u>, the Ninth Circuit indicated that "where
     the application of a state procedural rule operates to frustrate the exercise of a federal constitutional right, federal

28   courts may reach the merits of the underlying claim." <u>Id.</u>, 236 F.3d at 531.  The Court declines to render a
     decision on whether California's procedural rules so operate, but will consider Petitioner's claims on the merits
     for the reasons stated above.

04cv0122

at 33.) (citation omitted.)

The Ninth Circuit has previously declined to conduct a <u>Teague</u> analysis when the state mentions it "only in passing." <u>Arredondo v. Ortiz</u>, 365 F.3d 778, 781 (9th Cir. 2004) ("Normally we decline to address an issue that is simply mentioned but not argued, and we see no reason to depart from that practice in a habeas appeal.") (internal citation omitted). Again, aside from Claim 69, Respondent only offers a brief mention of <u>Teague</u> in the Answer to the Petition, and has not developed this argument in his Response Brief on the Group Three Claims.

Because Petitioner has not shown an entitlement to habeas relief on the asserted claims, the Court need not reach a decision on whether Respondent has properly raised the <u>Teague</u> issue with respect to the majority of the Group Three Claims. <u>See</u> <u>Franklin</u>, 290 F.3d at 1232 ("Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same."), citing <u>Lambrix</u>, 520 U.S. at 525 (1997). The Court will engage in a <u>Teague</u> analysis only with respect to Claim 69, and shall address that issue along with the merits of that claim, <u>infra</u>.

## IV. STANDARDS OF REVIEW

### A.    Standard of Merits Review under AEDPA

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in *violation of the Constitution or laws or treaties of the United States.*

28 U.S.C. § 2254(a) (emphasis added).

The Supreme Court has held that the AEDPA applies to federal habeas petitions filed after its effective date of April 24, 1996. <u>See</u> <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997); <u>Woodford v. Garceau</u>, 538 U.S. 202, 207 (2003). Petitioner filed his petition with this Court on August 16, 2005. Accordingly, AEDPA applies to this case.

Pursuant to AEDPA, 28 U.S.C. § 2254(d), reads as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim

1
that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

2
       (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

3

4
       (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

5

6
28 U.S.C.A. § 2254(d)(1)-(2).

7
     A decision is "contrary to" clearly established law if "the state court arrives at a conclusion

8
opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case

9
differently than [the Supreme] Court has on a set of materially indistinguishable facts." <u>Williams v.</u>

10
<u>Taylor</u>, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly

11
established federal law if "the state court identifies the correct governing legal principle . . . but

12
unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u>; <u>Bruce v. Terhune</u>, 376 F.3d

13
950, 953 (9th Cir. 2004). "Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as

14
opposed to the dicta, of [the Supreme] Court's decisions at the time of the relevant state-court

15
decision.'" <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71 (2003), quoting <u>Williams</u>, 362 U.S. at 412.

16
     "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the

17
Supreme Court," 28 U.S.C. § 2254(d)(1). It therefore cannot form the basis for habeas relief under

18
AEDPA." <u>Parker v. Matthews</u>, 567 U.S. ___, 132 S.Ct. 2148, 2155 (2012).[6] However, "circuit court

19
precedent may be persuasive in determining what law is clearly established and whether a state court

20
applied that law unreasonably." <u>Stanley v. Cullen</u>, 633 F.3d 852, 859 (9th Cir. 2011), quoting <u>Maxwell</u>

21
<u>v. Roe</u>, 606 F.3d 561, 567 (9th Cir. 2010); <u>see</u> <u>also</u> <u>Rodgers</u>, 133 S.Ct. at 1450-51 (While a reviewing

22
court may "look to circuit precedent to ascertain whether it has already held that the particular point in

23
issue is clearly established by Supreme Court precedent . . . it may not canvass circuit decisions to

24
determine whether a particular rule of law is so widely accepted among Federal Circuits that it would,

25

26
      [6] Respondent relies upon the Supreme Court's decision in <u>Parker</u> to assert that while Petitioner "cannot

27
rely on circuit precedent to show that the state court's decision was unreasonable . . . Respondent may rely upon circuit authority to illustrate the converse." (Resp. Brief at 15 n. 6.) Respondent's assertion is overbroad. As the Supreme Court has clearly indicated, circuit precedent continues to play a role in a habeas court's evaluation

28
of a petitioner's constitutional claims. <u>See</u> <u>Marshall v. Rodgers</u>, 569 U.S. ___, 133 S.Ct. 1446, 1450-51 (2013) (per curiam).

if presented to [the Supreme] Court, be accepted as correct.") (internal citations and quotations omitted).

Additionally, with respect to section 2254(d)(2), "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable– a substantially higher threshold." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007), citing <u>Williams</u>, 529 U.S. at 410. "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" <u>Rice v. Collins</u>, 546 U.S. 333, 338-39 (2006), quoting 28 U.S.C. § 2254(e)(1).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Harrington v. Richter</u>, 562 U.S. ___, 131 S.Ct. 770, 786 (2011), quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004). "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. . . . It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." <u>Richter</u>, 131 S.Ct. at 786.

Of the claims adjudicated in this Order, Claims 13-17, 32-34, 36-42, 54, 74 and 76 were each denied on the merits by the California Supreme Court in a December 23, 2003, Order which stated in relevant part:

> The petition for writ of habeas corpus, filed June 22, 1998, is denied. Every claim except claim XXIII is denied on the merits for failure to state a prima facie case for relief.

(Lodgment No. 16.)

Additionally, of the claims adjudicated in this Order, Claims 18, 20-21, 23, 35 and 77 (raised as claims 10, 11, 2, 9, 14, and 1, respectively, of the second state habeas petition) were each denied on the merits by the California Supreme Court in an August 19, 2009, Order which stated in full:

> The petition for writ of habeas corpus filed on October 27, 2006, is denied. All claims are denied on the merits. With the exception of claim 1 (ineffective assistance of appellate counsel), all claims are, separately and independently, denied as untimely (*In re Robbins* (1998) 18 Cal.4th 770; *In re Clark* (1993) 5 Cal.4th 750) and successive (*In re Robbins, supra*, at p. 788, fn. 9; *In re Clark, supra*, at pp. 767-768; *In re Horowitz* (1949) 33 Cal.2d 534, 546-547). Claims 2, 3, 4, 5, 6, 9, 10, 11, and 14 are, separately and independently, denied on the ground that they could have been raised in petitioner's previous petition for writ of habeas corpus. (*In re Clark, supra*, 5 Cal.4th at pp.

767-768.)  Except insofar as petitioner asserts ineffective assistance of counsel, claims 7, 8, 13, and 15 are, separately and independently, denied on the ground that they could have been raised on appeal.  (*In re Harris* (1993) 5 Cal.4th 813, 825, fn. 3, 829-841; *In re Dixon* (1953) 41 Cal.2d 756, 759.)  Insofar as these claims assert ineffective assistance of counsel, these claims are, separately and independently, denied on the ground that they could have been raised in petitioner's previous petition for writ of habeas corpus.  (*In re Clark*, *supra*, 5 Cal.4th at pp. 767-768.)  Claim 12 is, separately and independently, denied because it reiterates a claim of error that was raised on appeal.  (*In re Waltreus* (1965) 62 Cal.2d 218, 225.)  Insofar as it alleges trial court error, Claim 13 is, separately and independently, denied because it reiterates a claim that was raised in petitioner's previous petition for writ of habeas corpus.  (*In re Miller* (1941) 17 Cal.2d 734, 735.)

(Lodgment No. 26.)

Because these claims were denied on the merits without a statement of reasoning, the Court will conduct an independent review of the record with respect to Claims 13-18, 20-21, 23, 32-42, 54, 74, and 76-77 in order "to determine whether the state court clearly erred in its application of Supreme Court Law." See Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002); see also Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) (in the absence of a reasoned decision by the state court, "[o]nly by [an independent review of the record] may we determine whether the state court's decision was objectively unreasonable.")  "Under § 2254(d), a habeas court must determine what arguments or theories supported, or as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Richter, 131 S.Ct. at 786; see also Cullen v. Pinholster, 563 U.S. ___, 131 S.Ct. 1388, 1398 (2011) ("Section 2254(d) applies even where there has been a summary denial."), citing Richter, 131 S.Ct. at 786.

**B.      Standard for Evidentiary Hearing**

AEDPA also limits the circumstances under which district courts may grant an evidentiary hearing.  Section 2254(e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing unless the applicant shows that–
> (A) the claim relies on--
> (i)  a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no

1    reasonable factfinder would have found the applicant guilty of the underlying offense.

2

3    28 U.S.C.A. § 2254(e)(2).

4        Under AEDPA, when determining whether to grant an evidentiary hearing, the district court

5    must first decide "whether the petitioner has failed to develop the factual basis of a claim in State court."

6    Insyxiengmay v. Morgan, 403 F.3d 657, 670 (9th Cir. 2005).  As explained by the Supreme Court:

7        For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims

8        of constitutional error.  If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an

9        evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met.

10   Williams v. Taylor, 529 U.S. 420, 437 (2000).

11       If the petitioner has not failed to develop the facts in state court, an evidentiary hearing is

12   warranted if: (1) the petitioner "establishes a colorable claim for relief" - that is, the petitioner "has

13   alleged facts that, if proven, would entitle him to habeas relief" and (2) the petitioner "did not receive

14   a full and fair opportunity to develop those facts."  Earp v. Ornoski, 431 F.3d 1158, 1167 (9th Cir.

15   2005).  The second requirement is met by a showing that:

16       (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state

17       factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing;

18       (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears

19       that the state trier of fact did not afford the habeas applicant a full and fair hearing.

20   Townsend v. Sain, 372 U.S. 293, 312 (1963), overruled on other grounds by Keeney v. Tamayo-Reyes,

21   504 U.S. 1 (1992).

22       The United States Supreme Court has more recently held that, for claims previously decided on

23   the merits by a state court, a federal habeas court's "review under § 2254(d)(1) is limited to the record

24   that was before the state court that adjudicated the claim on the merits."  Pinholster, 131 S.Ct. at 1398.

25   The Supreme Court also noted that "[a]lthough state prisoners may sometimes submit new evidence in

26   federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so."  Id.

27   at 1401.  Thus, pursuant to Pinholster, it does not serve the interests of judicial economy to hold an

28   evidentiary hearing prior to conducting a review under section 2254(d).  In the instant order, the Court

will therefore conduct a section 2254(d) review along with the evaluation of whether Petitioner's federal habeas claims warrant an evidentiary hearing.

## V. DISCUSSION

The Group Three Claims allege instances of prosecutorial misconduct, trial court error, instructional error, judicial misconduct, and juror misconduct during pre-trial, guilt phase, and penalty phase proceedings, in addition to claims asserting insufficient evidence to sustain Petitioner's convictions, a lack of proportionality with respect to Petitioner's conviction and sentence, and claims alleging defects in California's death penalty statute.

### A.    PRE-TRIAL CLAIMS

#### 1.    Claim 1 - Miranda/ Edwards Violation

#### Claim 45 - Trial Court Erred in Admitting Petitioner's Confession

In Claim 1, Petitioner asserts that his "Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated by the admission of his post-arrest statements." (FAP at 32.) Petitioner challenges the admission of his statements at trial and before the California Supreme Court, contending that the state supreme court's holding conflicts with United States Supreme Court precedent, and that de novo review applies to this claim. (Id. at 35; Pet. Brief at 4-5.) In Claim 45, Petitioner asserts that because his statements to the police after his October 17, 1988, arrest were "involuntary, unreliable and obtained in violation of petitioner's rights under Miranda v. Arizona (1966) 384 U.S. 436," the trial court erred in allowing those statements to be admitted at trial, which violated Petitioner's constitutional rights. (FAP at 197.)

##### a.    Post-Arrest Exchange and State Supreme Court Opinion

The California Supreme Court recounted Petitioner's post-arrest interrogation and discussed his contentions in detail prior to rejecting this claim, as follows:

1. *Background*

Detectives Allen and Gaylor interrogated defendant at the Oceanside police station shortly after defendant's arrest:

Allen: "This is Kurt Michaels [defendant]. No middle name."

Gaylor: "Kurt, what's your middle name? None."

Defendant: "Legal [name is] changed for the third time."

1

2

Gaylor: "Where does your family live, Kurt?"

3

Defendant: "Who knows honestly? I wish I knew or I'd be with them now. I'd be able to get the other pictures in my other coat."

4

Gaylor: "Well, I'll tell you. I've been doing this for about twelve years. John's been doing this for about thirteen years, here. And a couple of years with the San Diego Police before that. And a few years with the Highway Patrol before that. And if there's one thing we know, it's that there's always more than one side to every story. So what we want to do is provide you with an opportunity to tell your side of the story, because this last two weeks, we've been talking with a lot of different people and have gotten a lot of different information from different people."

5

6

7

8

Defendant: "You found out I am a mental case. (Laughter.)"

9

Gaylor: "So, now it's your turn to tell your side of the story. Okay? Also, if you have any questions, it will be your opportunity to ask them, all right? Before we do that, though, I want to read you your rights. [Reads standard *Miranda* warnings.] Do you understand each of these rights I've explained to you? (Defendant nods his head yes.) Is that yes?"

10

11

Defendant: "Yes."

12

Gaylor: "Okay. Having in mind and understanding your rights as I've told you, are you willing to talk with us?"

13

14

Defendant: "Sure. No problem."

15

Gaylor: "Do you know why you're here?"

16

Defendant: "Yes."

17

Gaylor: "Tell me, in your own words."

18

Defendant: "Murder."

19

Gaylor: "Murder of who?"

20

Defendant: "Murder of JoAnn Clemons."

21

Gaylor: "Well, what's your side of the story? What happened?"

22

Defendant: "*I don't know if I should without an attorney.* (Laughter.) It ain't going to do me no .... (Laughter.)" (Italics added.)

23

24

Allen: "Well, we need to know. Let's put it this way, Kurt. He just advised you of your rights. And you said, that yeah, you wanted to talk to us. There's no problem. If at any time that you do not want to talk with us, you can stop at any particular time. If there's any time that we ask you a question that you don't want to answer, you can stop at any time."

25

26

Defendant: "*Okay, that one.* (Laughter.)" (Italics added.)

27

Allen: "Well, what I'm saying is that we just want to make sure you understand all those things."

28

04cv0122

Defendant: "Okay, I appreciate it."

Allen: "And the other thing that Chuck said was we have uh pretty much understand what the story is and we like to going to give you your opportunity."

Defendant: "You're one up on me."

Allen: "To understand your side of the story. How's that?"

Defendant: "I don't know what stories you've been told, and how accurate they are."

Allen: "Would it help you if we told you what, uh ..."

Defendant: "What information you got? That would be a blast."

Defendant here contends: (1) the italicized language from his conversation with Detectives Allen and Gaylor shows that he asserted his rights to counsel and to remain silent; (2) the confession and its context showed that defendant was under the influence of methamphetamine and lacked capacity to waive his rights; and (3) his waiver of his rights was the result of impermissible "softening-up" tactics by the detectives.

### 2. *Assertions of the right to counsel and to remain silent*

Defendant recognizes that under *Davis v. United States* (1994) 512 U.S. 452, 456, 459 [114 S.Ct. 2350, 2353-2354, 2355, 129 L.Ed.2d 362] and *People v. Crittenden* (1994) 9 Cal.4th 83, 130-131 [36 Cal.Rptr.2d 474, 885 P.2d 887], a request for counsel must be unequivocal. He acknowledges that defendant's first statement-"I don't know if I should without a lawyer"-is at best an equivocal request for representation. He argues, however, that his statement-"Okay, that one"-made in response to Detective Allen's comment, makes the request for counsel unequivocal and constitutes an unequivocal assertion of the right to silence.

We disagree. Defendant's statement, "Okay, *that one*" implies a refusal to answer a particular question, perhaps Detective Gaylor's question asking defendant: "[W]hat's your side of the story? What happened?" Defendant did not assert a right to refuse to answer any questions, ask that the questioning come to a halt, or request counsel. Instead, he was showing that he knew he could refuse to answer any or all questions and would exercise this right on a question-by-question basis. From time to time in the interrogation he did refuse to answer specific questions. But the words defendant used, and his subsequent conduct, do not show that he wanted to stop the interrogation and bar all further questions.

The case is analogous to *People v. Silva* (1988) 45 Cal.3d 604 [247 Cal.Rptr. 573, 754 P.2d 1070]. There, the defendant waived *Miranda* rights and answered several questions, then refused to answer a question that might place him at the site where the murder victim was kidnapped. The interrogation continued, with the defendant answering some questions and not others. We concluded that the defendant's constitutional rights were not violated, because "[a] defendant may indicate an unwillingness to discuss certain subjects without manifesting a desire to terminate 'an interrogation already in progress.'" (45 Cal.3d at pp. 629-630.) The same is true here.

### 3. *Capacity to waive Miranda rights*

Describing himself as a habitual user of methamphetamine, defendant argues that his responses during the interrogation suggest he was under the influence of that substance.

Defendant, however, specifically denied being under the influence of alcohol or narcotics at the time of the interview. Contrary to counsel's suggestion, we cannot determine from defendant's conversational pattern in a written transcript whether he was under the influence of methamphetamine, and if so, to such an extent that he was not competent to waive his rights. Moreover, defendant's failure to raise this issue in the trial court bars him from asserting it on appeal. (See *People v. Kipp* (2001) 26 Cal.4th 1100, 1130 [113 Cal.Rptr.2d 27, 33 P.3d 450]; *People v. Ray* (1996) 13 Cal.4th 313, 339 [52 Cal.Rptr.2d 296, 914 P.2d 846].)

### 4. *Police "softening-up" of defendant*

Before advising defendant of his constitutional rights, Detective Gaylor commented that there were two sides to every story. According to defendant, that comment was designed to soften him up and induce a confession. In support, he cites this passage from *People v. Honeycutt* (1977) 20 Cal.3d 150, 160-161 [141 Cal.Rptr. 698, 570 P.2d 1050]: "It must be remembered that the purpose of *Miranda* is to preclude police interrogation unless and until a suspect has voluntarily waived his rights or has his attorney present. When the waiver results from a clever softening-up of a defendant through ... ingratiating conversation, the subsequent decision to waive without a *Miranda* warning must be deemed to be involuntary for the same reason that an incriminating statement made under police interrogation without a *Miranda* warning is deemed to be involuntary." The Attorney General in reply correctly observed that the facts here are not at all like *Honeycutt*, which, as described in *People v. Kelly*, involved "an unrecorded 30-minute, pre-*Miranda* conversation, discussing mutual acquaintances, past events and finally the victim." (*People v. Kelly* (1990) 51 Cal.3d 931, 954 [275 Cal.Rptr. 160, 800 P.2d 516].)

In the trial court, defendant unsuccessfully argued that his confession was inadmissible because he did not waive his *Miranda* rights to counsel and to remain silent. The issue he now raises is different-he claims that even if he did waive his *Miranda* rights, that waiver was involuntary. The determination whether a waiver is voluntary is one entrusted to the trial judge, based on the totality of the facts and circumstances, including the background, experience and conduct of the accused. (See *People v. Kelly*, *supra*, 51 Cal.3d at p. 950.)

Because defendant failed to raise the voluntariness issue at trial, he cannot raise it now. (*People v. Ray*, *supra*, 13 Cal.4th at p. 339.) Defendant contends here that the issue is preserved for appeal by his trial court objection to the admissibility of the confession on the ground that he did not waive his *Miranda* rights. Because such an objection does not ordinarily lead to the presentation of evidence of defendant's background, experience, and conduct-evidence essential to determining whether a waiver was voluntary-we reject that contention.

Michaels, 28 Cal. 4th at 508-12.

### b. **Discussion of Claim 1**

"[W]aivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused.'" Edwards v. Arizona, 451 U.S. 477, 482 (1981), quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938). "First, the relinquishment of the right must have been

1   voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation,

2   coercion, or deception.  Second, the waiver must have been made with a full awareness of both the

3   nature of the right being abandoned and the consequences of the decision to abandon it." Moran v.

4   Burbine, 475 U.S. 412, 421 (1986).

5       Petitioner first asserts that the Court should consider this claim de novo because "the California

6   Supreme Court employed an analysis that was contrary to, and an unreasonable application of, Supreme

7   Court precedent." (Pet. Brief at 4-5.)  He contends that the state supreme court erroneously applied

8   Davis v. United States, 512 U.S. 452 (1994) instead of Smith v. Illinois, 469 U.S. 91 (1984), arguing

9   that Davis involved a post-waiver invocation of rights, while Smith, like Petitioner's situation, did not

10  involve an initial express waiver of Miranda rights.  (Pet. Brief at 4-5, Reply at 3-4.)  In the Petition,

11  Petitioner also asserted that "the Miranda warnings given to Mr. Michaels were deficient, particularly

12  because Mr. Michaels was not informed that he had the right to an attorney *during* the interrogation."

13  (FAP at 35.)

14      However, a plain reading of the interrogation transcript reveals that the police read Petitioner

15  his rights, which included informing Petitioner that he had the right to have an attorney present during

16  questioning, and that Petitioner expressly indicated a willingness to speak with them, as follows:

17      Gaylor:     So, now it's your turn to tell your side of the story. Okay? Also, if you
                    have any questions, it will be your opportunity to ask them, all right?
18                  Before we do that, though, I want to read you your rights. You have the
                    right to remain silent.  If you give up the right to remain silent, anything
19                  you do say can and will be used in court against you.  You have the right
                    to speak with an attorney of your choice before questioning and to have
20                  the attorney present during questioning. If you cannot afford an attorney,
                    one will be appointed for you by the court prior to any questioning, if you
21                  so desire. The attorney will not cost you anything. The services are free.
                    Do you understand each of these rights I've explained to you? (Michaels
22                  nods his head yes.) Is that yes?"

23      Michaels:   Yes.

24      Gaylor:     Okay. Having in mind and understanding your rights as I've told you, are
25                  you willing to talk with us?

        Michaels:   Sure. No problem.
26  ///

27  ///

28  ///

(CT 2393.)[7]  Thus, Smith v. Illinois does not govern Petitioner's case, as unlike Petitioner's case, Smith did not involve an initial waiver of Miranda rights.[8]  During the initial Miranda warnings in Smith, that defendant was told that, "You have a right to remain silent.  You do not have to talk to me unless you want to do so.  Do you understand that?," to which the defendant replied, "Uh.  She told me to get my lawyer.  She said you guys would railroad me."  Smith, 469 U.S. at 92.  The police then informed the defendant: "You have a right to consult with a lawyer and to have a lawyer present with you when you're being questioned.  Do you understand that?," to which he replied, "Uh, yeah.  I'd like to do that."  Id.  The officers continued to question Smith, and the reviewing courts considered the defendant's responses to further questioning in deciding whether he had initially invoked his right to counsel.  Id. at 94.  The Smith Court reversed, holding that "an accused *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself."  Id. at 100.  Again, in contrast to Smith, when Petitioner was advised of his Miranda rights, including both the right to remain silent and the right to counsel, he was first asked if he understood those rights, to which he answered yes.  Petitioner was then specifically asked, with those rights in mind, if he was willing to speak with the police, to which he replied, "Sure. No problem."

    "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver."  North Carolina v. Butler, 441 U.S. 369, 373 (1979).  In this case, Petitioner was given explicit Miranda warnings, which included advisement of both his right to remain silent and to counsel, and was asked if he was willing to speak with the police, to which he answered in the affirmative.  Petitioner now contends that: "Mr. Michaels responded that he was willing to speak

---

[7] The state record contains two versions of Petitioner's statement to police.  The first one was entered during the guilt phase of trial as People's Exhibit 38 and is 64 pages in length.  (CT 2323-87.)  The second version was entered into evidence at the penalty phase as People's Exhibit 73, is 69 pages in length, and contains additional portions that were not allowed into evidence at the guilt phase proceedings.  (CT 2392- 2461.)  As the initial waiver portion of both versions appear identical, the Court's discussion of Claims 1 and 45 shall refer to the second, more complete version.

[8] Petitioner's reliance on United States v. Rodriguez, 518 F.3d 1072 (9th Cir. 2008) is similarly unavailing, as that decision, like Smith, involved a situation where a defendant made an ambiguous statement in response to the initial Miranda waiver inquiry.  Id. at 1080-81.  As discussed, after receiving the Miranda warnings, Petitioner made an unambiguous statement indicating a willingness to speak with the police officers.  (CT 2324.)

1  with them, but he did not say that he was willing to speak with them *without a lawyer*."  (Reply at 3.)

2  However, in light of the circumstances presented here, the California Supreme Court was not objectively

3  unreasonable in concluding that Petitioner had waived his <u>Miranda</u> rights and that <u>Davis</u>, which

4  involved a post-waiver invocation, applied to Petitioner's situation.  <u>See</u> <u>Butler</u>, 441 U.S. at 373 n. 4

5  ("[A] court *may* find an intelligent and understanding rejection of counsel in situations where the

6  defendant did not *expressly* state as much.")

7           Petitioner also contends that he explicitly invoked his rights to an attorney and to remain silent,

8  and the officers failed to clarify his statements prior to continuing with the interrogation.  (Pet. Brief at

9  8-9.)  The trial court examined both the waiver and invocation issues and concluded: "So the Court finds

10  that the defendant made an unequivocal clear waiver of his <u>Miranda</u> rights, that there was no actual

11  request for an attorney, but that there was mention of an attorney as the defendant appeared to be

12  thinking out loud."  (RT 229-30.)  As outlined above, the portion of the interrogation giving rise to this

13  contention is as follows:

14       Gaylor: "Well, what's your side of the story? What happened?"

15       Defendant: "*I don't know if I should without an attorney.* (Laughter.) It ain't going to do
         me no .... (Laughter.)" (Italics added.)

16
17       Allen: "Well, we need to know. Let's put it this way, Kurt. He just advised you of your
         rights. And you said, that yeah, you wanted to talk to us. There's no problem. If at any
         time that you do not want to talk with us, you can stop at any particular time. If there's
18       any time that we ask you a question that you don't want to answer, you can stop at any
         time."
19
20       Defendant: "*Okay, that one*. (Laughter.)" (Italics added.)

21       Allen: "Well, what I'm saying is that we just want to make sure you understand all those things."

22       Defendant: "Okay, I appreciate it."

23       Allen: "And the other thing that Chuck said was we have uh pretty much understand
         what the story is and we like to going to give you your opportunity."

24       Defendant: "You're one up on me."

25       Allen: "To understand your side of the story. How's that?"

26       Defendant: "I don't know what stories you've been told, and how accurate they are."

27       Allen: "Would it help you if we told you what, uh ..."

28       Defendant: "What information you got? That would be a blast."

1   Michaels, 28 Cal. 4th at 509-10.

2       The state supreme court rejected this claim on direct appeal, finding that Petitioner's statement,

3   "I don't know if I should without a lawyer" was "at best an equivocal request for representation."

4   Michaels, 28 Cal. 4th at 510.  The state court concluded that Petitioner's next response, "Okay, that

5   one," was not an unequivocal invocation of the right to remain silent, but instead "implie[d] a refusal

6   to answer a particular question," and was a demonstration that Petitioner was aware of his rights and

7   his ability to refuse to answer certain questions.  Id.

8       "[A]fter a knowing and voluntary waiver of the Miranda rights, law enforcement officers may

9   continue questioning until and unless the suspect clearly requests an attorney." Davis, 512 U.S. at 461.[9]

10  In Davis, after waiving his Miranda rights, the defendant later stated, "Maybe I should talk to a lawyer,"

11  which the Supreme Court held did not require clarification or cessation of questioning, reasoning that

12  "[i]f the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have

13  no obligation to stop questioning him."  Id. at 462.  Petitioner's statement, "I don't know if I should

14  without an attorney. (Laughter.)  It ain't going to do me no .... (Laughter.)" was similarly equivocal, and

15  as the statement was made post-waiver, under Davis the police were not required to clarify the statement

16  or stop questioning Petitioner.  Davis, 512 U.S. at 459 ("We decline petitioner's invitation to extend

17  Edwards [v. Arizona, 451 U.S. 477 (1981)] and require law enforcement officers to cease questioning

18  immediately upon the making of an ambiguous or equivocal reference to an attorney.") The trial court

19  concluded that the comment was not a request for counsel and the state supreme court similarly and

20  reasonably concluded that it was "at best" an equivocal request.[10]  Petitioner fails to demonstrate that

21

22      [9] In the First Amended Petition, Petitioner contends that Davis is inapplicable to Petitioner's situation
    for another reason, stating that "the Supreme Court's plurality opinion in Davis was not rendered until 1994, four
23  years after the trial proceedings in this case.  Moreover, Davis had been overruled by Dickerson [v. United States,
    530 U.S. 428 (2000)] by the time the Supreme Court of California decided the direct appeal in this case in 2002."
24  (FAP at 37 n. 3.)  The Dickerson Court acknowledged that Miranda was a "constitutional decision," despite prior
    cases, including Davis, which supported a contrary conclusion.  See Dickerson, 530 U.S. 428, 437, 438 n. 2.
25  However, Davis remains good law, and has been relied upon numerous times since the Dickerson decision; most
    notably to the present discussion, the Supreme Court extended Davis' holding in Berghuis v. Thompkins, 560
26  U.S. 370 (2010), a decision issued over ten years after Dickerson.

27      [10] In a supplemental memorandum, Petitioner relies upon the Ninth Circuit's recent en banc decision in
    Sessoms v. Grounds, ___ F.3d ___, 2014 WL 4668005 (9th Cir. Sept. 22, 2014) (en banc) in support of this claim.
28  (See Doc. No. 150.)  However, Sessoms is distinguishable from Petitioner's situation in several important
    respects.  First, Sessoms requested an attorney prior to any Miranda warning, unlike Petitioner, who received
    Miranda warnings and in response stated a willingness to talk with the police.  (See CT 2324.)  Moreover,

the California Supreme Court's conclusion was objectively unreasonable.

Petitioner's assertion that his next response constituted an unequivocal invocation of his right to remain silent is similarly unpersuasive. He contends that after the police reiterated his rights, including his right to stop the interrogation, or to refrain from answering certain questions, Petitioner's reply of "Okay, that one," accompanied by laughter, expressed his clear intention to stop the interrogation. (Pet. Brief at 7, Reply at 4.) In Thompkins, the Supreme Court extended Davis to the right to remain silent, reasoning that:

> The Court has not yet stated whether an invocation of the right to remain silent can be ambiguous or equivocal, but there is no principled reason to adopt different standards for determining when an accused has invoked the Miranda right to remain silent and the Miranda right to counsel at issue in Davis.

Thompkins, 560 U.S. at 381, citing Solem v. Stumes, 465 U.S. 638, 648 (1984).

As in Thompkins, Petitioner "did not say that he wanted to remain silent or that he did not want to talk with the police," and thus did not invoke his right to remain silent under Miranda. Id., 560 U.S. at 382. As the state supreme court reasoned:

> Defendant did not assert a right to refuse to answer any questions, ask that the questioning come to a halt, or request counsel. Instead, he was showing that he knew he could refuse to answer any or all questions and would exercise this right on a question-by-question basis. From time to time in the interrogation he did refuse to answer specific questions. But the words defendant used, and his subsequent conduct, do not show that he wanted to stop the interrogation and bar all further questions.

Michaels, 28 Cal. 4th at 510. In light of the fact that Petitioner's statement was ambiguous, accompanied by laughter, and Petitioner did not indicate either his refusal to talk to police nor express an unequivocal assertion of his intention to stop the interrogation, the California Supreme Court was not unreasonable in concluding that Petitioner did not invoke his right to remain silent. See Thompkins, 560 U.S. at 388 ("[A]fter giving a Miranda warning, the police may interrogate a suspect who has neither invoked nor waived his or her Miranda rights.") Because the California Supreme Court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established

---

Sessoms's request for counsel, unlike Petitioner's, was unequivocal. See Sessoms, 2014 WL 4668005, at * 8 ("Viewing the totality of the circumstances of the interrogation, we conclude that not only did Sessoms claim the privilege twice before being suitably warned, he did so unequivocally.") As such, the Court is not persuaded that Sessoms supports Petitioner's claim for habeas relief.

1    federal law, nor based upon an unreasonable determination of the facts, Petitioner is not entitled to

2    habeas relief on Claim 1.

3                              **c.      Discussion of Claim 45**

4         In Claim 45,[11] Petitioner contends that his police statement was involuntary due to his

5    methamphetamine intoxication and because the "police engaged in improper softening-up and coercive

6    tactics to obtain the confession."  (FAP at 199.)

7         A review of the state record confirms that Petitioner's contentions regarding his capacity to

8    waive his Miranda rights and the police "softening-up" were both raised on direct appeal, and as

9    reported above, the California Supreme Court rejected both contentions in a decision issued on July 18,

10   2002, discussing the claims and concluding that Petitioner did not raise the issues at trial and therefore

11   failed to preserve them for appeal.  See Michaels, 28 Cal. 4th at 511-12.  Petitioner then re-raised both

12   of these contentions in the first state habeas petition as Claim VIII, incorporating the earlier arguments

13   made on direct appeal.  (See Lodgment No. 11 at 177-182.)  The California Supreme Court rejected that

14   claim on the merits in a decision issued on December 23, 2003, stating in relevant part: "The petition

15   for writ of habeas corpus, filed June 22, 1998, is denied.  Every claim except claim XXIII is denied on

16   the merits for failure to state a prima facie case for relief."  (Lodgment No. 16.)

17        "State procedural bars are not immortal, however; they may expire because of later actions by

18   state courts.  If the last state court to be presented with a particular federal claim reaches the merits, it

19   removes any bar to federal-court review that might otherwise have been available."  Ylst v.

20   Nunnemaker, 501 U.S. 797, 801 (1991), citing Harris, 489 U.S. at 262.  As the December 2003 order

21   denying the state habeas petition was the most recent decision with respect to the contentions raised in

22   Claim 45, and the California Supreme Court's decision explicitly rejected those contentions on the

23   merits, the Court will consider Claim 45 irrespective of the state supreme court's earlier imposition of

24   state procedural bars.  See Coleman, 501 U.S. at 735 ("In habeas, if the decision of the last state court

25   _____

26        [11] In the Petition, Petitioner also contends in Claim 45 that "[t]he Miranda warnings given to Mr. Michaels were deficient, particularly because Mr. Michaels was not informed that he had the right to an attorney *during* the interrogation." (FAP at 197.)  As mentioned in the discussion of Claim 1, a review of the state record refutes this contention, as the interrogation transcript clearly reflects that police explicitly informed Petitioner that he had the "right to speak to an attorney of your choice before questioning and to have the attorney present during questioning." (CT 2393.)

27

28

1  to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of

2  those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an

3  independent and adequate state ground, a federal court may address the petition.")

4        With respect to Petitioner's capacity to waive his <u>Miranda</u> rights, he presently argues that his

5  behavior during interrogation "strongly suggested that he was presently intoxicated on

6  methamphetmine" and the police "should have ended their interrogation of Michaels the moment they

7  realized or should have realized he was under the influence of the drug."  (FAP at 201.)  The

8  interrogation transcript reflects that Petitioner explicitly denied being under the influence of drugs or

9  alcohol at the time of his police statement:

10        Allen:         Have you had anything to drink today?

11        Michaels:    No. I don't drink.

12        Allen:         Did you have any narcotics?

13        Michaels:    No.

14        Allen:         When's the last time you had any narcotics?

15        Michaels:    Quite a while.  Before the incident.

16        Allen:         Are you under the influence of anything?

17        Michaels:    No. I'm tired.

18  (CT 2445-46.)  Petitioner nevertheless asserts that his behavior during the interrogation, including

19  inappropriate laughter and incomplete responses to the police questioning, as well as the officers'

20  knowledge of his drug use due to their prior questioning of Petitioner's friends and acquaintances who

21  were also involved in the use and distribution of methamphetamine, should have alerted the officers that

22  he was intoxicated at the time of his police statement.  (FAP at 200-01.)

23        Petitioner fails to provide support for his assertion that he was under the influence at the time

24  of the interview.  During a trial court hearing on the admissibility of Petitioner's police statement, at

25  which he did not raise the voluntariness issue, Detective Allen testified that Petitioner was "cooperative"

26  and "calm" during the interview.  (RT 217.)  Allen stated that Petitioner "did giggle from time to time"

27  during the interview, which was sometimes an indication of nervousness, but that Petitioner did not

28  appear nervous during the initial part of the interview.  (RT 219-20.)  The California Supreme Court,

prior to holding on direct appeal that the claim was barred for failing to raise it at trial, indicated that "we cannot determine from defendant's conversational pattern in a written transcript whether he was under the influence of methamphetamine, and if so, to such an extent that he was not competent to waive his rights." Michaels, 28 Cal. 4th at 511.

"While it is true that a waiver of one's Miranda rights must be done intelligently, knowingly, and voluntarily, the Supreme Court has never said that impairments from drugs, alcohol, or other similar substances can negatively impact that waiver." Matylinsky v. Budge, 577 F.3d 1083, 1095 (9th Cir. 2009) (internal citation omitted), citing Carey v. Musladin, 549 U.S. 70, 74 (2006). "The fact that a suspect is under the influence of drugs or medication is irrelevant if the suspect's statement was 'the product of a rational intellect and a free will.'" Shackleford v. Hubbard, 234 F.3d 1072, 1080 (9th Cir. 2000), quoting Mincey v. Arizona, 437 U.S. 385, 398 (1978).

The Court's own review of the interrogation transcripts fail to offer any indication that Petitioner was unable to understand his rights or the consequences of his waiver. Petitioner was verbally responsive to the officers throughout the two hour interview, providing substantive and often detailed answers to their questions. (See CT 2392-2461.) Again, when specifically asked if he was under the influence of drugs or alcohol midway during the interview, he denied it. (CT 2445-46.) Petitioner was explicitly advised of his Miranda rights, stated that he understood those rights, and clearly indicated a willingness to talk to the police. (CT 2393-94.) Based on this record, Petitioner fails to show that he was incapable of waiving his Miranda rights. See United States v. George, 987 F.2d 1428, 1430-31 (9th Cir. 1993) (rejecting claim that statements were involuntary where defendant waived rights and gave responsive statements during interrogation while he was in critical condition in the hospital emergency room due to overdose from smuggled heroin balloons).

Given the lack of actual record support for Petitioner's contention that he was intoxicated at the time of the police interview, much less that he was intoxicated to such a degree that his waiver was involuntary, as well as the absence of Supreme Court case law supporting this argument, the Court cannot conclude that the state supreme court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law. See Matylinsky, 577 F.3d at 1095, citing Miranda, 384 U.S. at 444 and Carey, 549 U.S. at 74.

Finally, Petitioner asserts that the police "employed tactics specifically designed to soften-up Michaels before advising him of his <u>Miranda</u> rights" and asserts that officers "intentionally delayed the advisement of rights until, in their estimation, he was sufficiently amenable to waiving his rights and telling 'his side of the story.'" (FAP at 201.) A review of the record does not support this argument. Again, the transcript of the interrogation begins as follows:

| | | |
|---|---|---|
| Allen: | | This is Kurt Michaels. No middle name. |
| Gaylor: | | Kurt, what's your middle name? None. |
| Michaels: | | Legal names changed for the third time. |
| Gaylor: | | Where does your family live, Kurt? |
| Michaels: | | Who knows honestly? I wish I knew or I'd be with them now. I'd be able to get the other pictures in my other coat. |
| Gaylor: | | Well, I'll tell you. I've been doing this for about twelve years. John's been doing this for about thirteen years, here. And a couple of years with the San Diego Police before that. And a few years with the Highway Patrol before that. And if there's one thing we always know, it's that there's always more than one side to every story. So what we want to do is provide you with an opportunity to tell your side of the story, because this last two weeks, we've been talking with a lot of different people and have gotten a lot of different information from different people. |
| Michaels: | | You found out I am a mental case. (laughter) |
| Gaylor: | | So, now it's your turn to tell your side of the story. Okay? Also, if you have any questions, it will be your opportunity to ask them, all right? Before we do that, though, I want to read you your rights. You have the right to remain silent. If you give up the right to remain silent, anything you do say can and will be used in court against you. You have the right to speak with an attorney of your choice before questioning and to have the attorney present during questioning. If you cannot afford an attorney, one will be appointed for you by the court prior to any questioning, if you so desire. The attorney will not cost you anything. The services are free. Do you understand each of these rights I've explained to you? (Michaels nods his head yes.) Is that yes?" |
| Michaels: | | Yes. |
| Gaylor: | | Okay. Having in mind and understanding your rights as I've told you, are you willing to talk with us? |
| Michaels: | | Sure. No problem. |

(CT 2393.) During the trial court's hearing on the <u>Miranda</u> waiver, Detective Allen was asked, "Now prior to turning on the tape machine, did you have any discussion with him about the facts of the case?"

- 24 -

04cv0122

1  to which Allen replied, "No. In fact the tape machine was on prior to us entering the room."  (RT 217.)

2        A defendant's waiver of his Miranda rights must be voluntary.  See Moran, 475 U.S. at 421

3  ("[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a

4  free and deliberate choice rather than intimidation, coercion, or deception.")  "[C]ourts look to the

5  totality of circumstances to determine whether a confession was voluntary."  Withrow v. Williams, 507

6  U.S. 680, 693 (1993); see also Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973) ("In determining

7  whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all

8  of the surrounding circumstances-both the characteristics of the accused and the details of the

9  interrogation.")

10       In this situation, the transcript reflects only a brief exchange prior to the Miranda warnings, and

11  the only evidence in the record indicates that the tape machine was on when the officers and Petitioner

12  entered the room where the interrogation took place.  (See RT 217.)  The officers asked Petitioner's

13  name and address, briefly mentioned their prior experience, and stated that they had talked to other

14  individuals to obtain information but knew there was more than one side to every story.  Then, the

15  officers advised Petitioner of his rights and Petitioner agreed to speak with them.  Petitioner fails to

16  provide any authority supporting his assertion that such a brief exchange prior to the Miranda

17  advisement constitutes coercion.

18       Considering the totality of the circumstances, the state record reflects that Petitioner had several

19  prior police contacts, was given Miranda warnings on at least three separate previous occasions in 1988

20  and had been cooperative with officers on those occasions.  (See RT 204-12.)  While Petitioner asserts

21  that he was under the influence of methamphetamine at the time of this interview, as discussed above,

22  the record contains Petitioner's explicit denial as to being under the influence.  In light of Petitioner's

23  prior experience with the police, including being subject to prior Miranda warnings, and the brief

24  exchange that occurred prior to the Miranda advisement at issue here, there is no support for a

25  conclusion that Petitioner's "will was overborne" under the circumstances presented.  Schneckloth, 412

26  U.S. at 226.  As such, the California Supreme Court's rejection of this claim was not objectively

27  unreasonable.  Petitioner is not entitled to habeas relief on Claim 45.

28  ///

**2.      Claim 24 - Trial Court Erred in Denying Petitioner's Motion for a Continuance**

In Claim 24, Petitioner asserts that the trial court "erred in denying a continuance after granting Mr. Michaels leave to represent himself," which "prevented him from preparing for trial" and resulted in a violation of his constitutional rights.  (FAP at 124.)

On direct appeal, the California Supreme Court considered and rejected this claim on the merits, as follows:

> One week after the trial court had granted his motion to represent himself, defendant asked for a 60-day continuance to prepare for trial. The court granted the request and set the trial for April 23, 1990. On March 9, however, defendant asked for an additional six-month continuance. Defendant complained that he had not been put in a "pro. per. cell" with access to law books and writing implements until February 23; that his former investigator, Thomas, had done little work; and that he did not receive necessary funding until March 13, 1990. The prosecutor pointed out that Attorney Chambers and the new defense investigator, Atwell, had been working on the case for months. Funding of $54,081.25 had been approved on February 7. The court noted that defendant would have the benefit of pretrial motions prepared by Grossberg. It noted also that defendant had been placed in the "pro. per. cell" 60 days before trial, and that he would probably have at least 90 days before opening statements at the trial. (The actual time before opening statements was 105 days.) The court then denied the request.
>
> "The granting or denial of a motion for continuance rests within the sound discretion of the trial court." (*People v. Mickey* (1991) 54 Cal.3d 612, 660 [286 Cal.Rptr. 801, 818 P.2d 84].) Here considerable work had been done to prepare for trial at the time of defendant's motion, and although much remained to be done, defendant had 60 days remaining in which to prepare. He had funding, an active investigator, and advisory counsel who was familiar with the case. The trial court's ruling was not an abuse of discretion.

Michaels, 28 Cal. 4th at 524-25.

In this case, after denying Petitioner's repeated Marsden motions requesting the removal of attorney Grossberg, the trial court granted Petitioner's motion for leave to proceed pro per on February 5, 1990, and assigned attorneys Grossberg and Chambers to remain on the case as advisory counsel. On February 13, 1990, Petitioner moved for a sixty-day continuance, stating that he was unable to properly prepare for trial due in part to the conditions of his incarceration at the Vista Jail, stating:

> The only answer I can give to the Court at this time is that if I am  - - is that if I am immediately placed in a pro per cell and given every legal aid allowed, I will be ready at the end of 60 days beginning from February 21st, and already requested prior to my being granted pro per status, to present Attorney Chambers' and Investigators Atwell's honest and conservative time estimates for the legal and investigative work necessary prior to being ready to present an adequate defense at trial.

(RT 682-83.)  The prosecutor objected to the request, arguing that Petitioner was "trying to manipulate

1   the processes of the court," and noting that the case had originally been set for trial in June 1989 and

2   had already been continued several times.  (RT 694.)

3          The trial court considered advisory counsel Grossberg's motion for a continuance, which had

4   been filed prior to Petitioner's <u>Faretta</u> motion and adopted by Petitioner. (RT 696-701.)  The trial court

5   also consulted and referred to numerous state cases in concluding that "the cases, one after another,

6   make the comment, a pro se defendant must be given a reasonable opportunity to prepare a defense.

7   Meaning, even though he had counsel who initially would have announced prepared, that a defendant,

8   once he represents himself, may, of course, change his tactics and develop his own abilities to proceed

9   in a way different than he had been required or expected to before." (RT 700-01.)  The trial court

10  granted a sixty-day continuance.  (RT 702.)

11         Several weeks later, on March 1, 1990, the defense notified the court that they intended to

12  request another continuance due to the recent receipt of the prosecution's amended notice of intent to

13  introduce evidence in aggravation at the penalty phase.  (RT 741-42.)  On March 9, 1990, Petitioner

14  filed a motion for continuance, and requested an additional six months. (CT 715, RT 774.)  Specifically,

15  at the March 26, 1990 hearing on the motion, Petitioner stated that he wasn't moved to a pro per cell

16  until February 22, that he received pens and highlighters on March 8, and received state funding March

17  13.  (RT 768.)  The prosecutor noted that Petitioner had writing utensils prior to the cited date, which

18  a jail official testified to on February 13, and asserted that the amended notice of evidence in

19  aggravation included only two new witnesses.  (RT 770.)

20         The trial court noted the case law and reasons for the prior continuance, and then addressed

21  Petitioner's assertion about the lack of supplies and movement to the pro per cell:

22          The Court went and looked at those facilities.  I looked at every place that the jail could
            find he had been kept at various intervals.  And where he was located in his individual
23          cell and had an opportunity to have a place to write, I could not find a basis to claim no
            preparation.  Even if the defendant chose not to accept those conditions as allowing him
24          full preparation, I don't find that he was unable to prepare prior to getting to his pro per
            cell.  Nor do I find the on and off status of what type of pencil or how sharp they were
25          provided any detriment to his ability to prepare.

26  (RT 776-77.)  The trial judge also reviewed the procedural history of the case, expressed concerns about

27  the impact of additional delays on witnesses' locations and memories, and specifically noted the prior

28  grant of continuances.  (RT 777-78.)  The trial judge then reasoned that:

04cv0122

1         April 23rd is as good as any other date.  It provides adequate time to prepare.
2   And this case was sent out for trial back on February 22, 1989, well over a year.  A year and two months later, this case is finally going to trial.

3         That in itself is occasioned by numerous activities that are clearly the
4   responsibility of the defense.  The <u>Marsden</u> motion which was granted occasioned a continuance which was necessary once I relieved Mr. Burns.  The motions by Mr.
5   Grossberg for more time the Court granted to make sure there was adequate time to prepare.  The defense then moves to have self-representation.  The Court followed the
6   <u>Cruz</u> case, but to follow the <u>Cruz</u> case doesn't mean it's a bludgeon that will forever cause me to grant needless strings of continuance motions and I'm going to refuse to do
7   that.  This case has to eventually come to trial.  And I think eventual is a year and a couple of months.  Therefore, it - - the Court denies the continuance motion for the
8   reasons stated.

9   (RT 779.)

10       "The matter of continuance is traditionally within the discretion of the trial judge, and it is not

11   every denial of a request for more time that violates due process even if the party fails to offer evidence

12   or is compelled to defend without counsel."  <u>Ungar v. Sarafite</u>, 376 U.S. 575, 589 (1964), citing <u>Avery</u>

13   <u>v. Alabama,</u> 308 U.S. 444 (1940); <u>see</u> <u>also</u> <u>Morris v. Slappy</u>, 461 U.S. 1, 11 (1983) ("[B]road discretion

14   must be granted trial courts on matters of continuances . . . .")  "There are no mechanical tests for

15   deciding when a denial of a continuance is so arbitrary as to violate due process.  The answer must be

16   found in the circumstances present in every case, particularly in the reasons presented to the trial judge

17   at the time the request is denied."  <u>Ungar</u>, 376 U.S. at 589.

18       Petitioner fails to demonstrate that the state court's rejection of this claim was objectively

19   unreasonable.  A review of the state record reflects that the trial court, who had granted prior requests

20   for continuances, and less than a month earlier had granted a request for a 60 day continuance,

21   thoroughly considered the basis for Petitioner's request for an additional six month continuance prior

22   to denying that request.  The trial judge offered a reasoned analysis rejecting Petitioner's contention that

23   the lack of a pro per cell and adequate supplies affected his ability to prepare, stating that Petitioner had

24   the benefit of advisory counsel, as well as investigative funding.  The trial judge also noted his concerns

25   about the impact that continued delays would have on witnesses' memories and their ability to be

26   physically present for the trial.  Given the "broad discretion" allowed trial courts in these matters and

27   the detailed reasoning the trial court offered to support its decision, the California Supreme Court was

28   objectively reasonable in concluding that the trial judge did not abuse his discretion in denying the

motion for an additional six month continuance.

Petitioner asserts that four factors set forth by Ninth Circuit case law, including United States v. Rivera-Guerrero, 426 F.3d 1130, 1138-39 (9th Cir. 2005), citing United States v. Flynt, 756 F.2d 1352, 1358-59 (9th Cir. 1985) and Armant v. Marquez, 772 F.2d 552, 556-57 (9th Cir. 1985), "guide the analysis" of this claim.  (See Pet. Brief at 27.)  However, as discussed previously, "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' 28 U.S.C. § 2254(d)(1).  It therefore cannot form the basis for habeas relief under AEDPA."  Matthews, 132 S.Ct. at 2155.  Clearly established federal law, as set forth in Ungar, clearly indicates that "[t]here are no mechanical tests" to evaluate  a constitutional claim arising from the denial of a continuance.  Ungar, 376 U.S. at 589.  In any event, even were the Court to analyze Petitioner's claim with guidance from the four factors identified by the Ninth Circuit, the claim fails because Petitioner fails to demonstrate prejudice.  See e.g. Rivera-Guerrero, 426 F.3d at 1142 ("Unlike the other Flynt factors, prejudice *must* be shown by the party seeking the continuance."); Armant, 772 F.2d at 557 ("Finally, we must look to the prejudice suffered by appellant because of the denial of the continuance.")

With respect to prejudice, Petitioner primarily contends that: "Because Mr. Michaels was pushed into trial, his defense was not prepared, and a critical witness was never called to testify– Christina's father" Wendell Clemons.  (Pet. Brief at 31.)  According to Petitioner, Mr. Clemons, "a marine, would have corroborated the entire defense concerning Joann's abuse of Christina."  (Id.)  Yet in Claim 21, which the Court addressed and rejected in the Group Two Order, Petitioner asserted that the failure to call Wendell Clemons to testify was due to the ineffectiveness of advisory counsel Chambers, and stated that the defense was aware of that witness and his prior testimony at Christina Clemons' juvenile court hearing.  (Lodgment No. 25, Ex. 5.)  Petitioner now asserts that it was instead the trial court's denial of additional time that prevented the defense from calling Mr. Clemons.

The Court's examination of billing records reflect that prior counsel Burns submitted a bill for costs in May 1989 concerning transcripts of a Juvenile Court hearing for a minor co-defendant in Petitioner's case.  (CT 2468.)  Mr. Clemons' testimony at Christina's Clemons' November 30, 1988, and December 2, 1988, hearings in juvenile court have the same dates as the hearings noted in Attorney Burns' billing statement.  (Compare Doc. No. 97-1 and CT 2469.)  As it appears clear that the defense

obtained copies of Wendell Clemons' juvenile court testimony nearly a year before Petitioner's trial and was thus aware of his potential testimony, the Court is not persuaded that the failure to call this witness can be persuasively attributed to the trial court's denial of the additional motion for a continuance.

Petitioner also generally contends that with additional time other witnesses and evidence could have been prepared and presented, as well as information relating to his background, substance abuse, and mental health issues. (Pet. Brief at 32.) In requesting the six month continuance, Petitioner asserted that he did not receive expert funds until March 13, 1990 and only minimal investigation, totaling approximately 11 hours, had been conducted prior to February 6, 1990. (Id. at 25, citing RT 764-68.) Petitioner also notes that the state supreme court's ruling indicated that some funding for experts was approved on Feburary 7, 1990, questions why funding was not requested or approved earlier and maintains that this amount of time was inadequate to prepare Petitioner's defense. (Id. at 29.)

Again, an examination of billing statements and available documentary evidence do not support this assertion. First, as discussed in the Group Two Order, the record reflects that the defense requested investigative funding at several points both prior to and during the trial proceedings, including in November 1989, as well as in January, February, March, and May 1990. (Doc. No. 135 at 106.) The Court previously discussed the record of defense efforts in investigating Petitioner's case, including numerous witnesses the defense contacted in the course of investigating Petitioner's background. (See id. at 106-11.)

Records similarly reflect that the defense began consulting experts well in advance of trial. For instance, prior counsel Burns obtained authorization for psychologist and psychiatrist Dr. Solomon to be admitted into the jail to interview Petitioner in July 1989. (CT 307.) Dr. Thomas MacSpeiden, a psychiatrist, was similarly admitted into the jail in July 1989, to examine Petitioner at the request of Attorney Burns. (CT 321.) On July 11, 1989, the trial court also granted Attorney Burns $12,000 in funding for tasks which included investigation and possible mental health experts. (CT 2476-77.) Moreover, as the Court discussed in the Group Two Order (see Doc. No. 135 at 49 n.9), Attorney Chambers filed a funding request on January 23, 1990, prior to Petitioner's request to proceed pro per, detailing a need for psychological, psychiatric, and psychopharmacological expert assistance and listing those experts. (CT 2500-09.) The trial court approved this request on February 7, 1990, and Chambers

later transferred the funds to Drs. Hubbard and Napoleon, the former who testified at trial and the latter who served as a defense consultant.  (See CT 2640, Doc. No. 135 at 22-23, 34.)

Petitioner has not persuasively demonstrated that the trial court's denial of his motion for an additional continuance prevented him from either presenting the testimony of Christina's father or from investigating and presenting witnesses and experts in his defense.  Because Petitioner fails to demonstrate prejudice, the claim is without merit.  See Rivera-Guerrero, 426 F.3d at 1142; Armant, 772 F.2d at 557.  The trial judge did not abuse his discretion in denying the motion for the additional continuance, and the state supreme court's rejection of this claim on appeal on that basis was not contrary to, nor did it involve an unreasonable application of, clearly established federal law, and was not based upon an unreasonable determination of the facts.  Petitioner does not merit habeas relief on Claim 24.

### 3.    Claim 46 - Trial Court Erred in Rejecting Petitioner's Guilty Plea and Permitting the Prosecution to Amend the Complaint to Charge First Degree Murder with Special Circumstance Allegations

In Claim 46, Petitioner asserts that the "trial court erred in rejecting petitioner's guilty plea and permitting the prosecution to amend the complaint to add first degree murder with special circumstance allegations," in violation of his constitutional rights.  (FAP at 202-03.)

On direct appeal, the California Supreme Court outlined the background of this claim in detail and adjudicated it as follows:

1. *Background*

On October 4, 1988, the prosecution filed a two-count complaint against defendant, alleging one count of robbery and one count of murder, without specifying the degree of the murder or adding special circumstance allegations. Defendant pleaded not guilty. At the bail review hearing on October 19, the prosecution persuaded the court to deny bail on the ground that special circumstance charges might be added to the complaint, a decision the prosecution said it would make after the preliminary hearing.

At the start of the preliminary hearing on December 6, 1988, defense counsel said his client would plead guilty to murder, and offered a fully executed change of plea form to the court. The prosecutor asked the court not to accept the plea, stating that the prosecution would amend the complaint to add special circumstance allegations. After a recess, the prosecution offered an amended complaint. The magistrate then rejected the guilty plea and allowed the filing of the amended complaint.

Defendant contends: (1) the magistrate erred in refusing to accept his guilty plea before the filing of an amended complaint charging special circumstances; and (2) the filing of

the amended complaint was a vindictive act, to penalize him for attempting to exercise his statutory right to plead guilty to the face of the complaint, and should have been rejected by the magistrate.

### 2. *The magistrate's rejection of defendant's guilty plea*

Defendant argues that he had an absolute right to plead guilty to the murder charge in the complaint. He relies on section 859a and the cases interpreting that statute. Section 859a, subdivision (a), provides in pertinent part: "While the charge remains pending before the magistrate and when defendant's counsel is present, the defendant may plead guilty to the offense charged, or, with the consent of the magistrate and the district attorney or other counsel for the people, ... plead guilty or nolo contendere to any other offense the commission of which is necessarily included in that with which he is charged ...."

Defendant sought to plead guilty to the charge of murder, not to any lesser included offense, so the consent of the magistrate and the district attorney was not required. [FN4] A defendant charged in more than one count has the right under section 859a to plead to an individual count. (See *People v. Reza* (1984) 152 Cal.App.3d 647, 653-654 [199 Cal.Rptr. 664].)

> [FN4] The magistrate erroneously reasoned that because the plea did not specify the degree of the murder, it was a plea to second degree murder, and that under section 859a, a plea to a lesser included offense required the consent of the prosecution. A defendant, however, may plead guilty to murder without specifying the degree (*People v. Atchley* (1955) 132 Cal.App.2d 444, 446 [282 P.2d 160]), leaving it to the court to decide the degree of the crime. (§ 1192.)

The Attorney General points out that section 1009, after providing that a prosecutor may amend a complaint without leave of court before a defendant enters a plea, states that after a defendant has pleaded or demurred to the charges "[t]he court in which an action is pending may order or permit an amendment of an indictment, accusation or information, or the filing of an amended complaint, for any defect or insufficiency, at any stage of the proceedings ...." Certain amendments are prohibited-those which change the offenses charged, or alter an information to add charges not supported by the evidence at the preliminary hearing. (*Ibid.*) But the statute does not prohibit the prosecution from amending a complaint, indictment, or information after a defendant offers to plead guilty.

Another statute, section 969.5, specifically authorizes amendment of a complaint after a plea of guilty to charge prior felony convictions. In *People v. Superior Court (Alvarado)* (1989) 207 Cal.App.3d 464 [255 Cal.Rptr. 46], the Court of Appeal held that a trial court had abused its discretion by refusing to allow an amendment after a guilty plea adding a prior felony conviction that made the defendant ineligible for probation. Rejecting the defendant's contention that section 969.5 was inconsistent with section 1009, the Court of Appeal said that section 969.5 was simply an example of the general rule that with leave of court charges could be amended after a guilty plea. (*Alvarado*, at p. 476.) We conclude that the magistrate here had discretion to permit the prosecution to amend the complaint against defendant.

The question remains whether the magistrate abused his discretion in granting the prosecutor leave to amend after defendant stated his desire to plead guilty to murder. On this subject, both parties call our attention to *Cronk v. Municipal Court* (1982) 138 Cal.App.3d 351 [188 Cal.Rptr. 28]. In that case a murder defendant, scheduled to enter a plea on July 24, 1981, made an ex parte motion to advance that date to July 21. On July

21, he appeared and offered to plead guilty. The prosecutor objected, asserting that he intended to add special circumstance charges but had not yet prepared an amended complaint. The Court of Appeal in Cronk rejected the defendant's contention that the magistrate erred in rejecting the plea. It stated that "'[i]f the defense, without notice to the other side, accelerated a hearing date so as to cut off a legitimate right to amend [citation], the magistrate has the inherent power to restore that right to the prosecution by refusing to accept the plea ....'" (*Id.* at p. 354.)

Defendant here points out that he did not manipulate the court's calendar, but offered his plea on the date scheduled. Defendant, however, knew of the prosecution's express intention to decide whether to charge special circumstances after the preliminary hearing, yet defendant gave no advance notice of his intent to enter a guilty plea before the preliminary hearing. Under these circumstances, the magistrate was within his discretion in refusing to accept the plea and allowing the prosecution to amend the complaint.

Because we conclude that defendant was not deprived of any right under state law, we necessarily reject his contention that the magistrate's order deprived defendant of a state-created due process right protected under the Fourteenth Amendment to the federal Constitution.

Michaels, 28 Cal. 4th at 514.

"A criminal defendant does not have an absolute right under the Constitution to have his guilty plea accepted by the court . . . although the States may by statute or otherwise confer such a right." North Carolina v. Alford, 400 U.S. 25, 38 n. 11 (1970) (internal citation omitted).  California law provides a criminal defendant the statutory right to plead guilty to pending non-capital charges. See Cal. Penal Code § 859 (a) (which states in part that "[w]hile the charge remains pending before the magistrate and when the defendant's counsel is present, the defendant may plead guilty to the offense charged, or, with the consent of the magistrate and the district attorney or other counsel for the people, plead nolo contendere to the offense charged or plead guilty or nolo contendere to any other offense the commission of which is necessarily included in that with which he or she is charged, or to an attempt to commit the offense charged and to the previous conviction or convictions of crime if charged upon a plea of guilty or nolo contendere. ") Petitioner contends that the magistrate erred in rejecting his guilty plea, as it was to the offense charged, counsel was present, and it did not require the consent of the court or the prosecution, and that this state-law error violated his federal constitutional rights.  (FAP at 206.)

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  Estelle v. McGuire, 502 U.S. 62, 68 (1991).  "When, however, a State creates a liberty interest, the Due Process Clause requires fair procedures for its vindication– and federal courts will review the application of those constitutionally required procedures."  Swarthout v. Cooke, 562

U.S. ___, 131 S.Ct. 859, 862 (2011).  "Habeas corpus relief for an asserted violation of due process [arising from a violation of state law] is available only when the state court's action is arbitrary or fundamentally unfair."  Cooks v. Spalding, 660 F.2d 738, 739 (9th Cir. 1981); see also Richmond v. Lewis, 506 U.S. 40, 50 (1992) (the question on habeas review is whether the asserted state law error was "so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation."), quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990).

Here, Petitioner fails to demonstrate that the magistrate's decision to allow the prosecution to amend the complaint resulted in a denial of federal due process.  The defense conceded that the prosecution had previously informed the court and the defense, at hearings held on October 25, 1988, and November 18, 1988, that it was considering filing special circumstance allegations and intended to make the decision after the preliminary hearing.  (See CT 360-61.)  At the outset of the December 6 preliminary hearing, the defense then attempted to enter a guilty plea absent prior notice.  The prosecution objected, stating, "I don't think this is a timely change of plea.  It is a ruse on the Court and the District Attorney and the community.  The defendant and Mr. Burns had been advised from the start we were going to prelim the case and evaluate the case at the conclusion of the prelim to determine whether or not special circumstances were appropriate on Mr. Michaels."  (CT 28.)

The magistrate judge correctly found that while California law did not require the consent of the court or prosecutor in order for a defendant to plead guilty to the charges as filed, state law did provide that the prosecution could amend a complaint before a plea, and that the court could permit amendment of the complaint under certain circumstances.  See Cal. Penal Code § 859(a); Cal. Penal Code §1009.[12]

_____

[12] The text of California Penal Code section 1009 reads as follows:

An indictment, accusation or information may be amended by the district attorney, and an amended complaint may be filed by the prosecuting attorney, without leave of court at any time before the defendant pleads or a demurrer to the original pleading is sustained. The court in which an action is pending may order or permit an amendment of an indictment, accusation or information, or the filing of an amended complaint, for any defect or insufficiency, at any stage of the proceedings, or if the defect in an indictment or information be one that cannot be remedied by amendment, may order the case submitted to the same or another grand jury, or a new information to be filed. The defendant shall be required to plead to such amendment or amended pleading forthwith, or, at the time fixed for pleading, if the defendant has not yet pleaded and the trial or other proceeding shall continue as if the pleading had been originally filed as amended, unless the substantial rights of the defendant would be prejudiced thereby, in which event a reasonable postponement, not longer than the ends of justice require, may be granted. An indictment or accusation cannot be amended so as to change the offense charged,

1    Therefore, as the magistrate and later the state supreme court both correctly concluded, the court

2    retained the discretion to allow amendment of a complaint, even after a plea of guilty, or in this case,

3    the offer to plead guilty.  Moreover, instead of merely allowing amendment of the complaint without

4    a showing, the magistrate elected to hear the prosecutor's offer of proof and factual basis in support of

5    any charged special circumstances before deciding whether to allow amendment.  (CT 32.)  After

6    hearing the offer of proof, only then did the court permit the prosecution to file the amended complaint

7    alleging special circumstances. (CT 32-35.) Given the magistrate's consideration of the various statutes

8    implicated by this issue and the procedures the court carefully employed to ensure that the special

9    circumstances charged were supported by an offer of proof prior to allowing amendment, Petitioner fails

10   to demonstrate that the magistrate's actions were so "arbitrary or fundamentally unfair" as to rise to the

11   level of a due process violation.  Cooks, 660 F.2d at 739.

12        The state supreme court, meanwhile, reasonably concluded that the "magistrate was within his

13   discretion in refusing to accept the plea and allowing the prosecution to amend the complaint," and

14   found no federal constitutional error.  Michaels, 28 Cal. 4th at 514.  As this Court is in accord with that

15   decision, Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim on

16   appeal was either contrary to, or an unreasonable application of, clearly established federal law, or that

17   it was based upon an unreasonable determination of the facts.  Petitioner does not merit habeas relief

18   on Claim 46.

19       **4.**    **Claim 47 - Trial Court Error- Allowed Prosecution to Vindictively Charge Special**

20           **Circumstances**

21        Petitioner asserts that the trial court erred "in allowing the prosecution to vindictively charge

22   special circumstances."  (FAP at 207.)  He contends that "[i]f a case does not warrant the death penalty

23   at the outset, the penalty should not be made available subsequently to intimidate a defendant who

24   asserts a statutory right to plead guilty to the face of the complaint," and asserts that the bringing of

25   ――――――――――――

26           nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination. A complaint cannot be amended to charge an offense not attempted to be charged

27           by the original complaint, except that separate counts may be added which might properly have been joined in the original complaint. The amended complaint must be verified but may be

28           verified by some person other than the one who made oath to the original complaint.

    Cal. Penal Code § 1009.

1    additional charges was prohibited by the Due Process Clause.  (Id. at 208-09.)

2         The California Supreme Court considered and rejected this claim on direct appeal, reasoning as

3    follows:

                        3. *Allegedly vindictive prosecution*

         After the prosecution amended the complaint to charge special circumstances, defendant
         moved to strike the special circumstances. He contended that the amendment was a
         vindictive response to his attempt to exercise his right to plead guilty. The trial court
         held an evidentiary hearing and denied the motion.

         There is no doubt that the timing of the amendment was occasioned by the defendant's
         attempt to plead guilty to the charge of murder. But there is nothing in the record to show
         the amendment was a vindictive response. The prosecution had already made clear,
         before defendant's plea, that it was considering special circumstance allegations. There
         is nothing suspicious in its failure to file them with the initial charges. "'"[A] prosecutor
         should remain free before trial to exercise the broad discretion entrusted to him to
         determine the extent of the societal interest in prosecution. An initial decision should not
         freeze future conduct [because] the initial charges filed by a prosecutor may not reflect
         the extent to which an individual is legitimately subject to prosecution."'" (*People v.
         Edwards* (1991) 54 Cal.3d 787, 828 [1 Cal.Rptr.2d 696, 819 P.2d 436], quoting *In re
         Bower* (1985) 38 Cal.3d 865, 874 [215 Cal.Rptr. 267, 700 P.2d 1269].)

         Here, defendant was not yet in jeopardy. The United States Supreme Court has refused
         to apply a presumption of vindictiveness in a pretrial setting. (*United States v. Goodwin*
         (1982) 457 U.S. 368, 384 [102 S.Ct. 2485, 2494, 73 L.Ed.2d 74].) In *Edwards* we noted
         that the attachment of jeopardy was an "important factor" in determining vindictiveness
         (*People v. Edwards, supra*, 54 Cal.3d at p. 828), and although *Edwards* did not
         absolutely prohibit a court from presuming vindictiveness in a pretrial setting, neither
         *Edwards* nor any other California case has done so. (See *People v. Bracey* (1994) 21
         Cal.App.4th 1532, 1544 [26 Cal.Rptr.2d 730], and cases there cited.) The circumstances
         here do not present a "reasonable likelihood of vindictiveness" (*In re Bower, supra*, 38
         Cal.3d 865, 877) that would shift the burden of proof to the prosecution to show that the
         amendment "was justified by some objective change in circumstances or in the state of
         the evidence." (*Id.* at p. 879.)

         Because vindictiveness is not presumed, the defense must present evidence showing that
         the "'prosecutor's charging decision was motivated by a desire to punish [the defendant]
         for doing something that the law plainly allows him to do.'" (*People v. Bracey, supra*, 21
         Cal.App.4th at p. 1549, quoting *United States v. Goodwin, supra*, 457 U.S. at p. 384 [102
         S.Ct. at p. 2494].) Defendant here failed to present such evidence.

23   Michaels, 28 Cal. 4th at 514-15.

24        "In our system, so long as the prosecutor has probable cause to believe that the accused

25   committed an offense defined by statute, the decision whether or not to prosecute, and what charges to

26   file or bring before a grand jury, generally rests entirely in his discretion." Bordenkircher v. Hayes, 434

27   U.S. 357, 364 (1978).  However, "[t]o punish a person because he has done what the law plainly allows

28   him to do is a due process violation of the most basic sort, and for an agent of the State to pursue a

1   course of action whose objective is to penalize a person's reliance on his legal rights is 'patently

2   unconstitutional.'"   Bordenkircher, 434 U.S. at 363 (internal citation omitted), quoting Chaffin v.

3   Stynchcombe, 412 U.S. 17, 32-33 (1973).

4          The Supreme Court has cautioned that only in certain types of situations, such as those

5   surrounding retrial proceedings after a reversed conviction, is a rebuttable presumption of prosecutorial

6   vindictiveness warranted.  See North Carolina v. Pearce, 395 U.S. 711, 724-25 (1969); Blackledge v.

7   Perry, 417 U.S. 21, 27 (1974); but see Alabama v. Smith, 490 U.S. 794 (1989) (reversing Simpson v.

8   Rice, 395 U.S. 711, companion case to Pearce, and holding that presumption does not apply where

9   sentence imposed after trial was greater than that imposed after guilty plea.)  The Supreme Court has

10  repeatedly declined to adopt this presumption in cases involving pretrial matters such as plea

11  negotiations.  See Bordenkircher, 434 U.S. at 365-66; United States v. Goodwin, 457 U.S. 368, 380-82

12  (1982) ("A prosecutor should remain free before trial to exercise the broad discretion entrusted to him

13  to determine the extent of the societal interest in prosecution.  An initial decision should not freeze

14  future conduct.  As we made clear in Bordenkircher, the initial charges filed by a prosecutor may not

15  reflect the extent to which an individual is legitimately subject to prosecution.") (footnotes omitted).

16         Here, after the magistrate allowed the prosecutor to file an amended complaint, Petitioner filed

17  a motion to strike the special circumstances as vindictively charged.  (CT 358-63.)  The prosecution

18  filed an opposition.  (CT 651-57.)  The trial court rejected Petitioner's motion on the record, stating as

19  follows:

20         In this case, the People took time to determine what to file, and that's a two-
       edged sword.  The People can be accused of being rash if they file it right away, and,
21     secondly, if they wait for any phase of the proceedings to take place such as a bail review
       or beginning of motions, then they can be accused of vindictive enhancement of the
22     charges.

23         But a complete - - the case of United States v. Goodwin, 1982 case, 457 U.S.
       368, a defendant refused a pre-indictment plea to a misdemeanor and the government
24     turned around and indicted him for a felony, and the Court went on to say such plea
       bargaining goes on in the judicial process and is not a sign of vindictiveness.
25
26         In this case the defendant had tried a very quick early plea in Municipal Court
       and that was not accepted, and the People have filed special circumstances after that
27     initial attempt.  It does not appear to the Court that that was an act of vindictiveness.
       And, again, the People would be faulted if they charged it any sooner or [sic] not having
28     adequate reflection and contemplation for a charge so serious.

(RT 870-71.)

Petitioner contends that his "attempted assertion of his statutory right to plead guilty resulted in the prosecution's urging the magistrate to refuse the plea to give the people time to amend the complaint to include special circumstance allegations." (FAP at 207.) While Petitioner asserts that a presumption of vindictiveness applies in this case, it appears clear that this case is in line with <u>Bordenkircher</u> and <u>Goodwin</u>. The contested action took place well before trial, during plea proceedings. While the actual timing of the prosecution's amended complaint came just after Petitioner attempted to plead guilty to a non-capital complaint, the prosecution had informed the trial court and the defense at hearings in October and November, 1988 that they were continuing to evaluate the case, and anticipated potentially amending the complaint to allege special circumstances after the preliminary hearing scheduled for December 6, 1988. Petitioner's attempt to enter a change of plea took place on the morning of the December 6, 1988, preliminary hearing.

Thus, while the actual timing of the amended complaint occurred just after Petitioner's attempted plea, there is no indication that there was any intent to penalize, punish, or intimidate Petitioner for that exercise. In the written motion to strike the special circumstances, Petitioner's trial defense conceded that they were aware of the prosecution's potential pursuit of special circumstances well before the attempted guilty plea, noting that at the October 1988 bail hearing, "the prosecution advised the court that the case was a possible 'special circumstance' case and that defendant should be held on a no-bail status." (<u>See</u> CT 360-61.) Moreover, at the December 6, 1988 hearing, after counsel for co-defendant Paulk stated that the amended complaint was "staggering" in light of his client's involvement, the trial court stated that: "I do remind you, you were advised early on that the People did intend to file special circumstances, so this should not come as too great a surprise." (CT 37-38.) The only evidence Petitioner cites to in support of his claim of prosecutorial vindictiveness is the timing of the charging decision; there is no evidence that the amended complaint was actually filed as retaliation in response to Petitioner's attempt to plead guilty. <u>See</u> <u>Goodwin</u>, 457 U.S. at 380-82, 382 n. 15 (declining to apply presumption of vindictiveness in pretrial charging decision and noting that "the only evidence [the petitioner] is able to marshal in support of his allegation of vindictiveness is that the additional charge was brought at a point in time after his exercise of a protected legal right.") Meanwhile, the record

clearly reflects that the filing of special circumstances had been contemplated well before Petitioner attempted to enter a plea in this case and demonstrates that the amended complaint was supported by an offer of proof.  See Bordenkircher, 434 U.S. at 364 ("In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.")  Petitioner fails to show that a presumption of vindictiveness should apply in this situation, and without any such presumption, the claim fails.  See Goodwin, 457 U.S. at 384-85.

Accordingly, Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim on appeal was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based upon an unreasonable determination of the facts.  Petitioner is not entitled to habeas relief on Claim 47.

**B.   GUILT PHASE CLAIMS**

**1.   Claim 28 - Prosecutorial Misconduct- Commenting on Silence**

In Claim 28, Petitioner contends that the "prosecutor engaged in misconduct during the examination of criminalist William Chisum by improperly commenting on Mr. Michaels' silence in violation of his Fifth and Fourteenth Amendment rights."  (FAP at 136.)

This contention was considered and rejected by the California Supreme Court on direct appeal, as follows:

> Defendant accuses the prosecutor of misconduct when he asked criminologist William Chisum: "And you haven't had a chance to talk to Mr. Michaels about where any of those knives [the knives used in the murder] might be, have you?" Chisum answered: "No, sir, I have not talked to Mr. Michaels." The trial court sustained defendant's objection and admonished the jury not to consider the question and answer.

> It is doubtful whether the prosecutor's question could be construed as a comment on defendant's failure to testify; it appears to be a comment only on the scope of Chisum's investigation. It was, however, argumentative and defendant successfully objected on that ground. We perceive no reason why the trial court's action in sustaining the objection and admonishing the jury would be insufficient to cure any harm.

Michaels, 28 Cal. 4th at 527-28.

The Supreme Court has held that the Fifth and Fourteenth Amendments to the United States Constitution "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."  Griffin v. California, 380 U.S. 609, 615 (1965).  "While

a direct comment about the defendant's failure to testify always violates <u>Griffin</u>, a prosecutor's indirect comment violates <u>Griffin</u> only 'if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify.'" <u>Hovey v. Ayers</u>, 458 F.3d 892, 912 (9th Cir. 2006), quoting <u>Lincoln v. Sunn</u>, 807 F.2d 805, 809 (9th Cir. 1987).

A review of the record shows that, at the very most, the comment in question was indirect, as the prosecutor asked Mr. Chisum if he had spoken to Petitioner during his investigation and preparation of the case, and did not actually mention, either directly or indirectly, Petitioner's failure to testify. The entire contested exchange, including the trial court's admonition to the jury, is as follows:

Q:    Mr. Chisum, you don't know how many knives were used in this crime, do you?

A:    No, sir.

Q:    And you haven't had a chance to talk to Mr. Michaels about where any of those knives might be, have you?

A:    No, sir, I have not talked to Mr. Michaels.

Mr. Chambers:    Objection, argumentative.

The Court:    That question is sustained. The jury is admonished to disregard both the question and the answer and that is stricken from the record.

(RT 4216.)

Instead of constituting a comment on Petitioner's failure to testify, the prosecutor's inquiry, which occurred on redirect examination, appeared to be following up on the defense's earlier questions to Mr. Chisum on cross-examination regarding a knife that was recovered and the general importance of locating the murder weapon as a piece of evidence. (RT 4214-16.) In any event, even were the Court to consider the questions to Mr. Chisum as a comment on Petitioner's failure to testify, any such comment was indirect. Moreover, any potential error was ameliorated by the trial court's timely ruling and admonition to the jury to disregard both the prosecutor's question and the witness' response. A jury is presumed to understand and follow the trial court's instructions. <u>Weeks v. Angelone</u>, 528 U.S. 225, 234 (2000); <u>Richardson v. Marsh</u>, 481 U.S. 200, 211 (1989); <u>see</u> <u>also</u> <u>Greer v. Miller</u>, 483 U.S. 756, 766 n.8 ("We normally presume a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it . . .") In addition to being addressed in the jury questionnaire and during

voir dire proceedings, the jury was instructed at the conclusion of both the guilt and penalty phase proceedings that Petitioner had a constitutional right not to testify and the jurors could not discuss the matter or rely upon it in any way during their deliberations. (See e.g. RT 1736, 1767, 1797 (juror questionnaires); RT 2227, 3450 (voir dire); RT 4891 (guilt phase instructions); RT 5930 (penalty phase instructions).)

Thus, in light of the indirect nature of the contested comments, the trial court's prompt action and admonition, and the repeated instructions to the jury regarding Petitioner's constitutional right not to testify, any possible error was harmless. See Hovey, 458 F.3d at 912-13. Accordingly, the California Supreme Court's rejection of this claim on appeal was reasonable. Petitioner is not entitled to habeas relief on Claim 28.

### 2. Claim 29 - Prosecutorial Misconduct - Introduction of Negative Character Evidence

Petitioner contends that the "prosecutor repeatedly elicited inadmissible evidence during the guilt phase questioning of several witnesses," committing misconduct which resulted in a fundamentally unfair trial. (FAP at 137.) Specifically, Petitioner asserts that the prosecutor asked witness Rodney Hatch about Petitioner's drug-dealing, asked Hatch and Leon Madrid whether Petitioner had expressed remorse about the murder, asked Christina Clemons about Petitioner's prior violent acts and engaged in improper attempts at impeaching her as a witness, and asked several witnesses questions about Petitioner's appearance and conduct.[13] (Id. at 137-40.)

Petitioner presented this claim on direct appeal, and the California Supreme Court rejected it on the merits, reasoning as follows:

> Defendant also complains of the prosecutor's questions to prosecution witnesses Rodney Hatch and Leon Madrid that elicited replies that defendant showed no remorse after the murder. Defendant's contention that remorse or the absence of remorse is inadmissible at the guilt phase overstates the law. Absence of remorse is irrelevant to prove that a defendant committed a homicide, but it may be relevant, because it sheds light on the defendant's mental state, in determining the degree of the homicide or the existence of special circumstances. (See *People v. Mayfield* (1993) 5 Cal.4th 142, 178-179 [19 Cal.Rptr.2d 836, 852 P.2d 331].)
>
> Defendant made damaging admissions to both Hatch and Madrid. He claimed those statements were not true, but constituted boasting designed to enhance defendant's image

_____

[13] For instance, the prosecutor asked several witnesses about Petitioner's past appearance and whether the witnesses had ever seen Petitioner wear a suit, and posed questions to Christina Clemons about Petitioner's work history.

1       as a powerful and dangerous person. Defendant's demeanor when he made those
2       statements would help the jury determine whether they constituted truthful admissions
3       or mere braggadocio. That the questions elicited replies that defendant did not appear
      remorseful does not make them improper.

4       Defendant complains that the prosecutor asked four witnesses-Mark Hebert, Velinda
      Davis, Kimberly Buckhalter, and Dennis Lucas-if they had ever previously seen
5       defendant wearing a suit. Defendant only objected once, on the third such occasion, and
      that objection was sustained. His failure to object bars him from claiming prosecutorial
6       misconduct on the other three occasions. (*People v. Lewis*, *supra*, 25 Cal.4th 610,
      670-671.)

7       Defendant also complains of the prosecutor's questions about defendant's violence
8       toward Christina, but he failed to object at trial. The trial court, however, excluded the
      evidence on its own motion and admonished the jury to disregard it. We conclude both
9       that the defendant did not preserve the issue for appeal, and that defendant has shown
      no prejudice.

10 Michaels, 28 Cal. 4th at 528.

11      To warrant habeas relief on a claim of prosecutorial misconduct, a petitioner must demonstrate

12 that the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a

13 denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986), quoting Donnelly v.

14 DeChristoforo, 416 U.S. 637, 643 (1974). As discussed below, Petitioner fails to demonstrate that the

15 state court's rejection of this claim was contrary to, or an unreasonable application of, clearly

16 established federal law. Even to the extent the Court considers the alleged instances of misconduct that

17 were not preserved due to counsel's failure to object, habeas relief is unavailable.

18      In the Group Two Order, the Court previously addressed and rejected Petitioner's contention that

19 advisory counsel rendered ineffective assistance for failing to object to several of these alleged instances

20 of misconduct. (See Doc. No. 135 at 82-90.) For instance, with respect to Petitioner's contention that

21 the prosecutor committed misconduct in asking Christina Clemons about prior acts of violence

22 Petitioner committed against her in Texas, the Court previously noted that the trial judge, after a hearing,

23 excluded this evidence from the jury's consideration. (Id. at 84, citing RT 4546.) The trial court

24 instructed the jurors to disregard both the questions and answers regarding any threats or acts of

25 violence. (RT 4550.) As the Court noted in the Group Two Order:

26       At the end of the guilt phase, the trial judge again instructed the jury with respect to this
      testimony, stating,
27

28           The Court earlier struck any reference by way of question or answer to
          any alleged violence by defendant Michaels while in Texas with
          Christina Clemons. Be reminded that you are not to discuss or consider

any such reference.  It is stricken and was stricken by the Court and cannot be mentioned in your deliberations in any way.

(RT 4888, CT 1085.)

(Doc. No. 135 at 85.)  In light of the fact that the trial court struck the testimony about the prior acts of violence and specifically instructed the jurors to disregard any references to that testimony, Petitioner fails to demonstrate any reasonable possibility that the testimony resulted in a due process violation.

Similarly, regarding the prosecutor's questions about Petitioner's work history, the Court previously noted that "the record reflects that at least one of the prosecutor's questions to Clemons about Petitioner's work history was sustained on objection as argumentative.  (See RT 4527.)" (Doc. No. 135 at 86.)  In light of the trial court's action sustaining the objection, Petitioner fails to demonstrate that the question on its own "so infected" Petitioner's trial as to result in a violation of due process.

With respect to Petitioner's contention that the prosecutor improperly inquired as to Petitioner's past appearance and whether several witnesses had ever seen him wear a suit, the Court previously held that the questions did not constitute misconduct, reasoning that:

> A review of the record demonstrates that these questions were part of several which inquired about Petitioner's appearance around the time of the murder, including his penchant for wearing moccasin boots.  As such, the evidence, and questions, appeared to be related to the evidence about Petitioner's efforts to alter his appearance in the days before the crime, and the Court cannot conclude that the inquiry was improper.

(Id. at 87.)

Finally, Petitioner contends that the prosecutor committed misconduct in asking witness Rodney Hatch about Petitioner's involvement in selling drugs, and asking Hatch and Leon Madrid about Petitioner's lack of remorse.  With respect to the prosecutor's questions about his involvement in selling drugs, a review of the record shows that the defense had previously asked witness Mark Hebert about his involvement in selling drugs, and on redirect, the prosecutor elicited the testimony that the drugs Hebert sold had been supplied by Petitioner.  (See RT 3898-99, 3906-07.)  Rodney Hatch, meanwhile, testified simply that he had known Petitioner for about six months, that Petitioner sold crystal methamphetamine, and that Hatch had purchased drugs from Petitioner on several occasions.  (RT 4246-47.)  However, similar to this Court's adjudication of Claim 36, which alleged ineffective assistance of advisory counsel for opening the door to questions concerning Petitioner's drug use and involvement in selling drugs, even if the prosecutor's questions constituted misconduct, Petitioner fails to

demonstrate prejudice.  Because Petitioner's statement to police at the time of his arrest not only

detailed his involvement in drugs but in planning and carrying out the murder, coupled with similar

damaging admissions to friends and acquaintances both before and after the murder, the testimony about

his drug selling could not have "so infected" Petitioner's trial that it resulted in a due process violation.

With respect to the prosecutor's questions about Petitioner's lack of remorse, a review of the

record shows that the prosecutor asked witness Hatch about Petitioner's "attitude" when talking about

the murder, as follows:

> Q:   What was his attitude when he talked to you about killing this woman?
>
> A:   He was [sic] the same attitude if I was to tell you that I just bought a soda, he showed no remorse, no nothing.
>
> Q:   Nonchalant?
>
> A:   Yes.

(RT 4246.) Later, the prosecutor clarified Hatch's reasons for initially disbelieving Petitioner's account:

> Q:   Mr. Hatch, why is it that you didn't believe Mr. Michaels when he said that he had sliced a chick's throat?
>
> A:   Because of the manner in which he told me.
>
> Q:   What do you mean by that?
>
> A:   He just didn't show any emotion, didn't look like he was running from anybody. He just sat there and just told me just like I am talking to you right now, showed no remorse, nothing.

(RT 4250.)  The prosecutor also asked Leon Madrid about Petitioner's attitude in relating his account

of the evening of the homicide:

> Q:   What was his attitude when he was telling you these things?
>
> A:   He was very solemn, he didn't seem like he had any remorse or anything.

Mr. Chambers:     Objection as to remorse; speculation.

The Court:        Overruled.

By Mr. Brodrick:

> Q:   Did he appear to be emotional in any way?
>
> A:   No, he didn't.

(RT 4268.)

Here, Petitioner fails to cite any clearly established law indicating that the elicitation of this type of evidence constituted misconduct. Petitioner argues that: "Remorse or lack thereof is inadmissible in the guilt phase of the trial. Evidence regarding remorse is essentially character evidence, which should be limited to the penalty phase. <u>McKinney v. Rees</u>, 993 F.2d 1378, 1380-81 (9th Cir. 1993)." (FAP at 138.) However, <u>McKinney</u> is distinguishable, as it involved, in part, the introduction of evidence that the defendant previously owned knives, which the Ninth Circuit concluded was "evidence of another act offered to prove character and giving rise to a propensity inference, and did not tend to prove a fact of consequence." <u>McKinney</u>, 993 F.2d at 1382-83. The <u>McKinney</u> Court reasoned that:

> The prosecution used evidence of the Gerber knife, which could not possibly have been used to commit the murder, to help paint a picture of a young man with a fascination with knives and with a commando lifestyle. The prosecutor raised the issue on cross-examination of why McKinney had purchased a knife with a black blade, asking him whether it was because such knives are favored by commandos because they do not reflect light. The jury was offered the image of a man with a knife collection, who sat in his dormitory room sharpening knives, scratching morbid inscriptions on the wall, and occasionally venturing forth in camouflage with a knife strapped to his body. This evidence, as discussed above, was not relevant to the questions before the jury. It served only to prey on the emotions of the jury, to lead them to mistrust McKinney, and to believe more easily that he was the type of son who would kill his mother in her sleep without much apparent motive.

<u>Id.</u> at 1385. In light of the otherwise circumstantial evidence against the defendant and the charged nature of the erroneously admitted evidence, the Ninth Circuit found that the admission of this propensity evidence rendered the defendant's trial fundamentally unfair. <u>Id.</u> at 1385-86. Petitioner's case is distinguishable. The trial record clearly reflects that the prosecutor posed simple questions to Hatch and Madrid asking only about Petitioner's attitude in discussing the murder, and it was the witnesses who stated that Petitioner recounted the murder in a dispassionate manner and did not appear remorseful. The questions did not elicit improper propensity evidence of the type discussed in <u>McKinney</u>.

Even assuming that the prosecutor committed misconduct in asking witnesses Hatch and Madrid about Petitioner's attitude when discussing his involvement in the homicide, Petitioner fails to demonstrate that the testimony of Madrid or Hatch about his lack of remorse resulted in a due process violation. As discussed previously, Petitioner gave a detailed statement to the police outlining his involvement in planning the murder and related crimes, recruiting Popik to assist and Paulk to drive, procuring a key to the apartment from Christina, and waiting for the arrival of the getaway car and for

the victim to go to sleep before commencing the fatal series of acts.  As discussed in the Group Two Order, Petitioner's statement to the police included graphic details about the murder and subsequent events:

> With respect to the murder itself, Petitioner stated that while both he and Popik participated in the murder, it was he, and not Popik, who did the bulk of the stabbing. (CT 2333, 2345-46, 2357.)  Petitioner also acknowledged that he was the one who cut the victim's throat and that she died shortly after, stating, "After I cut her throat - you don't live long after that."  (CT 2346.)  Petitioner called the murder "sloppy," and said that he broke one knife, so Popik had to go to the kitchen to retrieve another one.  (CT 2332-33.)  Petitioner said the police arrived quickly, within a few minutes, and they had to go.  (CT 2333.)  After the murder, Petitioner returned to the car and left, and told Paulk the "gory" details because he "wanted to scare him" and shut him up, as Paulk kept asking to drive.  (CT 2346.)

(Doc. No. 135 at 43-44.)  Petitioner also mentioned his admissions to Hatch and Madrid in his statement to the police, as follows:

> Allen:       But you told him some really gory details.  Right?
>
> Michaels:    If you scare people, it works.  That way . . .
>
> Gaylor:      What did you tell Hatch?
>
> Michaels:    Same thing I told Paulk.
>
> Gaylor:      Which was?
>
> Michaels:    Cut the throat, a nightmare.
>
> Allen:       How many other people did you try to scare this way?
>
> Michaels:    Madrid, probably.
>
> Allen:       Paulk, Hatch, Madrid.  Who else?
>
> Michaels:    Lucas was there.
>
> ...
>
> Allen:       What was the basic thing you told people to scare them.  Just kind of run that down briefly by us.
>
> Michaels:    I went in to do something, person woke up.  And shit fucking went wrong with Daz.  And ended up having to cut her throat.  It was a fucking nightmare.  If I described it, best example I could tell you would be one of those dawn of the dead stories so that they could picture it in their head.  This is what it's like people.  A lot of people sit there and say, "Yeah, that'd be great.  An easy way to make money."
>
> Allen:       You premeditated.

1    Michaels:      Like that, yeah.

2   (CT 2368-69.)  In light of Petitioner's own statements to the police admitting that he told Hatch and

3   Madrid, among others, specific details about the murder in order to scare them, and his factual

4   recounting of administering a fatal wound to the victim's neck, the Court is unable to conclude that the

5   testimony of Hatch or Madrid about Petitioner's lack of remorse "so infected the trial with unfairness

6   as to make the resulting conviction a denial of due process." <u>Darden</u>, 477 U.S. at 181, quoting

7   <u>Donnelly</u>, 416 U.S. at 643.  Accordingly, the Court cannot conclude that the California Supreme Court's

8   rejection of this claim was either contrary to, or an unreasonable application of, clearly established

9   federal law.  Petitioner is not entitled to habeas relief on Claim 29.

10       **3.     Claim 31 - Failure to Collect and/or Preserve Material Exculpatory Evidence**

11        Petitioner contends that "the state intentionally destroyed and/or failed to preserve material

12  exculpatory evidence," when "the state failed to adequately preserve the blood samples" and "destroyed

13  important evidence by failing to test the petitioner's blood for the presence of methamphetamine." (FAP

14  at 143-44.)  Petitioner asserts that: "Had these violations not occurred, petitioner would not have been

15  convicted of each count charged, the special circumstance allegations would not have been found true,

16  and petitioner would not have been sentenced to death."  (<u>Id.</u> at 144.)  Petitioner presented this claim

17  to the California Supreme Court in his first state habeas petition, which the state supreme court rejected

18  on the merits without a statement of reasoning.  (Lodgment No. 16.)

19        "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be

20  limited to evidence that might be expected to play a significant role in the suspect's defense." <u>California</u>

21  <u>v. Trombetta</u>, 467 U.S. 479, 488 (1984).  The <u>Trombetta</u> Court further stated that for evidence to be

22  considered material, it "must both possess an exculpatory value that was apparent before the evidence

23  was destroyed, and be of such a nature that the defendant would be unable to obtain comparable

24  evidence by other reasonably available means." <u>Id.</u> at 489.  Later, in <u>Arizona v. Youngblood</u>, 488 U.S.

25  51 (1988), the Supreme Court explained that, in contrast to material exculpatory evidence, "unless a

26  criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful

27  evidence does not constitute a denial of due process of law."  <u>Id.</u>, 488 U.S. at 58; <u>see</u> <u>also</u> <u>Illinois v.</u>

28  <u>Fisher</u>, 540 U.S. 544, 545 (2004) (per curiam).

First, Petitioner fails to demonstrate that the blood samples themselves were actually destroyed in his case.  Instead, Petitioner simply contends that "the state failed to adequately preserve the blood samples using accepted methods of preservation in the scientific community.  Further, different methods are used to preserve blood for testing for drugs other than alcohol.  The state contaminated and degraded the samples by using the wrong methods."  (FAP at 144.)  Petitioner alleges that the blood samples "should have been placed immediately into bactericidal containers to prevent exposure to microorganisms that can cause putrefaction."  (Id.)  Petitioner also asserts that the "state destroyed important evidence by failing to test the petitioner's blood for the presence of methamphetamine. Methamphetamine and its metabolite disappear over time."  (Id.)

Yet Petitioner fails to offer any specific facts to support his assertions about what the state actually did, or did not do, to preserve the blood samples.  As such, he fails to establish that the state's method of storing or preserving the blood samples was actually inadequate or that it resulted in the destruction of evidence.  Moreover, a review of the record reflects that in June 1989, over nine months before trial, the parties informed the trial court that they had reached an agreement that experts from each side would confer and work out the release and/or testing of physical evidence, and that if they encountered any disagreements they would return to court.  (RT 176-77.)  The trial record reflects that experts testified that Petitioner's blood sample had been subjected to a number of tests, including blood typing and other serology tests, in comparing the blood to that recovered from the scene of the murder. (See e.g. RT 4168-78 (blood typing); RT 4182-94 (electrophoresis).)  Petitioner fails to demonstrate that he was unable to perform the desired testing on the items due to the state's allegedly inadequate preservation method.

Second, Petitioner fails to demonstrate how the blood evidence had any apparent exculpatory value.  He instead generally asserts that had the evidence been properly collected and preserved, it could have been tested, and "tests would [sic] provided exculpatory evidence which the state would have had to provide to trial counsel.  Trial counsel would have presented that evidence to petitioner's jury, and it is reasonably probable that petitioner would not have been convicted of the charges, and would not have been sentenced to death."  (FAP at 145.)  Even if this blood evidence could have been tested, the Ninth Circuit has held that "[t]he mere failure to preserve evidence which could have been subjected

to tests which might have exonerated the defendant does not constitute a due process violation." <u>United States v. Hernandez</u>, 109 F.3d 1450, 1455 (9th Cir. 1997), citing <u>Youngblood</u>, 488 U.S. 51; <u>Mitchell v. Goldsmith</u>, 878 F.2d 319, 321 (9th Cir. 1989).

Petitioner contends that testing the blood for the presence of drugs would have revealed his habitual use of methamphetamines and would have supported an argument that he was under the influence of the drug at the time of the crime. Yet, as previously discussed with respect to Claim 16 in the Group Two Order, the trial record clearly shows that the blood samples in question were taken at the time of Petitioner's October 17, 1988, arrest, and Petitioner fails to explain how the analysis of blood samples taken over two weeks after the October 2, 1988, murder could have persuasively demonstrated that he was under the influence of methamphetamine at the time of the crime. (<u>See</u> Doc. No. 135 at 59.) In any event, as also previously discussed in the prior order, the Ninth Circuit has expressed skepticism regarding the viability of this type of defense. (<u>Id.</u>); <u>see</u> <u>Mayfield v. Woodford</u>, 270 F.3d 915, 931 n. 17 (9th Cir. 2001) ("We note that juries are unlikely to favor defenses based on abuse of dangerous drugs in evaluating a defendant's culpability for violent behavior.") Given the significant length of time between the murder and the collection of the blood sample, Petitioner's acknowledgment that methamphetamine has a half life of 8-17 hours in plasma (<u>see</u> FAP at 107), and Petitioner's statement at the time of his arrest that the last time he took drugs was before the murder, which was over two weeks earlier (<u>see</u> CT 2372), Petitioner fails to show that testing the blood evidence in his case would have provided the defense with exculpatory evidence that could have proven he was under the influence of drugs at the time of the murder.

Because Petitioner's contention is without merit, the Court cannot conclude that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law. Petitioner does not merit habeas relief on Claim 31.

**4.    Claim 49 - Trial Court Erred in Allowing Jury to View Unedited Tape of the Crime Scene**

Petitioner contends that the "trial court erred in allowing the jury to view the unedited videotape of the crime scene," particularly the second and third segments, which consisted of shots of the victim's body, the crime scene itself, and the coroner's examination, which Petitioner asserts are "truly

objectionable and should have been either heavily edited or wholly eliminated."  (FAP at 217-19.)

The California Supreme Court rejected this claim on direct appeal in a reasoned decision, as follows:

> The prosecution offered into evidence several still photographs of the victim's body and a police videotape made shortly after the murder. The first segment of the videotape showed the areas around the victim's apartment, including defendant's escape route. Defendant here does not object to that segment. The second segment showed the victim's nude body lying between the bed and the wall. Defendant complains that this segment contained repeated close-up shots of the victim's pubic area, falsely implying that she had been sexually assaulted. (At the time the videotape was made, the police thought the victim had been sexually assaulted.)  The video's third segment was taken at the coroner's office. After showing the body being lifted to an examining table and the coroner opening the victim's eyes, the video segment focused on the fatal throat wound and then the bagging of the victim's hands and feet. Defendant argues that all this was especially gruesome and unnecessary.
>
> At trial, the defense moved to exclude the photographs and the videotape. The judge noted that bagging the hands and feet was relevant because the prosecutor introduced evidence of one of defendant's hairs that was found in the victim's hands. The judge later found that the segment showing the victim's body at the crime scene was relevant to the special circumstance of lying in wait, apparently because it showed her nude in her bedroom, implying that the assailants waited until she was in bed or asleep before attacking. The judge mentioned that he had presided over the trial of codefendant Popik, and the jurors there did not seem shocked by the videotape. The judge also noted that the jurors in this case had been questioned extensively in voir dire about their ability to deal with graphic photographs. He concluded that the photographs and videotape would not have a prejudicial effect that outweighed their probative value.
>
> Defendant questions whether voir dire can ever prepare a jury adequately for gruesome photographs and videotapes. He adds that everything shown by the videotape was also proven by less shocking evidence. Although photographic evidence is often cumulative of testimonial evidence, that fact does not require its exclusion, "[b]ecause the photographic evidence could assist the jury in understanding and evaluating the testimony." (*People v. Price* (1991) 1 Cal.4th 324, 441 [3 Cal.Rptr.2d 106, 821 P.2d 610].) It is, however, a factor the trial court may consider in exercising its discretion under Evidence Code section 352. (*People v. Marsh* (1985) 175 Cal.App.3d 987, 998 [221 Cal.Rptr. 311].)
>
> In ruling on the admissibility of photographs and videotapes under Evidence Code section 352, "the court enjoys broad discretion in deciding whether prejudice substantially outweighs probative value." (*People v. Memro* (1995) 11 Cal.4th 786, 866 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) The trial judge here was conscious of that discretion, and of the danger that gruesome evidence could prejudice the jury, and ruled carefully in admitting the evidence. The photographs, and most of the videotape, were unquestionably probative. Defendant suggests that the tapes could have been edited to eliminate sexual suggestiveness and to avoid showing the victim's body being lifted to the coroner's table. But whether or not such editing would have been desirable, we cannot find an abuse of discretion in the trial judge's conclusion that the tape as a whole was more probative than prejudicial.

Michaels, 28 Cal. 4th at 531-32.  Petitioner also presented this claim to the California Supreme Court

1   in his second state petition.  The state supreme court denied the claim on the merits and alternately

2   found it was procedurally barred.  (See Lodgment No. 26.)  As discussed above in Section III-A, the

3   Court will review Claim 49 on the merits irrespective of the state supreme court's application of

4   procedural bars.

5          Again, a federal court may not generally grant federal habeas relief based on errors of state law.

6   See Estelle, 502 U.S. at 68 ("[I]t is not the province of a federal habeas court to reexamine state-court

7   determinations on state-law questions.")  A claim of state law error may warrant habeas relief if "the

8   state court's admission of this evidence violated the petitioner's due process right to a fair trial under

9   the Constitution."  Gordon v. Duran, 895 F.2d 610, 613 (9th Cir. 1990); see also Estelle, 502 U.S. at 70.

10  The reviewing court must determine "whether the admission of the evidence so fatally infected the

11  proceedings as to render them fundamentally unfair."  Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th

12  Cir. 1991); Ortiz-Sandoval v. Gomez, 81 F.3d 891, 897 (9th Cir. 1996) ("While a petitioner for federal

13  habeas relief may not challenge the application of state evidentiary rules, he is entitled to relief if the

14  evidentiary decision created an absence of fundamental fairness that 'fatally infected the trial.'"),

15  quoting Kealohapauole v. Shimoda, 800 F.2d 1463, 1465 (9th Cir. 1986).

16         The record reflects that the crime scene videotape contained three portions that were admitted

17  into evidence, the first segment showing the area where the murder was committed and the surrounding

18  apartments, a second segment surveying the crime scene and the victim's body, and a third segment

19  from the coroner's examination.  Petitioner contests the admission of the second and third segments,

20  arguing that: "The first portion of the tape, while disjointed and of little probative value, is not truly

21  objectionable.  Any error in its admittance is harmless.  The second and third segments, however, are

22  truly objectionable and should have been either heavily edited or wholly eliminated."  (FAP at 218-19.)

23  Petitioner argues that the second segment included  "panning shots of the body, particularly the victim's

24  exposed pubic area, imply that she was sexually assaulted."  (Id. at 219.)  With respect to the third

25  section, Petitioner argues that: "Given that the cause of death, the instrumentality used, and even Kurt's

26  participation were never at issue, and that the jury already examined the static photos of the wound and

27  heard the testimony of the investigators and the examiners describing the wound, the morbid and

28  gruesome display of the wound on the videotape served no probative value."  (Id.)  Petitioner states that

the third segment also included a section where the coroner opened the victim's eyes, and argues that the victim's exposed breasts also increased the implication of a sexual aspect to the crime.  (Id.)

At trial, the defense objected to the admission of the video, arguing that it was cumulative to several photographs previously admitted into evidence and that it was graphic and overly prejudicial. (RT 4108.)  Meanwhile, the prosecutor asserted that the video was probative in that it corroborated witness testimony about the struggle at the scene, showed the bloody hand print relative to the victim's body, memorialized the bagging of the victim's hands, which contained hair samples similar to that of defendant, and showed the defendant's escape route.  (RT 4114-15.)  The prosecutor asserted that the tape also reflected open drawers in the victim's apartment, supporting theft of her belongings, and that the video demonstrated that the victim was found in a vulnerable position, supporting the lying in wait allegation.  (RT 4115-16.)  The trial judge ruled the tape admissible in its entirety:

> It has been played.  I watched the whole thing.  I find that it is probative.  I find that it is probative of the elements necessary to establish special circumstances in addition to first degree murder; in addition to being relevant on the independent crimes charged in the information, the burglary and the robbery counts.
>
> In addition to which I do not find that there is anything in the video that is so gruesome that it would impassion a juror to the point of not being a fair and impartial participant as a juror.
>
> We questioned these jurors in detail individually about their ability to handle graphic and explicit photographs.  This video is certainly no violation of that expectation.
>
> Furthermore, the Court viewed the reaction of the jurors very closely when they were shown People's 12, and I found no indication from any of the jurors that they were taken aback by those photos.
>
> So I find that the video does not have undue prejudice that outweighs its probative value and in its entirety that video should be shown.

(RT 4118-19.)  The video was introduced into evidence, with a Escondido detective in charge of the crime lab providing narration for the jury and comprising three transcript pages.  (See RT 4143-46.) The detective's narrative described the contents of the video, including but not limited to, the outside of the apartment complex and the balcony of the victim's apartment, the alley, hallway, the victim's body, the condition of the apartment, the bloody print, the bagging of the victim's hands and feet, and the examination of the victim's body for wounds.  (Id.)

In light of the trial court's reasoning for allowing the tape into evidence and the narration of the

detective regarding the contents of the tape, it appears that the tape provided the jury with a view of the crime scene and the surrounding area at the time the victim was discovered, as well as evidence relevant to the murder charge and the charged special circumstances. See Jammal, 926 F.3d at 920 ("Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process.") Petitioner's argument that certain shots of the victim's body imply a sexual aspect to the crime are speculative, as there was no evidence offered that the victim was sexually assaulted, and no charges were issued to that effect.

At any rate, even if the contested sections of the crime scene tape were admitted erroneously, Petitioner fails to demonstrate that it rendered the trial "fundamentally unfair." Jammal, 926 F.2d at 919; Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005) ("A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision.") Here, the trial court issued a reasoned ruling admitting the tape into evidence, thoroughly considering and outlining its probative value and weighing it against the possible prejudicial effect. See e.g. Kealohapauole, 800 F.2d at 1464-66 (admission of 45 minute autopsy tape of a "badly decomposed" victim's body, shown to jurors with commentary by a pathologist, was not fundamentally unfair). Moreover, this Court's review is necessarily deferential, and ultimately Petitioner fails to demonstrate that the California Supreme Court's rejection of his claim was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based upon an unreasonable determination of the facts. Petitioner does not merit habeas relief on Claim 49.

**4.    Claim 50 - Trial Court Erred in Admitting Gruesome and Graphic Color Photos and a Bloody Nightshirt into Evidence and Permitting the Jury to Bring Them Into the Jury Room**

Petitioner contends that "the trial court erred when it admitted gruesome and graphic color photographs and a bloody nightshirt into evidence and permitted the jury to bring them into the jury room," contending that the evidence was "irrelevant" and "their prejudicial effect substantially outweighed their probative value." (FAP at 223.)

As noted in greater detail in the discussion of Claim 49, when the California Supreme Court considered and rejected the claim about the admission of the video, the state court also discussed the

admission of the photos:

> In ruling on the admissibility of photographs and videotapes under Evidence Code section 352, "the court enjoys broad discretion in deciding whether prejudice substantially outweighs probative value." (*People v. Memro* (1995) 11 Cal.4th 786, 866 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) The trial judge here was conscious of that discretion, and of the danger that gruesome evidence could prejudice the jury, and ruled carefully in admitting the evidence. The photographs, and most of the videotape, were unquestionably probative.

Michaels, 28 Cal. 4th at 531-32.  In the first state habeas petition, Petitioner raised a separate claim concerning the admission of the photographs and also asserted that the trial court erred in admitting the victim's nightgown into evidence.  (See Lodgment No. 11 at 195-201.)  The state supreme court denied that claim on the merits and alternately found it was procedurally barred.  However, as discussed above in Section III-A, the Court will review Claim 50 on the merits irrespective of the state supreme court's application of procedural bars.

As discussed above, a claim of state law error may warrant habeas relief if "the state court's admission of this evidence violated the petitioner's due process right to a fair trial under the Constitution."  Gordon, 895 F.2d at 613; see also Estelle, 502 U.S. at 70.  A habeas court must determine "whether the admission of the evidence so fatally infected the proceedings as to render them fundamentally unfair."  Jammal, 926 F.2d at 919; see also Ortiz-Sandoval, 81 F.3d at 897.

Petitioner asserts that these items "simply showed the manner of death, and the victim's blood" and were cumulative to the testimony of the medical examiner and other witnesses.  (FAP at 223-24.) He argues that because there was a confession, the manner of death was not at issue and "the trial court abused its discretion in admitting gruesome and irrelevant photographs, and a bloody nightshirt, that also had no relevance to the matters in dispute."  (Id.)

At trial, the defense specifically contested the admission of several sets of photographs, labeled trial exhibits 12, 24-A, 24-B and 24-C.  Exhibit 12 was a photoboard of the crime scene containing a series of photographs labeled A through H, which were admitted into evidence and used during the testimony of Officer Buh, who was the first officer inside the apartment.  (RT 4080-88.)  After a hearing, the trial judge excluded exhibit 24-B as cumulative, but admitted the other two sets of photographs, exhibits 24-A and 24-C, into evidence, finding that they were probative and not unduly prejudicial.  (RT 4094-4101, 4119-22.)  After that ruling, the defense noted that a few of the photos in

1    24-A had been excluded in co-defendant Popik's trial as prejudicial, to which the trial judge replied:

2            Since you want to bring that up, I will bring this up.  This is not the same defendant, this is the man who is alleged by the People to be the cutter.  And if he is the

3            cutter, the cutting pictures go to the jury.  And Mr. Popik was the holder, and it is not the same defendant, it is not the same trial.  This is a death penalty case with special

4            circumstances.  Mr. Popik was not tried on the same basis as Mr. Michaels.

5            And the Court, in excluding that in another trial, has no obligation to follow the same rules in the next trial when there are different relevant issues before the Court.

6

7            Therefore, I, first of all, find that comment one of scant weight; and secondly, I find that those photographs, in view of this case, in view of the fact that Mr. Michaels is alleged to be the one who actually did the cutting, the throat slitting and the planning

8            to do it by the People's evidence, is relevant to this jury.

9            On the other hand, when somebody is merely an aider and abetter, as Mr. Popik was alleged that he was, that may be more prejudicial in his case when it was balanced.

10            I made the same balancing in this case.  It is probative in this case.

11    (RT 4121-22.)  Aside from the testimony of Officer Buh, noted above, several of the photos were also

12    cited during the testimony of Detective Bass.  (RT 4166-67.)  Additionally, several photos were also

13    used during the testimony of Medical Examiner Dr. Jariwala in discussing the different wounds inflicted

14    on the victim, including lacerations, abrasions, stab wounds, and blunt force trauma, and in identifying

15    which of the stab wounds were fatal.  (RT 4302-07.)

16        With respect to the night shirt or sweatshirt worn by the victim at the time of the homicide,

17    Detective Bass testified:

18      Q:      Showing you what has been marked as People's 18, a bag with a sweatshirt in it; do you recognize that?

19

20      A:      Yes, I do.

     Q:      What is that?

21

22      A:      That's the sweatshirt that I recovered from the victim at the time of the autopsy that she was wearing.

23      Q:      Did you find any hair in the victim's hand?

24      A:      Yes, I did.

25      Q:      Where did you first observe that?

26      A:      Protruding from the right hand I saw what appeared to be a darker hair than the victim had.  And I saw that when I first went on the scene and examined the body

27             prior to touching her. [] I also saw a dark hair stuck in blood on the victim's stomach, and that I [sic] appeared to be the same color than was in the victim's

28             hand.

1    Q:    Did you recover those hairs?

2    A:    Yes, I did.

3  (RT 4151.)  Criminalist Charles Merritt testified that he examined hairs that had been collected from

4  the victim's sweatshirt, that Petitioner's hair was similar to the hairs found on the victim, and that

5  Petitioner could not be eliminated as the source of those hairs.  (RT 4179-81.)

6         In support of his contention that the trial court erred in the admission of the photos and

7  nightgown, Petitioner offers the declaration of habeas investigator Thomas Crompton, who interviewed

8  several of Petitioner's trial jurors, and states that:

> Juror, Mandy Atkisson said that when they were in their deliberations, she and another female juror, who she thought was Brooke Patterson were going through the bags of evidence and opened a brown paper bag.  When they took out the item in the bag they realized that is [sic] was a blood stained Miami Vice night shirt that the victim had been wearing when she had been killed.  Ms. Atkisson said it also had a stab or slice mark through the shirt.  She said the shirt was now rust colored because of the dried blood. Ms. Atkisson said that Brooke Patterson and she freaked out and they started screaming. According to Ms. Atkisson the night shirt had not been presented as evidence during the trial.  She also said there were several graphic pictures of the victim in with the other evidence that had not been previously seen as exhibits during the trial.  She described these pictures as enlarged graphic photographs of the wounds to the victim and these photographs were very upsetting to herself and several of the other jurors.

16  (Lodgment No. 11c, App. 42 at ¶ 8.)

17         First, the record does not support Juror Atkisson's recollection that "the night shirt had not been

18  presented as evidence during the trial."  As noted above, Detective Bass identified the clothing worn

19  by the victim at the time of the crime and criminalist Merritt testified about examining hairs found on

20  the clothing.  Moreover, the record reflects that the shirt was entered into evidence.  (See RT 3839, CT

21  1633.)  Juror Atkisson's recollection about viewing graphic photos that had not been previously seen

22  as exhibits is similarly without support, as the only specific information offered is that the photos in

23  question were "enlarged graphic photographs of the wounds to the victim."  Indeed, both exhibits 24-A

24  and 24-C, as well as the photos in exhibit 12, showed wounds to the victim and all were admitted into

25  evidence.  (See RT 4119-20.)  Exhibit 24-A, in particular, was described as showing the main cut or slit

26  inflicted on the victim's throat.  (RT 4096, 4121.)  Exhibit 24-C was described as showing "an

27  additional knife wound on the neck."  (RT 4097.)  Given that several graphic photos were entered into

28  evidence, Petitioner fails to offer any specific or conclusive support for the assertion that the jurors

1   viewed other graphic photos not entered into evidence.

2        Second, as noted by the trial judge in ruling on the admissibility of the videotape, the jurors were

3   questioned during voir dire about their ability to view graphic photos.  (RT 4119 - "We questioned these

4   jurors in detail about their ability to handle graphic and explicit photographs.")  Thus, given that the

5   photos and nightgown provided the jurors with information including the condition of the victim at the

6   time of discovery, the wounds inflicted on the victim, and the identification of which of the stab wounds

7   were fatal, and hair samples found on the victim similar to Petitioner, it is apparent that this evidence

8   was relevant to the murder charge and the alleged special circumstances.  See Jammal, 926 F.2d at 920

9   ("Only if there are *no* permissible inferences the jury may draw from the evidence can its admission

10  violate due process.")

11       At any rate, even if the trial court erred in admitting the photos or the night shirt, Petitioner fails

12  to demonstrate that it rendered the trial "fundamentally unfair."  Jammal, 926 F.2d at 919; Boyde, 404

13  F.3d at 1172 ("A habeas petitioner bears a heavy burden in showing a due process violation based on

14  an evidentiary decision.")  As with Claim 49 discussing the admission of the videotape, the trial court

15  issued a reasoned ruling admitting the photos into evidence, finding the graphic photos probative, and

16  distinguishing the different ruling in Petitioner's case admitting exhibit 24-A from that in the prior trial

17  of his co-defendant because Petitioner stood accused of inflicting the fatal wounds to the victim.  See

18  Villafuerte v. Stewart, 111 F.3d 616, 627 (9th Cir. 1997) (photos depicting the victim's body and blood

19  at the crime scene were relevant and their admission did not violate due process); see also Batchelor v.

20  Cupp, 693 F.2d 859, 865 (9th Cir. 1982) (trial court "did not commit error, much less error of

21  constitutional magnitude" in admitting graphic photos depicting the victim's "genital area and lower

22  body where there were no wounds.")

23       In sum, Petitioner fails to demonstrate that the California Supreme Court's rejection of his claim

24  was either contrary to, or an unreasonable application of, clearly established federal law, or that it was

25  based upon an unreasonable determination of the facts.  Accordingly, Petitioner is not entitled to habeas

26  relief on Claim 50.

27  ///

28  ///

1      **5.      Claim 55 - Trial Court Erred in Failing to Instruct Jury on Unreasonable Defense**

2              **of Others**

3          Petitioner contends that the trial court erred in failing to instruct the jury on unreasonable defense

4   of others, asserting that "the evidence at trial plainly raised that defense." (FAP at 241-42.) Petitioner's

5   related Claim 17, which asserted ineffective assistance of advisory counsel for failing to request a jury

6   instruction on unreasonable defense of others, was rejected in the Group Two Order. (See Doc. No. 135

7   at 60-64.)

8          On direct appeal, the California Supreme Court rejected Petitioner's contention that the trial

9   court had a *sua sponte* duty to instruct jurors on imperfect or unreasonable self-defense, stating that, "At

10  the time of defendant's trial, the concept of imperfect defense of others was not a commonly known and

11  established defense." Michaels, 28 Cal. 4th at 530. The court stated that:

12          Defendant's problem is that both self-defense and defense of others requires a fear of
            imminent harm. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 [56 Cal.Rptr.2d 142,
13          921 P.2d 1]), so presumably imperfect self-defense or imperfect defense of others would
            require an unreasonable belief that harm was imminent. But when defendant committed
14          the homicide, Christina was at Broad Horizons, a juvenile detention facility, and murder
            victim JoAnn was asleep in her apartment. The record does not indicate when Christina
15          would next be released to visit JoAnn, but even if it was the next day it is doubtful that
            the facts would show that defendant believed, reasonably or unreasonably, that any
16          threatened danger to Christina was "imminent."

17  Id. at 530-31.

18         As the Court previously noted in the discussion of Claim 17 (see Doc. No. 135 at 60-61), "[i]t

19  is well-settled that a criminal defendant is entitled to a jury instruction 'on any defense which provides

20  a legal defense to the charge against him and which has some foundation in the evidence, even though

21  the evidence may be weak, insufficient, inconsistent, or of doubtful credibility.'" United States v.

22  Sotelo-Murilo, 887 F.2d 176, 178 (9th Cir. 1989), quoting United States v. Yarbrough, 852 F.2d 1522,

23  1541 (9th Cir. 1988). A trial court's "failure to instruct the jury on the defendant's theory of the case,

24  where there is evidence to support such instruction, is reversible per se and can never be considered

25  harmless error." United States v. Zuniga, 6 F.3d 569, 571 (9th Cir. 1993).

26         Petitioner now asserts that the actual imminence of the anticipated harm did not negate the trial

27  court's duty to instruct, and argues that "[a] defendant's unreasonable but genuine belief in the need to

28  defend himself or another from imminent harm requires that instructions on unreasonable defense of

others be given.  The fact that a reasonable person would not view the harm as imminent is not dispositive."  (FAP at 243.)

However, for the reasons previously discussed in the adjudication of Claim 17, the Court's review of the state trial record fails to support a conclusion that Petitioner actually believed, either reasonably or unreasonably, that he needed to defend Christina from any imminent peril.  (See Doc. No. 135 at 61.)  In the Group Two Order, the Court concluded:

> Indeed, in Petitioner's own statement to the police after his arrest, he explained that the impetus for the murder was that he did not want Christina to return to her mother, who had abused her, beat her, and likely molested her.  (CT 2353-54, 2363.) Petitioner stated that Christina had told him she would find it difficult to handle returning to her mother's home upon her anticipated release from the juvenile detention facility, and told Petitioner that she would "probably end up killing herself then."  (CT 2327, 2330.)  Petitioner told the police that Christina and her mother "hated each others guts," that her mother was manic-depressive and abused Christina, and that because he did not want Christina to lose her sobriety and everything she had accomplished, he told Christina he would kill her mother.  (CT 2330-31.)
>
> Christina Clemons testified that after suffering abuse during a September 15, 1990 weekend pass, she went to find Petitioner, told him what had taken place, and said that she wanted her mother killed.  (RT 4496-03.)  She admitted lying to Petitioner and telling him that due to a court order, she had to stay with her mother for six months after her release.  (RT 4503-06.)  On the weekend of September 30, she and Petitioner again discussed the situation, with Clemons telling Petitioner that she had earlier tried and failed to kill her mother with pesticides, and stating that she wanted her mother's throat cut in her sleep, with a pillow over her head.  (RT 4509-18.)  Clemons told Petitioner it was either her or her mother, and that she would kill herself if her mother was not killed. (RT 4509-18.)
>
> Clemons stated that she told Petitioner that she would be forced to live at home with her mother in order to give him added incentive to kill her.  (RT 4551-55.)  She also stated that the main motivation for the murder was the past abuse she suffered at the hands of her mother, and that she had her mother killed for fear the abuse would continue, because she could not take it any longer, and because she was not strong enough to do it herself.  (RT 4613-16.)  Neither the testimony of Christina Clemons, nor Petitioner's statements to the police, support an argument that Petitioner unreasonably believed Clemons was in any *imminent* danger of harm.  See People v. Humphrey, 13 Cal. 4th 1073, 1082 (Cal. 1996) ("[F]or either perfect or imperfect self-defense, the fear must be of imminent harm.  'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice.  The defendant's fear must be of imminent danger to life or great bodily injury.'), quoting In re Christian S., 7 Cal. 4th 768, 783 (Cal. 1994).  As Petitioner fails to indicate where this defense theory would have "some foundation in the evidence," the Court cannot conclude that an instruction on unreasonable defense of others was warranted.  Sotelo-Murilo, 887 F.2d at 178.

(Doc. No. 135 at 61-62.)  The trial testimony recounted above and cited case authority is relevant and applicable to the claim currently at issue.

Moreover, as previously discussed in the adjudication of Claim 17, the state trial record reflects

that the trial court repeatedly noted the lack of any evidence supporting this defense theory.  (See RT 4788, 4789, 4790. 4792-93.)   During discussions on proposed jury instructions, the trial court specifically stated that "there is no reasonable interpretation of the evidence which could provide for the unreasonable belief and necessity to defend.  It's not a self-defense case in any stretch of the imagination.  Therefore, that form of negating malice is not present."  (RT 4790.)  A review of the record supports the trial court's conclusion.

Because Petitioner fails to demonstrate that the evidence presented at his trial supported the instruction at issue, the Court cannot conclude that the trial court erred or abused its discretion in declining to provide a jury instruction regarding unreasonable defense of others.  Ultimately, Petitioner fails to demonstrate that the state supreme court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or that it was based upon an unreasonable determination of the facts. Accordingly, Petitioner is not entitled to habeas relief on Claim 55.

**C.      GUILT AND PENALTY PHASE CLAIMS**

      **1.      Claim 19 - Trial Court Erred When it Gave Improper Necessity Instruction**

             **Claim 22 - Trial Court Erred in Limiting Abuse Evidence**

             **Claim 56 - Trial Court Instruction Directed the Jury to Disregard All Evidence of Harm to Christina Clemons**

In Claim 19,[14] Petitioner contends that "the trial court improperly instructed the jury, over objection, that necessity was not a defense," in violation of Petitioner's constitutional rights.  (FAP at 117.)  Specifically, Petitioner asserts that the trial court's instructions "improperly interfered with the jury understanding that it could return a verdict of second degree murder or voluntary manslaughter based on Mr. Michaels' mental state," and the erroneous instruction interfered with his right to present

---

[14]  In the FAP, Petitioner originally contended that the trial court's error in instructing the jury on necessity interfered with jury's ability to return a verdict on a lesser degree of murder such as second degree or manslaughter, in light of Petitioner's mental state, and argued it was not harmless given the prosecution's emphasis on the instruction and that it interfered with his right to present a defense.  (FAP at 117-18.)  In the Group Three briefing, Petitioner now additionally contends that the necessity instruction, when considered along with the errors alleged in Claims 19, 22 and 56, impeded his right to present an effective defense, which impacted both the guilt and penalty phase determinations.  (Pet. Brief at 13-14.)  Petitioner's assertion that the cumulative impact of these alleged errors amounted to a violation of his constitutional rights will be considered below, as part of Petitioner's cumulative error claim, Claim 76.

a defense.  (<u>Id.</u> at 118.)  In Claim 22, Petitioner asserts that his rights were violated by the trial court's instructions limiting the jury's consideration of evidence concerning the abuse of Christina Clemons, and that this error impacted both the guilt and penalty phase verdicts.  (<u>Id.</u> at 121.)  In Claim 56, Petitioner asserts that "the trial court erred when it directed the jury to disregard all evidence of actual harm to Christina Clemons" in giving an unnecessary instruction that necessity was not a defense, as the instructions "essentially directed the jury that a threat of future harm to Christina was irrelevant," and that "the jury virtually was obliged to find premeditation and convict petitioner of first-degree murder," prejudicing Petitioner.  (<u>Id.</u> at 246-48.)

The California Supreme Court rejected the contentions now raised as Claims 19 and 56 in a reasoned decision, as follows:

> The trial court instructed the jury: "It is not a defense under the law of necessity that the homicide was committed to prevent the victim from committing future wrongdoing against the defendant or another." The court erred in giving this instruction. No defense of necessity was presented, and no evidence was presented to support such a defense. The prosecutor offered the instruction out of concern that the jurors would on their own come up with such a defense and apply it in this case. But the jury was correctly instructed on the law of homicide and the defenses, and those instructions plainly excluded any defense of necessity. Instructions should not be unnecessarily complicated by telling the jury that a defense unclaimed by the defendant and excluded by the other instructions is inapplicable.

> The trial court's error in instructing on the defense of necessity was harmless, however, because defendant did not assert this defense. Defendant here argues that the instruction precluded the jury from considering evidence of the murder victim's abuse of her daughter Christina, defendant's girlfriend. The instruction, however, was limited to the defense of necessity, a defense that could, if present, lead to complete exoneration. It did not prevent the jury from considering the evidence of abuse in connection with defendant's argument that he killed in the heat of passion, or that he did not act with the motivation required for some of the special circumstances-the main focus of the guilt trial-or as mitigating evidence in the penalty phase.

<u>Michaels</u>, 28 Cal. 4th at 531.

Petitioner raised Claim 22 in the second state habeas petition, where the California Supreme Court rejected it on the merits and alternately imposed several procedural bars.  (Lodgment No. 26.)  As  discussed above in Section III-A, the Court will review Claim 22 on the merits irrespective of the state supreme court's application of procedural bars.

The Supreme Court has held that "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"  <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986), quoting

1  <u>Trombetta</u>, 467 U.S. at 485.  Yet, even "the right to present relevant testimony is not without limitation.

2  The right 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial

3  process.'"  <u>Rock v. Arkansas</u>, 483 U.S. 44, 55 (1987), quoting <u>Chambers v. Mississippi</u>, 410 U.S. 284,

4  295 (1973).  "While the Constitution thus prohibits the exclusion of defense evidence under rules that

5  serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote,

6  well-established rules of evidence permit trial judges to exclude evidence if its probative value is

7  outweighed by certain other factors as unfair prejudice, confusion of the issues, or potential to mislead

8  the jury."  <u>Holmes v. South Carolina</u>, 547 U.S. 319, 326 (2006).

9  As stated above, a federal court generally may not grant federal habeas relief based on errors of

10  state law.  <u>See</u> <u>Estelle</u>, 502 U.S. at 68 ("[I]t is not the province of a federal habeas court to reexamine

11  state-court determinations on state-law questions.")  In reviewing a claim of instructional error, a habeas

12  court must determine "whether the ailing instruction by itself so infected the entire trial that the resulting

13  conviction violates due process."  <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977), quoting <u>Cupp v.

14  Naughten</u>, 414 U.S. 141, 147 (1973).  Moreover, "'a single instruction to a jury may not be judged in

15  artificial isolation, but must be viewed in the context of the overall charge.'"  <u>Boyde v. California</u>, 494

16  U.S. 370, 378 (1990), quoting <u>Cupp</u>, 414 U.S. at 146-147.  Even if the trial court is found to have erred,

17  habeas relief is unavailable unless the error had a "substantial and injurious effect or influence in

18  determining the jury's verdict."  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).

19  With respect to Claim 19, Petitioner fails to demonstrate that any error resulting from the trial

20  court's decision to instruct on the defense of necessity either restricted his right to present a defense or

21  "so infected" the trial as to result in a denial of due process.  As reasonably noted by the California

22  Supreme Court, Petitioner did not assert a defense of necessity, instead advancing a defense that

23  primarily contested the truth of the special circumstances, which was not impacted by the contested

24  instruction.  After reviewing the record, it is apparent that the jury was properly instructed on the

25  elements and degrees of homicide, the elements of the charged special circumstances, as well as a

26  requested heat of passion instruction.  (<u>See</u> RT 4905-22.)  Based on a review of the instructions as a

27  whole, the Court is not persuaded that the acknowledged erroneous necessity instruction restricted the

28  jury's consideration of Petitioner's proffered guilt phase defenses, which again did not include a defense

1   of necessity, much less that the asserted error had a "substantial and injurious effect or influence in

2   determining the jury's verdict." Brecht, 507 U.S. at 637.

3   In Claim 22, Petitioner asserts that the trial court erred in limiting the jury's consideration of

4   Christina Clemons's testimony about the victim's abuse, stating that while the "trial court ultimately

5   allowed Christina to testify about the abuse, [] it repeatedly instructed the jury not to consider the facts

6   concerning the abuse for the truth of the matter asserted." (FAP at 122.) Petitioner contends this

7   instruction was in error, as the truth of the abuse allegations was relevant to Petitioner's guilt phase

8   defense. (Id.) Petitioner also asserts that the jurors were not properly informed, due to trial court error

9   and the ineffective assistance of advisory counsel, that the guilt phase limiting instruction regarding the

10  abuse did not apply to the penalty phase. (Id.)

11  During the guilt phase proceedings, the defense noted its intent to reference the abuse as early

12  as in opening statements, stating that "we can represent to the Court that it will be specifically directed

13  at the special circumstances." (RT 3966.) The trial court allowed the defense to reference what

14  Petitioner knew about the abuse at the time of the murder, and not what he learned after the fact. (RT

15  3967.) Later, in discussing Christina's prospective testimony, the prosecution argued that what she told

16  Petitioner was hearsay, but acknowledged that it was admissible if offered as to Petitioner's state of

17  mind and not for the truth of matter asserted. (RT 4424.) The trial court then allowed Christina

18  Clemons to testify as to what she told Petitioner about the abuse suffered at the hands of her mother, but

19  instructed the jurors that the abuse evidence was admissible only as to Petitioner's state of mind and was

20  not offered for the truth of whether it actually occurred. (See e.g. RT 4454, 4493-94, 4496, 4499-4500,

21  4508-09, 4510.) Petitioner asserts this limiting instruction violated his right to present a defense at both

22  the guilt and penalty phases.

23  Petitioner relies upon United States v. James, 169 F.3d 1210 (9th Cir. 1999) (en banc) and

24  DePetris v. Kuykendall, 239 F.3d 1057 (9th Cir. 2001), in support of his contention that the trial court's

25  limiting instructions denied him the right to present a defense. (Pet. Brief at 15.) In James, the

26  defendant sought to admit records corroborating the violent history of the victim, and the Ninth Circuit

27  held that the trial court's decision to exclude those records constituted an abuse of discretion, as the

28  records were relevant and corroborative of the defendant's proffered defense. See James, 169 F.3d at

1212-15 ("Because the crux of James's defense rested on her credibility and because her credibility could be directly corroborated through the excluded documentary evidence, exclusion of the documents was prejudicial and more probably than not affected the verdict.") In DePetris, the Ninth Circuit found a trial judge erroneously excluded the victim's journal, which corroborated the victim's threats against and abuse of the defendant, and found that the exclusion of this corroborative evidence violated the defendant's right to present a defense of imperfect self-defense.  See DePetris, 239 F.3d at 1061-65, 1065 ("We hold that the erroneous exclusion of both the journal evidence and any reference to it- especially petitioner's own testimony about it- unconstitutionally interfered with her ability to defend against the charges against her.")

DePetris and James are distinguishable from Petitioner's situation, as each of those cases involved the trial court's exclusion of corroborative evidence about a victim's violent past.  Meanwhile, Christina's testimony about the abuse, even if considered for the truth of the matter, would not have itself corroborated the defense's assertion that Petitioner believed Christina was in danger.  The trial court's limitation on her testimony was not an abuse of discretion, as the truth of the abuse was not the ultimate issue in Petitioner's case.  Instead, the central matter for the jury to decide was whether Petitioner acted with premeditation, rather than some lesser intent, and whether he had the intent necessary to satisfy the special circumstances.  Christina's testimony about the abuse, and about what she told Petitioner about the extent of the abuse, was only relevant with respect to Petitioner's state of mind and how it impacted his belief in the need to defend or protect Christina from further harm.  Again, Petitioner's guilt phase defense primarily involved contesting the truth of the special circumstances and asserting that he killed JoAnn Clemons out of the desire to protect Christina rather than for the purposes of financial gain, robbery, or burglary, as the prosecution contended.[15]  The trial court's limitations did not prevent the jurors from considering his proffered defense, or violate Petitioner's right to present a defense.

_____

[15] Petitioner asserts that the trial court unfairly allowed the prosecution to "present independent evidence that Clemons had an insurance policy in order to support its theory that Mr. Michaels' motive for the crime was the insurance proceeds."  (Pet. Brief at 14.)  However, it is clear that the evidence regarding the existence of the victim's insurance policy was itself relevant to the charged special circumstance alleging that the crime was committed for financial gain, as opposed to Christina's testimony about the abuse, which was only relevant to the extent it impacted Petitioner's state of mind.

Petitioner also fails to demonstrate that the asserted error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. There was a significant amount of evidence demonstrating Petitioner's premeditation and planning of the murder for motives other than the protection of his girlfriend, including his admissions to friends and acquaintances that he committed the crime for money and property, including furs and jewelry. The evidence demonstrated that Petitioner recruited the assistance of others by promising portions of the insurance proceeds or proceeds from the robbery of the victim's home. With respect to the guilt phase contentions, Petitioner fails to demonstrate that the state supreme court's rejection of Claim 22 was either contrary to, or an unreasonable application of, clearly established federal law.

In Claim 56, Petitioner asserts that the trial court's limiting instruction as to the abuse, coupled with the erroneous necessity instruction, "obliged" the jurors to find premeditation and convict Petitioner of first-degree murder. (FAP at 248.) For the reasons discussed earlier, Petitioner's contention is without merit. Again, the necessity instruction did not preclude or limit the jury from considering the elements and degrees of homicide, including the requested heat of passion instruction. (See RT 4905-22.) The abuse evidence was properly limited to its impact on Petitioner's state of mind in committing the homicide, and as noted before, given the ample evidence of premeditation, including Petitioner's police statement and admissions about planning the homicide, Petitioner fails in any event to demonstrate that the asserted errors had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.

With respect to the penalty phase contentions, Petitioner asserts in Claim 19 that "a juror certainly could have viewed the purported 'necessity' instruction as prohibiting consideration as a mitigating factor that Mr. Michaels believed, even if unreasonably, that it was necessary to kill Joann to protect Christina from future abuse." (Pet. Brief at 18.) However, a plain reading of the jury instruction does not support this contention. The instruction reads as follows: "It is not a defense under the law of necessity that the homicide was committed to prevent the victim from committing future wrongdoing against the defendant or another." (RT 4905.) It is clear that the instruction, given along with the instructions on the law of homicide, applied only to that determination. The instruction did not include any mention of mitigation. At the penalty phase, the jurors were instructed pursuant to

California Penal Code section 190.3 factor (k), modified and expanded at the request of the defense, which allowed them to consider "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial, such as whether or not Kurt Michaels was impaired as a result of his overall psychological condition." (RT 5932-33.)  Moreover, immediately after giving the factor (k) instruction, the trial judge specifically stated that: "You must disregard any jury instruction given to you in the guilt or innocence phase in this trial which conflicts with this instruction."  (RT 5933.)  Even were the Court persuaded that the necessity instruction had the potential to impact the jury's consideration of mitigating evidence, the jurors were explicitly instructed that the penalty phase instructions, factor (k) included, prevailed in any potential conflict with earlier instructions.  As such, even given the acknowledged instructional error, Petitioner fails to demonstrate under <u>Brecht</u> that "the error substantially and injuriously influenced the jury's decision." <u>Deck v. Jenkins</u>, ___F.3d ___,2014 WL 4800349, *6 (9th Cir. Sept. 29, 2014), citing <u>O'Neal v. McAninch</u>, 513 U.S. 432, 436 (1995).

For similar reasons, Claim 22 is without merit with respect to the penalty phase, as again, the jury was explicitly instructed that earlier conflicting instructions were superceded by the penalty phase instructions allowing for the consideration of, among other factors, "any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death." (RT 5932-33.)  During the penalty phase proceedings, several witnesses testified about the abuse, including Christina's foster mother Carol Durkee, Christina Clemons, and psychiatrist Russell Bruce Hubbard.  Durkee stated that, viewing things retrospectively, she witnessed the victim JoAnn Clemons act inappropriately towards her daughter Christina, including holding and caressing Christina on a bed. (RT 5392.)  Durkee also saw the victim act similarly towards another young woman who lived in the same apartment complex.  (RT 5393.)  Durkee was supportive when Christina and Petitioner moved to Texas, explaining that she "had seen all of the anguish and abuse that that child had gone through and all of these attempts to try to reunite, and it was not happening," and stated that reuniting mother and daughter was a mistake.  (RT 5393-94.)

Christina Clemons testified at the penalty phase that until the abuse started during the August

1988 camping trip, she had enjoyed some of the trip with her mother.  (RT 5565-67.)  Clemons also stated that she enjoyed violent sex, starting from age 11 or 12, and noted that the first episode she could recall was with her mother.  (RT 5589-95.)  Dr. Hubbard testified extensively about Petitioner's background and upbringing, as well as Christina's.  Hubbard stated that Christina's borderline personality likely stemmed from growing up with an "exceedingly" disturbed mother and undergoing repeated abuse, stating that "[m]uch of the abuse was horrible, sadistic to a degree that is difficult to imagine."  (RT 5627-28.)  Dr. Hubbard stated that he believed the victim's sexual abuse of Christina was the "key" motivating factor in the murder.  (RT 5737-38, 5747.)

Each side also mentioned the abuse in their penalty phase arguments to the jury.  The prosecutor acknowledged that factor (k) was a "catch all" factor for the consideration of mitigation, stating that: "This k factor is really for kitchen sink.  Anything you want to think is sympathetic about Mr. Michaels or his background, you may consider under this factor."  (RT 5852.)  In closing, the prosecutor also addressed the defense's argument that victim was a bad person, stating that, "I believe Mr. Chambers told you it's unfortunate but JoAnn Clemons died for what she did to her daughter."  (RT 5857.)  The prosecutor asserted that, "Whether you decide JoAnn Clemons was a nice lady or not makes no difference.  Whether she is nice or not nice, you don't get to rob her."  (RT 5885.)  The defense, meanwhile, quoted in its closing Dr. Hubbard's statements about Petitioner, that he "appears well meaning in various aspects of relationships with bonded others such as Christina Clemons, appearing to act out of a grandiose need to protect and care for those unjustly treated by society."  (RT 5898.)

Given the evidence and arguments presented by the parties about the abuse and its impact on Petitioner's motivations, as well as the specific instructions to the jury allowing for the consideration of "any" circumstance or aspect of Petitioner's character or record in mitigation, Petitioner fails to show that the jury was prevented from considering the abuse evidence in their penalty phase determination.  See Ayers v. Belmontes, 549 U.S. 7, 24 (2006) (upholding general factor (k) instruction and rejecting claim that jury did not properly consider evidence in mitigation where "the jury heard mitigating evidence, the trial court directed the jury to consider all the evidence presented, and the parties addressed the mitigating evidence in their closing arguments."), citing Boyde, 494 U.S. 370 and Brown v. Payton, 544 U.S. 133 (2005).  Based on a review of the record, the Court remains unpersuaded by

1    Petitioner's argument that the trial court's limiting instruction with respect to the abuse testimony was

2    improper or somehow curtailed the jury's consideration of that evidence in mitigation.  (See Pet Brief

3    at 18, Reply at 7),[16] citing Davis v. Coyle, 475 F.3d 761, 774-75 (6th Cir. 2007) ("[W]hen a trial court

4    improperly excludes mitigating evidence or limits the fact-finder's consideration of such evidence, the

5    case must be remanded for a new sentencing hearing.")

6         Thus, with respect to the errors alleged in Claims 19, 22 and 56 and based on a review of the

7    entirety of the given instructions, Petitioner fails to show that the erroneous instruction so infected the

8    trial as to cause a federal due process violation, or that the asserted errors had a "substantial and

9    injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637; Kibbe, 431 U.S.

10   at 154.  Accordingly, the California Supreme Court's rejection of these claims was neither contrary to,

11   nor an unreasonable application of, clearly established federal law, nor was it based upon an

12   unreasonable determination of the facts.  Petitioner is not entitled to habeas relief on Claims 19, 22 or

13   56.[17]

14   **D.    PENALTY PHASE CLAIMS**

15        **1.    Claim 27 - Prosecutorial Misconduct- Lack of Notice of Penalty Phase Evidence**

16        In Claim 27, Petitioner asserts that the "prosecution failed to provide notice of its intent to

17   introduce a supposed 'hit list' during the penalty phase," that the "'hit list' evidence was unreliable and

18   impermissible non-statutory aggravation evidence and should have been excluded," and that its

19   introduction prejudiced Petitioner.  (FAP at 133.)

20        Petitioner raised this claim in the first state habeas petition, and the California Supreme Court

21   denied the claim on the merits and alternately found it was procedurally barred.  As discussed above in

22   Section III-A, the Court will review Claim 27 on the merits irrespective of the state supreme court's

23

24        [16] Petitioner contends that the errors asserted in this claim "limited the jury's consideration of a powerful
25   mitigation circumstance" and constituted structural error.  (Pet. Brief at 19.)  However, Petitioner also
     acknowledges a circuit split on this issue.  (Id., citing Stokely v. Ryan, 704 F.3d 1010, 1011-15 (9th Cir. 2012)
26   (dissents from en banc denial).  In light of the circuit split, Petitioner fails to demonstrate that clearly established
     federal law supports his position. Accordingly, the Court will evaluate whether the asserted errors were harmless.
27   See Arizona v. Fulminante, 499 U.S. 279, 306 ("[T]he Court has applied harmless-error analysis to a wide range
     of errors and has recognized that most constitutional errors can be harmless.")

28        [17] As stated above, Petitioner's assertion that the cumulative effect of these alleged errors amounted to
     a violation of his constitutional rights will be considered as part of Claim 76 below.

1    application of procedural bars.

2         The prosecution is required to provide a capital defendant with a notice of intent to present

3    evidence in aggravation as follows: "Except for evidence in proof of the offense or special

4    circumstances which subject a defendant to the death penalty, no evidence may be presented by the

5    prosecution in aggravation unless notice of the evidence to be introduced has been given to the

6    defendant within a reasonable period of time as determined by the court, prior to trial." Cal. Penal Code

7    § 190.3. In this case, Petitioner contends that the prosecutor failed to provide notice that it intended to

8    introduce a "hit list" found in Petitioner's possession during an August 31, 1988, arrest. (FAP at 133.)

9         While a review of the record reveals that the "hit list" itself was not specifically mentioned as

10   evidence, the arrest in question was listed in the first Notice of Intention to Introduce Aggravation, filed

11   on July 13, 1989, several months prior to the commencement of trial proceedings in his case. (See CT

12   317-19.) In the Notice, the prosecution stated that it intended to introduce: "The incident occurring on

13   or about August 31, 1988, in Oceanside, California, in which the defendant was in possession of a

14   concealed and loaded .45 caliber pistol in a vehicle in a public place, as alleged and described in the

15   records of North County Municipal Court, citation #U357138, and Oceanside Police Department case

16   #88-018678, as well as all statements by defendant with regard to this incident." (CT 318-19.) The

17   Notice also indicated that the prosecution intended to introduce: "The nature and circumstances of the

18   present offenses, to wit: all crimes committed against the person and property of JoAnn Clemons; all

19   acts done by the defendant relevant to said crimes; and all statements made to any person before, during,

20   and after said crimes which are relevant to said crimes." (CT 317.)

21        In Claim 44 of the Group Two Order, the Court previously considered and rejected Petitioner's

22   claim of ineffective assistance of advisory counsel for failing to properly object to testimony and

23   argument concerning the "hit list," as follows:

24        During an August 1988 arrest for weapon possession, Petitioner had on his person a list
          of names and other writing, described by the trial court as follows:

25

26             It does have a title of "hit list," not at the top. The top says "middle man
               to H.A." Then in goes down to talk about "Julio," then there is a name
27             of "Tito," then it says "hit list," then there is "Tony" and "Scooter" and
               "Kirk" and "Andy," with some further writing. Then at the bottom it
28             says "Job to be done by," then it's got a colon, it says "Kirk." Looks like
               K-I-R-K, "drives red Chevy Nova, U.S.M.C. Recon Unit.["]

(RT 5326.)  Sergeant Coppack, the arresting officer, stated that Petitioner told him that "he was given it by another person to find out why the people on this list were marked to be hit or murdered."  (RT 5238.)  The prosecution offered the list into evidence regarding "the implied nature of the violence, and him being armed, and the entire circumstances of him having that gun and being involved and tracking down people related to the hit list, whether it be by his own statement that he is just doing the detective work, but it's certainly relevant to all of the circumstances under which he possessed that - - that loaded gun with a round in the chamber. [¶]  Also, it corroborates his own perception of himself as somebody who is involved in doing this type of work." (RT 5325-26.)  Over defense objection, the trial court admitted the list into evidence as "an overall background piece of information helping the jury evaluate the nature and the circumstances of the crime before them," stating that the evidence "is not forceful probative value, but is of almost no undue prejudice e[i]ther," as the prosecutor indicated his intention to argue that "this is a perception of Mr. Michaels rather than that he was actually fully engaged in such operations."  (RT 5326.)

(Doc. No. 135 at 145-46.)  In rejecting the claim, the Court noted that the state supreme court denied a related claim on direct appeal asserting trial court error in allowing the hit list into evidence.  (See id. at 146, citing Michaels, 28 Cal. 4th at 534-35.)  The Court also similarly rejected Claim 32, asserting ineffective assistance of advisory counsel for failing to object to the prosecutor's misconduct in introducing the "hit list" into evidence, as follows:

> While Chambers objected to the admission of the "hit list" into evidence (see Claim 44, infra), the trial judge overruled his objection for failure to demonstrate that prejudice outweighed the probative value of the evidence, stating, "In weighing the two in the balance, it appears that it would be admissible on the basis that the People are indicating to the Court that they are going to be arguing that this is a perception of Mr. Michaels rather than that he was actually fully engaged in such operations." (RT 5326.) A review of the prosecutor's closing shows that the argument given hewed to his stated intentions, as the prosecutor quoted specifically from Petitioner's writings and comments. (See RT 5883- "When you consider Mr. Michaels the man and how much sympathy he deserves, consider some of the writings that he authored in his tackle box.")  In any event, even were these comments, or the prosecutor's argument that Petitioner himself "would vote for the death penalty" (RT 5880) improper, the trial court clearly and repeatedly instructed the jury that the arguments of counsel were not evidence.  (See RT 5849- "[B]e advised, as I indicated before, that the statements made in argument are not evidence.  They allow each side to focus in on factors and evidence that they wish you to consider, but it is not evidence.  Regardless of who makes the arguments to you, arguments are not evidence.")

(Doc. No. 135 at 89.)

The defense was provided with specific and timely notice that the prosecution intended to introduce evidence surrounding Petitioner's August 31, 1988, arrest.  "The purpose of the notice requirement is to allow the defendant sufficient opportunity to prepare a defense to the aggravating evidence."  People v. Blair, 36 Cal. 4th 686, 751 (2005), rejected on other grounds by People v. Black, 58 Cal. 4th 912, 920-21 (March 27, 2014).  "However, the prosecutor is not prevented from introducing

all the circumstances of a duly noticed incident or transaction simply because each and every circumstantial fact was not cited therein." People v. Hart, 20 Cal. 4th 546, 639 (1999), citing People v. Howard, 44 Cal. 3d 375, 424-25 (1988). Given that the notice referenced the date and location of the arrest and cited to both the court file and police case number, as well as specifically noted an intention to introduce "all statements by defendant with regard to this incident" (see CT 319), it appears that Petitioner was given sufficient notice that the prosecutor intended to introduce at least the circumstances of the August 31, 1988, incident as evidence in aggravation, which reasonably would have included Petitioner's statements about the list. While the list itself was not mentioned in the notice, any error arising from the failure to specifically mention it in the notice was minimal, as the Court agrees with the conclusion of the trial court that the list by itself "is not forceful probative value, but is of almost no undue prejudice either." (RT 5326.) Instead, it was Petitioner's statements about the list that offered the greater possibility of prejudice and the prosecutor gave specific notice that it intended to introduce Petitioner's statements into evidence. (See CT 318-19.) As such, the omission of the list itself from the notice did not deprive Petitioner of a "sufficient opportunity to prepare a defense" against evidence relating to the list. See Blair, 36 Cal. 4th at 751, citing Mitcham, 1 Cal. 4th at 1070; see also Ortiz v. Stewart, 149 F.3d 923, 939 (9th Cir. 1998) (thirteen days notice provided defendant with an "effective opportunity to defend" against evidence of prior conviction introduced at sentencing proceedings), quoting Goldberg v. Kelly, 397 U.S. 254, 268 (1970). Moreover, the prosecution specifically noticed its intention to introduce evidence surrounding the circumstances of the crimes against JoAnn Clemons (see CT 317), and the note was ultimately introduced into evidence as "an overall background piece of information helping the jury evaluate the nature and the circumstances of the crime before them." (RT 5326.) At the penalty phase, the prosecutor also introduced additional portions of Petitioner's taped police statement, which included Petitioner's assertion that he had killed "anywhere between ten and fifteen" people prior to the murder of JoAnn Clemons, while stating that Clemons' murder was the first premeditated murder that was not committed in self-defense. (CT 2430-34.) Thus, in any event, even if the prosecutor committed misconduct in failing to specifically mention the hit list found in Petitioner's possession in the notice of aggravating evidence, Petitioner fails to show that the list by itself was of such a dimension that it "so infected the trial with unfairness as to make the resulting conviction a denial

1  of due process." <u>Darden</u>, 477 U.S. at 181, quoting <u>Donnelly</u>, 416 U.S. at 643.

2         As a related matter, Petitioner states that witness Dennis Lucas also testified about a "death list,"

3  and contends that after Lucas' testimony, "the court expressed its concern that the list was not among

4  the aggravating factors." (FAP at 133.) However, a review of the record appears to reflect that the

5  "death list" Petitioner spoke of during a conversation in Leon Madrid's barracks sometime after the

6  murder appears to be different than the "hit list" found in Petitioner's possession during his August 1988

7  arrest. (<u>See</u> RT 5318.) Moreover, a review of the record reveals that Dennis Lucas testified as early

8  as the preliminary hearing that Petitioner told him about a "death list." That list was also mentioned in

9  a May 19, 1989, motion for a separate trial, filed by former counsel Burns, in which counsel quoted

10 from the transcript of that hearing. (<u>See</u> CT 226- "Defendant told Lucas he had a death list," citing to

11 multiple pages of the preliminary hearing transcript.) Again, the prosecution specifically noticed its

12 intention to introduce evidence surrounding the circumstances of the crimes against JoAnn Clemons

13 (<u>see</u> CT 317), and the trial court allowed Lucas' mention of the death list, as well as statements

14 Petitioner made at an earlier hearing about the existence of the list and that the victim's name was not

15 on that list, into evidence as "further evidence as to the facts and circumstances of the underlying

16 crime." (RT 5326.) Even if the Court were to consider the admission of this evidence to constitute

17 misconduct, Petitioner fails to show that it "so infected the trial with unfairness as to make the resulting

18 conviction a denial of due process." <u>Darden</u>, 477 U.S. at 181, quoting <u>Donnelly</u>, 416 U.S. at 643.

19        Accordingly, Petitioner fails to demonstrate that the California Supreme Court's rejection of this

20 claim was either contrary to, or an unreasonable application of, clearly established federal law.

21 Petitioner is not entitled to habeas relief on Claim 27.

22        **2.    <u>Claim 30 - Other Cumulative Prosecutorial Misconduct</u>**

23        Petitioner asserts that during trial proceedings, "the prosecutor overstepped the bounds of

24 permissible zealous advocacy in several respects," which deprived Petitioner of a fair trial and violated

25 his constitutional rights. (FAP 140-41.) In particular, Petitioner cites the prosecutor's argument that

26 Petitioner engaged in "devil worship," called Petitioner a "beast," "monster" and "evil," cited to

27 Petitioner's opinion on the death penalty, used the Popik note, argued that co-defendant Paulk was one

28 of Petitioner's victims, and offered argument on Petitioner's future dangerousness. (<u>Id.</u>)

a.    <u>State Court Proceedings and Exhaustion</u>

On direct appeal, Petitioner asserted that advisory counsel's failure to object to the prosecutor's comment about "devil worship," calling Petitioner a "beast" and reference to Paulk as "another victim" of Petitioner constituted ineffective assistance of counsel, to which the California Supreme Court stated that such contentions should be raised on habeas corpus.   <u>See</u> <u>Michaels</u>, 28 Cal. 4th at 539-40. Petitioner also raised a claim of penalty phase prosecutorial misconduct regarding the prosecutor's dangerousness argument, and the state supreme court adjudicated that claims as follows:

D. *Prosecutorial Misconduct at the Penalty Phase*

The defense did object to one penalty phase argument by the prosecutor. The prosecutor asked the jurors to: "Just think of all the generations of prisoners that will go through the prison system and be exposed to [the] extreme danger that is Kurt Michaels. Just think of all the prison guards who will be lucky enough to meet Kurt Michaels." The trial court overruled the objection but told the prosecutor to move on to a new subject.

Defendant contends that because future dangerousness is not a listed aggravating factor, the prosecutor can argue that point only to rebut defense argument or evidence. We disagree. This court has "repeatedly declined to find error or misconduct where argument concerning a defendant's future dangerousness in custody is based on evidence of his past violent crimes admitted under one of the specific aggravating categories of section 190.3." (*People v. Ray* (1996) 13 Cal.4th 313, 353 [52 Cal.Rptr.2d 296, 914 P.2d 846].) Likewise, in *People v. Champion* (1995) 9 Cal.4th 879, 940 [39 Cal.Rptr.2d 547, 891 P.2d 93], a case in which the defendant introduced no penalty phase evidence, we said: "Although we have held that at the penalty phase of a capital case the prosecutor may not introduce expert testimony forecasting that, if sentenced to life without the possibility of parole, a defendant will commit violent acts in prison (*People v. Murtishaw* (1981) 29 Cal.3d 733, 779 [175 Cal.Rptr. 738, 631 P.2d 446]), we have never held that in closing argument a prosecutor may not comment on the possibility that if the defendant is not executed he or she will remain a danger to others. Rather, we have concluded that the prosecutor may make such comments when they are supported by the evidence."

<u>Michaels</u>, 28 Cal. 4th at 540-41.  Petitioner also presented Claim 30 to the California Supreme Court in his second state habeas petition.  The state supreme court denied the claim on the merits and alternately found it was procedurally barred.  (<u>See</u> Lodgment No. 26.)  As discussed above in Section III-A, the Court will review Claim 30 on the merits irrespective of the state supreme court's application of procedural bars.

In the Group Three briefing, Respondent argues that this claim suffers from several procedural defects.  (<u>See</u> Resp. Brief at 33-34.)  First, Respondent contends that Petitioner's allegations about "devil worship" were only raised with respect to Claim 43, alleging ineffective assistance of advisory counsel, and asserts that "because the First Amended Petition does not assert this as a specific stand-

1   alone claim, it should not be reviewed here, and it falls outside the scope of the Group 3 Brief as ordered

2   by the Court."  (Id. at 33.)  A review of the FAP confirms that Petitioner clearly mentioned the "devil

3   worship" comment as part of Claim 30 (see FAP at 141), and is thus within the scope of the Group 3

4   briefing.  (See Doc. No. 123.)

5         Next, Respondent contends that Petitioner's argument that the "devil worship" comment violated

6   Dawson v. Delaware, 503 U.S. 159 (1992), is "a new and novel theory" which was not raised in the First

7   Amended Petition.  (Resp. Brief at 34.)  Respondent also contends that Petitioner failed to raise either

8   the Dawson argument or the challenge to comments about Petitioner's future dangerousness in state

9   court.  (Id.)  He asserts that there was no opportunity to respond to this argument and the contentions

10  are unexhausted.  (Id. at 34-35.)  Again, a review of the First Amended Petition reflects that Petitioner

11  argued in Claim 30 that the "devil worship" comments constituted prosecutorial misconduct and that

12  the "remarks overstepped the bounds of propriety," but did not contain a specific citation to Dawson.

13  (FAP at 141.)  Instead, Petitioner cited to Dawson in the argument on Claim 43, the related ineffective

14  assistance of counsel claim.  (FAP at 194.)  In any event, as the Court will necessarily consider relevant

15  clearly established law in adjudicating the claim of prosecutorial misconduct, which includes Dawson,

16  the lack of specific citation to that case does not prevent the Court from considering the argument.

17        A review of the state record also reflects that Petitioner specifically cited to Dawson in the

18  context of the prosecutorial misconduct claim on direct appeal before the California Supreme Court.

19  In Petitioner's supplemental brief filed in June 1999, he presented this argument in a claim entitled

20  "Prosecutorial Misconduct During Penalty Phase Argument."  (Lodgment No. 4 at 10.)   In fact,

21  Respondent also filed a supplemental brief, in September 1999, which referenced Petitioner's argument.

22  (See Lodgment No. 5 at 7-8.)  As such, it is evident that Respondent had an opportunity to respond to

23  this argument and that the contention was presented to the state court.  Moreover, in the February 21,

24  2006 Order, this Court previously ruled that Petitioner's prosecutorial misconduct claim regarding the

25  devil worship comments and future dangerousness argument was exhausted, having been raised on

26  direct appeal.  (See Doc. No. 53.)  The Dawson argument is properly before the Court.

27        Respondent also argues that Petitioner failed to previously raise the contention, in either state

28  court or in the federal Petition, that the prosecution committed "constitutional misconduct" in using the

Popik note during the penalty phase, and the claim is therefore unexhausted.  (Resp. Brief at 37.)  In

state court, Petitioner asserted on direct appeal that the trial court erred in allowing the introduction of

the Popik note and contended on state habeas review that counsel violated the attorney-client privilege,

and rendered ineffective assistance of counsel, in turning over the note.  (See Lodgment No. 1 at 270-74,

Lodgment No. 25 at 44-49.)  In the FAP, Claim 2 alleges ineffective assistance of counsel/violation of

attorney-client privilege, and Claim 51 alleges trial court error in allowing the note into evidence.  Thus,

Petitioner's claim of prosecutorial misconduct appears unexhausted.  Yet, a federal court has the

discretion to deny a habeas claim on the merits despite a petitioner's failure to exhaust state remedies.

See 28 U.S.C. § 2254(b)(2); Gatlin v. Madding, 189 F.3d 882, 889 (9th Cir. 1999).  Because, as

discussed below, the claim is without merit, the Court denies it despite any failure to exhaust.

Finally, Respondent argues that because the Court previously found Claim 43, which alleged

advisory counsel rendered ineffective assistance of counsel in failing to object to several instances of

prosecutorial misconduct in penalty phase closing arguments, unexhausted and denied it on the merits,

that decision "necessarily vitiates any claimed prejudice in this context; there is no reason to address

it again here."  (Resp. Brief at 34.)  In the Group Two Order, the Court previously considered and

rejected Claim 43 on the merits despite a failure to exhaust.  (See Doc. No. 135 at 138-44, Claim 43.)

However, Claim 43 was of limited scope and concerned only a few specific instances of misconduct in

closing penalty phase arguments.  The Court found Claim 43 unexhausted because while it had been

raised on direct appeal, the state supreme court held that claims alleging ineffective assistance of

counsel should be presented in a habeas petition, and Petitioner did not re-raise that claim on state

habeas review.  (Doc. No. 135 at 139-40.)  Claim 30 is of much wider breadth, has a different legal

basis, and contains numerous asserted instances of misconduct.  Moreover, Supreme Court authority

instructs that allegations of misconduct must be considered in view of the trial as a whole.  See

Donnelly, 416 U.S. at 639 (in examining impact of contested prosecutorial comments, a reviewing court

is to "consider whether such remarks, in the context of the entire trial, were sufficiently prejudicial to

violate respondent's due process rights.")  As such, the additional allegations of misconduct outlined

here necessitate the Court evaluate the prejudicial impact of any identified misconduct in light of the

entire trial.

1

**b.     Current Allegations of Misconduct and the Court's Group Two Order**

2     As previously outlined in the discussion of Claim 43 (see Doc. No. 135 at 138-44), during

3 penalty phase closing arguments, the prosecutor made several comments which Petitioner now

4 challenges, including the following remarks with respect to items found in a tackle box belonging to

5 Petitioner, as follows:

6     We also know that Mr. Michaels was a member of a Presbyterian church in Big Springs,
      Texas.  And you may consider that to be a factor in mitigation. [¶] We also know from
7     his tackle box and what appears to be that pentagram and the six six six that Mr.
      Michaels had interests in other types of religion, which I think we call devil worship, and
8     three sixes is a sign of the beast, and that is Mr. Michaels; he is a beast.

9 (RT 5858-59.)

10     The prosecutor also implied that Petitioner might be a danger to other prisoners, or prison

11 guards, if given life in prison, stating:

12     [Prosecutor:]          Just think of all the generations of prisoners that will go through
                              the prison system and be exposed to extreme danger that is Kurt
13                            Michaels.  Just think of all the prison guards who will be lucky
                              enough to meet Kurt Michaels.
14

15     Mr. Chambers:          Objection.  Improper argument.

16     The Court:             Well, move on to something else.  Overruled; a new subject.

17 (RT 5881.)

18     The prosecutor also argued that co-defendant Joseph Paulk could be considered one of

19 Petitioner's victims, as follows:

20     Joseph Paulk, another Kurt Michaels victim.  Joseph Paulk made the mistake of
      meeting Kurt Michaels and look what happened to him.  Kurt Michaels lied to him.  Kurt
21     Michaels told him "It's just a robbery, and you will make $200."

22     Well, it wasn't just a robbery.  They lied to Joseph Paulk.  Joseph Paulk will be
      serving a life sentence for this murder.  He is another Kurt Michaels victim.  That's a
23     factor of crime; it's a factor of aggravation.

24 (RT 5881-82.)

25     In the adjudication of Claim 43, with respect to Petitioner's arguments that the prosecutor

26 committed misconduct in the comments about devil worship and calling Petitioner a beast, the Court

27 assumed without deciding that the remarks constituted misconduct, as follows:

28 ///

- 76 -

Again, a prosecutor is entitled to make reasonable inferences based on the evidence presented at trial.  See Menendez, 422 F.3d at 1037.  However, even assuming without deciding that this argument may have amounted to error constituting misconduct, it would not warrant relief unless the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Donnelly, 416 U.S. at 643.

Here, the trial court's instructions to the jury that statements or arguments by counsel were not evidence would have ameliorated any unfairness that these comments may have injected into the trial.  Prior to penalty phase opening statements, the trial court instructed, "So the Court at this time is ready for counsel to make what they may make as opening statements.  These, again, are not evidence, they are what counsel expects the evidence to show you.  And, again, I instruct you, the opening arguments or statements, I should say, of counsel at this phase are not evidence." (RT 5187-88.)  Then, prior to closing arguments, the trial judge stated, "[B]e advised, as I indicated before, that the statements made in argument are not evidence.  They allow each side to focus in on factors and evidence that they wish to consider, but it is not evidence.  Regardless of who makes the arguments to you, arguments are not evidence."  (RT 5849.)  A jury is presumed to understand and follow the trial court's instructions.  Weeks, 528 U.S. at 233; Richardson, 481 U.S. at 211.  Petitioner fails to demonstrate that any error arising from these comments had a prejudicial effect, particularly since he has not offered any indication that the jury did not understand and follow the trial court's explicit instructions that the statements of counsel did not constitute evidence.

Moreover, given the evidence that was introduced in aggravation, including but not limited to the brutal and premeditated nature of the murder itself, the accompanying robbery and burglary, the four special circumstances the jury had already found true, and the evidence of prior criminal activity, Petitioner has not shown that counsel's failure to object to the prosecutor's arguments resulted in prejudice.  See Strickland, 466 U.S. at 691 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.")

(Doc. No. 135 at 143-44.)    Meanwhile, the Court's consideration of the prosecutor's future dangerousness argument was limited to the finding that there was no ineffective assistance of counsel in failing to object to the remarks, as a review of the trial record showed that advisory counsel raised an objection.  (Id. at 142.)  With respect to Petitioner's allegations of misconduct stemming from the prosecutor's arguments about Paulk, the Court stated in the Group Two Order:

Yet, it is clear that a prosecutor is entitled to argue reasonable inferences based on the evidence presented at trial.  See Menendez v. Terhune, 422 F.3d 1012, 1037 (9th Cir. 2005); see also Ceja v. Stewart, 97 F.3d 1246, 1253-54 (9th Cir. 1996) ("Counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom.")  Petitioner's own statement to the police indicated that Paulk had merely given Petitioner and Popik a ride to the scene and was only aware that they were committing a robbery.  (CT 2336.)  Petitioner also told the police that after the murder, he returned to the car and told Paulk the "gory" details because he "wanted to scare him" and shut him up, as Paulk kept asking to drive.  (CT 2346.)  Given these statements and the other evidence introduced at trial, it appears the prosecutor's argument that Paulk was a "victim," while forceful, was not improper.

1 | (Doc. No. 135 at 142.)

2 |      In addition to the alleged instances of misconduct previously raised as allegations of ineffective
3 | assistance of advisory counsel, Petitioner also now asserts that the prosecutor made "blatantly
4 | inappropriate emotional appeals," including arguing that Petitioner "is a man who expects mercy, this
5 | is a man who showed no mercy to anyone," and describing the crime from the victim's perspective and
6 | calling Petitioner a beast, stating: "A primal fear that we all have, the idea of waking up and having
7 | somebody in our bedroom who might hurt us, a stranger.  Only it's two men; one of them is a stranger,
8 | Popik.  The other is a beast, Michaels."  (Pet. Brief at 36, citing RT 5888-89.)

9 |      Petitioner also contends that the prosecutor committed misconduct in stating that: "I like to think
10 | of Mr. Michaels as the 13th juror in this case because if Mr. Michaels were voting on this case, he would
11 | vote for the death penalty; there is no doubt about it.  He believes in the death penalty."  (RT 5880.)
12 | Petitioner also argues that the prosecutor's comments about the Popik note, such as that former counsel
13 | Duff was his "favorite witness" who "had to testify against his own client," as well as the introduction
14 | of the note itself, was improper and prejudicial.  (Pet. Brief at 39, citing RT 5863.)  Specifically,
15 | Petitioner argues that the prosecutor improperly relied upon the note to argue future dangerousness.
16 | (Pet. Brief at 39, citing 5863-64.)

17 |      Petitioner also advances several instances of misconduct in the Petition which were not
18 | addressed or expounded upon in the Group Three briefing, alleging that the prosecutor improperly
19 | introduced evidence about Petitioner's poverty and then argued that it served as a motive for the crime,
20 | the allegedly improper introduction of evidence that Petitioner wanted to rape the victim, improper
21 | questions of witnesses and conveyance of personal opinions, failure to serve the defense with a witness
22 | list, attacks on advisory counsel Chambers, opposing the removal of counsel Grossberg, and opposing
23 | Petitioner's motion for a continuance.  (FAP at 140-42.)

24 |      Again, as Supreme Court authority instructs that allegations of misconduct must be viewed in
25 | view of the trial as a whole, the Court will consider whether each of the identified comments or actions
26 | constitute misconduct and if so, whether in light of the whole trial, such misconduct was prejudicial.
27 | See Donnelly, 416 U.S. at 639 (1974).
28 | ///

1

c.      Discussion

2          To warrant habeas relief, a petitioner must demonstrate that alleged prosecutorial misconduct

3   "so infected the trial with unfairness as to make the resulting conviction a denial of due process."

4   Darden, 477 U.S. at 181, quoting Donnelly, 416 U.S. at 643.  "[I]t is not enough that the prosecutors'

5   remarks were undesirable or even universally condemned."  Darden, 477 U.S. at 181, quoting Darden

6   v. Wainwright, 699 F.2d 1031, 1036 (11th Cir. 1983).

7          "Past decisions of th[e Supreme] Court demonstrate that the touchstone of due process analysis

8   in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the

9   prosecutor." Smith v. Phillips, 455 U.S. 209, 219 (1982), citing Brady v. Maryland, 373 U.S. 83 (1963).

10   As such, alleged instances of misconduct must be viewed in light of the entire trial record.  See

11   Donnelly, 416 U.S. at 639, 643; Greer v. Miller, 483 U.S. 756, 765-66 (1987) (a reviewing court must

12   consider alleged misconduct "in context" of the case), citing Darden, 477 U.S. at 179 and Donnelly, 416

13   U.S. at 639.

14

1.      "Devil worship" references

15          At the penalty phase proceedings, the trial court allowed into evidence several notes found in

16   Petitioner's tackle box, finding that it had "some bearing" on the prosecutor's intended argument, and

17   that it was relevant to both the circumstances of the crime and to Petitioner's state of mind and motive

18   in committing the murder, and was not unduly prejudicial.  (RT 5319-23.)  As noted, the prosecutor then

19   argued in closing that while the defense had introduced evidence that Petitioner was the member of a

20   Texas church, those tackle box writings, which included a pentagram and the number 666, evidenced

21   his interest in other types of religion, such as "devil worship," stating that 666 was the sign of the beast,

22   and calling Petitioner a "beast."  (RT 5858-59.)

23          Petitioner contends that the prosecutor's reference to devil worship constituted structural error

24   under Dawson.  In Dawson, the Supreme Court found the admission of evidence regarding a defendant's

25   Aryan Brotherhood membership to be error, as the evidence of membership, by itself, was not "bad"

26   character evidence introduced to rebut evidence introduced in mitigation.  Id., 503 U.S. at 167-68.  The

27   Dawson Court held that constitutional guarantees prevented a state "from employing evidence of a

28   defendant's abstract beliefs at a sentencing hearing when those beliefs have no bearing on the issue

1   being tried." Id. at 168.

2       Petitioner's case is distinguishable from Dawson.  First, the tackle box notes were reasonably

3   found to be relevant to Petitioner's state of mind in committing the crime, and were not simply negative

4   character evidence with no bearing on the issues at hand.  Meanwhile, the prosecutor only specifically

5   mentioned the tackle box notes in his closing argument to contrast it with defense evidence of

6   Petitioner's religiosity, as Petitioner's Texas pastor testified about his church membership and baptism.

7   Thus, it is evident from the record that the prosecutor's argument was not akin to Dawson, where the

8   objected-to evidence was "employed simply because the jury would find these beliefs morally

9   reprehensible." Id. at 167.  Instead, the prosecutor's argument was specifically designed to rebut the

10  defense's mitigation evidence.  As the Dawson Court recognized, "just as the defendant has the right

11  to introduce any sort of relevant mitigating evidence, the State is entitled to rebut that evidence with

12  proof of its own." Id., 503 U.S. 159, 167 (1992), citing Payne v. Tennessee, 501 U.S. 808, 825 (1991).

13  In this case, because the defense presented evidence of Petitioner's religious beliefs, the Court finds no

14  error in the prosecutor's attempt to neutralize that evidence by noting for the jury the existence of

15  contrasting evidence in the record.

16              **2.      Name Calling and Emotional Appeals**

17      During the same portion of the argument containing the reference to devil worship, the

18  prosecutor referred to Petitioner as a "beast," and later called him "evil," a "psychopath" and a

19  "monster." (Pet. Brief at 34-35, citing RT 5857-59, 5863, 5880-81, 5883.)  Petitioner argues that these

20  references were improper and, in combination with emotional appeals invoking the victim's point of

21  view and urging vengeance, was prejudicial.  (Pet. Brief at 35-37.)  As Supreme Court authority

22  supports Petitioner's contention that the name calling and emotional appeals may constitute improper

23  argument that could result in prejudice, the Court will consider the impact of those comments in light

24  of trial as a whole.  See Darden, 477 U.S. at 180-81.

25              **3.      Argument that Paulk was a "victim" of Petitioner's**

26      Petitioner argues that the prosecutor committed misconduct in arguing that co-defendant Joseph

27  Paulk was a victim of Petitioner's and falsely claiming that Paulk would be serving a life sentence, when

28  Paulk actually reached a plea agreement resulting in a 16 year sentence.  (FAP at 141.)  As the Court

previously concluded in the adjudication of Claim 43, the record reflects that the prosecutor made the argument about Paulk's sentence on June 18, 1990, nearly six weeks prior to the trial court's statement that Paulk had pled to offenses leading to a 16 year sentence.  (Doc. No. 135 at 142, citing RT  5882, 5976.)  Moreover, Paulk submitted a declaration in which he states: "After Michaels' trial, I pleaded guilty to second-degree murder."  (Lodgment No. 11c, App. 39 at ¶ 1.)  Petitioner fails to demonstrate that the argument was untrue at the time it was made.  Moreover, the Court previously concluded the remarks, "while forceful, were not improper."  (Doc. No. 135 at 142.)  The Court remains unpersuaded that these comments constituted misconduct.

### 4.     Popik Note and Future Dangerousness

Petitioner asserts that the prosecutor engaged in "constitutional misconduct" in using the Popik note at the penalty phase.  (Pet. Brief at 39.)  However, as reflected in the record and discussed with respect to Claims 2 and 51, it was the actions of trial counsel that revealed the contents of the note and it was the decision of the trial court to allow the note into evidence.  Once the note was admitted into evidence, the prosecution was entitled to present evidence relating to the note and rely upon it in arguments to the jury.

Petitioner argues that the prosecution's use of the note, which was protected by attorney-client privilege, constituted misconduct.  (Pet. Brief at 39, citing Cluchette v. Rushen, 770 F.2d 1469, 1471 (9th Cir. 1985).)  However, in Cluchette, the Ninth Circuit rejected a claim that the government violated an attorney-client relationship where a third party turned over evidence against a defendant, reasoning that "[t]he state did not deliberately intrude into [Petitioner's] privileged relationship with his attorney." Id. at 1472.  Like in Cluchette, it was the actions of others, in this case, Petitioner's trial counsel in turning over the Popik note and the trial court's ruling that the note was not privileged, rather than any actions by the prosecution, that caused the asserted breach in the attorney-client relationship.  See id. at 1471-72.  Moreover, Cluchette is further distinguishable as it involved a claim asserting a Sixth Amendment violation of the right to counsel, not a claim of prosecutorial misconduct.

Relatedly, Petitioner asserts that the prosecutor committed misconduct "by making an argument based on future dangerousness in the absence of any evidence," relying in part on the Popik note.  (FAP at 141.)  The Supreme Court has repeatedly held that a jury may consider the future dangerousness of

a defendant in making the penalty phase decision.  See Simmons v. South Carolina, 512 U.S. 154, 162 (1994) ("This Court has approved the jury's consideration of future dangerousness during the penalty phase of a capital trial, recognizing that a defendant's future dangerousness bears on all sentencing determinations made in our capital system."), citing Jurek v. Texas, 428 U.S. 262, 275 (1976) and California v. Ramos, 463 U.S. 992, 1003 n. 17 (1983); see also Campbell v. Kincheloe, 829 F.2d 1453, 1457-58 (9th Cir. 1987) ("The Supreme Court has consistently held that the future dangerousness of a defendant is a proper consideration for the jury in a capital sentencing proceeding.")

There was substantial aggravating evidence at the penalty phase to support the prosecutor's argument about Petitioner's violent nature apart from the Popik note, including prior violent criminal acts such as the Fuller robberies, multiple instances of illegal weapon possession, and Petitioner's own statements about the crime, in addition to the brutal and violent nature of the murder and related crimes against JoAnn Clemons.  The prosecutor preceded the contested comments with a lengthy and detailed recounting of Petitioner's history of violence (see RT 5869-81), thus properly focusing the jury's consideration on Petitioner's individual character and record.  See Ramos, 463 U.S. at 1005-06 (approving instruction which allowed jury to consider defendant's future dangerousness, noting that jury's decision remained properly focused on the defendant's individual character and record).  As the prosecutor's argument was supported by the evidence and was a proper factor for the jury's consideration, it did not constitute misconduct.

### 5.    Petitioner's Views on Death Penalty, 13th Juror Comment

Next, Petitioner contends that the prosecutor committed misconduct in making comments about Petitioner's belief in the death penalty, asserts that the comments constituted misconduct because "the argument was not true and was based on no evidence," and alleges that arguments based on personal opinions about the crime or penalty are improper and inadmissible at the penalty phase.  (Pet. Brief at 37-38.)

Respondent argues that the Court already considered and rejected this contention in the adjudication of Claim 32.  (Resp. Brief at 38.)  In Claim 32, which alleged guilt phase error, the Court first reasoned that because this evidence was not argued until the penalty phase proceedings, the prosecutor's comments could not have impacted the guilt phase proceedings.  (See Doc. No. 135 at 88.)

1   The Court also concluded that the prosecutor's comments, aside from advisory counsel's lack of

2   objection, and even if considered improper, did not appear to constitute prejudicial misconduct at the

3   penalty phase in light of the evidence introduced in aggravation.  (Id. at 89-90.)  However, the Court

4   did not specifically decide whether the comments were improper, and will engage in that analysis now.

5          Petitioner's friend Michael Brohammer testified at the penalty phase that in high school, he and

6   Petitioner had conversations about how they were both in favor of the death penalty, stating that "if

7   somebody commits a heinous crime, that if they deserve it, and if that is what is found to be the

8   punishment, then there should be no problem with it."  (RT 5295.)  The prosecutor then argued in

9   closing that: "I like to think of Mr. Michaels as the 13th juror in this case because if Mr. Michaels were

10  voting on this case, he would vote for the death penalty; there is no doubt about it.  He believes in the

11  death penalty."  (RT 5880.)

12         Petitioner asserts that this testimony and argument was improper because "*opinions* about the

13  crime, the defendant, and the appropriate sentence violates the Eighth Amendment."  (Pet. Brief at 38,

14  quoting Payne, 501 U.S. at 830 n.2 (emphasis in brief).)  In Payne, however, the Supreme Court

15  specifically stated that its decision was specifically limited to overruling in part the prior holdings in

16  Booth v. Maryland, 482 U.S. 496 (1987) and South Carolina v. Gathers, 490 U.S. 805 (1989), regarding

17  a per se bar to the admission of victim impact statements and argument to the jury about those

18  statements, but leaving in place the Booth Court's holding "that the admission of a victim's family

19  members' characterizations and opinions about the crime, the defendant, and the appropriate sentence

20  violates the Eighth Amendment."  Payne, 501 U.S. at 826-27, 830 n.2.  Meanwhile, Petitioner appears

21  to contend that Payne and Booth support a ban on *all* opinions about the crime and appropriate

22  punishment, not just those of the victim's family.  The Court is not persuaded that clearly established

23  law supports his position.

24         A review of the record shows that the prosecutor's argument was based on the evidence

25  presented at trial, that Petitioner was in favor of the death penalty in appropriate cases, such as for

26  "heinous" crimes.  As stated before, "[c]ounsel are given latitude in the presentation of their closing

27  arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented

28  and all reasonable inferences therefrom."  Ceja, 97 F.3d at 1253-54; see also Menendez, 422 F.3d at

1037.  While this argument was forceful, it appears to be based on rational inferences given the evidence introduced at trial.  Petitioner's claim of misconduct is without merit.

### 6.  Comments on Poverty and Rape, Questions to Witnesses

In the Petition, but not expanded upon in the Group Three briefing, Petitioner also asserted that the prosecutor made improper comments about Petitioner's poverty, commented that Petitioner wanted to rape the victim, and asked improper questions of witnesses.

With respect to Petitioner's contention that the prosecutor made improper comments concerning Petitioner's poverty, the Ninth Circuit has noted that "evidence of poverty is not admissible to show motive, because it is of slight probative value and would be unfairly prejudicial to poor people charged with crimes."  United States v. Mitchell, 172 F.3d 1104, 1108 (9th Cir. 1999).  However, reviewing courts have not categorically excluded evidence of a defendant's financial motive, as "those courts admitting evidence of financial motive have been confronted with more than the mere fact that the defendant is poor."  United States v. Jackson, 882 F.2d 1444, 1449 (9th Cir. 1989).

A review of Petitioner's case demonstrates that the evidence supporting Petitioner's motive consisted of far more than his financial situation.  While the prosecutor presented evidence that Petitioner had a meager bank balance and had welfare documents in his possession (see RT 3876, 3927, 4951), as well as the testimony of his roommate Velinda Davis that Petitioner was unemployed and received food from the government (see RT 3927), the prosecutor also presented evidence of a specific financial motive aside from poverty- that Petitioner sought benefits from the victim's life insurance policy, of which the victim's daughter/Petitioner's girlfriend Christina was the beneficiary.  (RT 4220-23.)  Additionally, the prosecution presented evidence, including Petitioner's own statement to the police, indicating that Christina wanted to attend a mechanic's school, needed $9,000 to do so, and Petitioner admitted that the insurance proceeds were a secondary benefit of the murder.  (RT 4372-76.)  As the prosecution presented much "more than the mere fact that the defendant is poor," the Court is unpersuaded that the prosecutor's argument about Petitioner's poverty constituted misconduct, or that the state court erred in rejecting this contention.  Jackson, 882 F.2d at 1449.

Next, Petitioner asserts that the prosecutor improperly attempted to introduce evidence that Petitioner wanted to rape the victim.  (FAP at 142, citing RT 3975.)  However, a review of the trial

record shows that this citation was to a question posed to witness Velinda Davis, in which the prosecutor asked Davis if she was aware that Petitioner and Popik had discussed raping the victim, to which a defense objection was overruled, and Davis replied no.  (RT 3975.)   The trial court immediately instructed the jurors as follows: "Again I instruct you that questions are not evidence.  So be aware when the witness says no to something, that just erases the question too; such as that last question about whether there was a discussion about rape, that is gone because the answer is no and then the question has nothing to stand on." (RT 3975-76.)  Moreover, Petitioner's own statement to police indicated that he had "joked about" raping the victim in front of Christina and Popik and that he had "considered having Mexicans do the job and having her raped." (CT 2355-56.)  As this police statement was also introduced into evidence at trial and the contested question appears based on that statement, Petitioner fails to demonstrate how the prosecutor's questions to Davis were improper or constituted misconduct.

Petitioner also generally asserts that the prosecutor posed improper questions of witnesses and attempted to convey his own personal opinions despite being admonished by the trial court, offering numerous citations to the record without specific argument.  (FAP at 142.)  A review of the cited pages shows that advisory counsel objected to numerous questions posed by the prosecutor, resulting in several sustained objections due to relevance or argumentative questions, as well as several overruled objections.  After one such sustained objection, the trial court directed the jurors to strike the questions and reminded them that questions were not evidence.  (RT 5696.)  Despite the lack of specific argument as to how these questions constituted misconduct, the Court will err on the side of caution and evaluate the potential prejudice from these instances in light of the trial as a whole.

### 7.    Allegedly Improper Actions and Comments about Counsel

Finally, Petitioner asserts that the prosecutor committed misconduct in failing to serve the defense with a witness list, verbally attacking advisory counsel Chambers in front of the jury, and advocating against the removal of counsel Grossberg and pushing Petitioner's case to trial.

First, Petitioner contends that the prosecutor failed to provide the defense with a witness list. (FAP at 142, citing RT 3997.)  A review of the record reflects that the prosecutor stated that he provided discovery to the defense, along with contact information for prospective witnesses upon request, but objected to providing a complete list with contact information that would be viewable to Petitioner as

well as the defense. (RT 3997-99.)  In light of Petitioner's self-representation, the trial court reviewed the issue and Petitioner and the prosecution stipulated that the witnesses' contact information would remain with advisory counsel and the defense investigator absent "specific authorization from the Court." (RT 3999-4002.)  The Court finds no misconduct in this action.

Petitioner also asserts that the prosecutor "improperly attacked Chambers before the jury, commenting that he was knowingly attempting to introduce inadmissible evidence." (FAP at 142, citing RT 4287-88.)  A review of the record shows that the prosecutor objected to a defense question and added "Your Honor, could we have a side bar? Mr. Chambers knows that this is not relevant." (RT 4287.)  The trial court admonished the prosecutor, stating that it was "an unfair tact" to state what advisory counsel knows or does not know. (Id.)  At the side bar, the trial court sustained the prosecutor's objection, finding the defense's intended line of questioning to be not relevant and not probative. (RT 4289.)  To the extent the prosecutor's question was improper and could be construed as misconduct, the Court will consider it in the prejudice section below.

Petitioner also argues that prosecutor repeatedly commented that Petitioner was trying to manipulate the system, advocated against removing Grossberg, and improperly pushed the case to trial, stating that: "Rather than fulfilling his role to see that justice was done, the prosecutor improperly attempted to secure a death penalty conviction by ensuring that Mr. Michaels could not present an adequate defense." (FAP at 142.)  The Court finds no support in the record for this contention.  A review of the record shows that the prosecutor's actions in these instances, opposing the removal of competent counsel and opposing an additional continuance, were not improper.  Moreover, in the Group One Order, the Court previously rejected Petitioner's claim of error based on the trial court's refusal to remove Grossberg as counsel, and in the Group Three Order, the Court rejected Petitioner's claim of error stemming from the trial court's denying the defense's motion for an additional continuance.  The Court remains unpersuaded that the prosecutor's actions in this regard were improper, or that they constituted misconduct.

### 8.  **Prejudice**

Again, the Court will consider the potential impact of the prosecution's name calling, emotional appeals, allegedly improper questions, and comments about counsel, on the fairness of Petitioner's

penalty phase proceedings.  See Smith, 455 U.S. at 219 ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."), citing Brady, 373 U.S. 83 (1963).  In this case, in light of the strength of the prosecution's case, the trial court's repeated instructions to the jurors that the questions and arguments of counsel were not evidence, and the fact that most of the instances and events alleged in this claim did not actually constitute misconduct, the Court is not persuaded that the contested questions and comments violated Petitioner's right to a fair trial.  See Darden, 477 U.S. at 181-82 (listing factors to consider in evaluating prejudice).

The prosecution's penalty phase case was strong.  The burglary, robbery and brutal murder of the victim, in addition to the four special circumstances, was compelling evidence in aggravation.  The evidence showed that Petitioner planned the crime and recruited assistance with promises of money and proceeds from the robbery, as well as from the victim's insurance policy.  Petitioner admitted to police, and boasted to acquaintances, that he was the one who cut the victim's throat.  The prosecution also introduced evidence of multiple instances of uncharged criminal activity, including multiple robberies against victim Chad Fuller, numerous instances of concealed or otherwise illegal weapon possession, assaults against his girlfriend in Texas, and burglarizing his neighbor's home, during which Petitioner took his neighbor's firearms and car.[18]

Meanwhile, the prosecutor's closing argument comments invoking the victim's point of view

---

[18] As he previously contended with respect to the Group Two claims, Petitioner asserts that the jury's lengthy deliberations, three days, demonstrate that the case was close.  (Pet. Brief at 41.)  Yet, as noted in the Group Two Order, the cases Petitioner cites in support of this contention remain distinguishable from Petitioner's situation.  (See Doc. No. 135 at 161-63.)  In a supplemental memorandum filed on August 29, 2014, Petitioner contends that the Ninth Circuit's recent decision in Wharton v. Chappell, ___F.3d ___, 2014 WL 4211102 (9th Cir. Aug. 27, 2014), similarly supports his prejudice argument.  (See Doc. No. 147.)  However, the Court previously rejected this argument in the Group Two Order, as follows:

> While Petitioner's jury deliberated over the course of several days before rendering the death penalty decision, they had heard guilt and penalty phase evidence over the course of twelve court days, all of which could be considered in their penalty phase deliberations. Here, it appears that instead of merely demonstrating that the case was close, the length of time the jury spent deliberating also showed their diligence and thoughtfulness in considering and weighing the evidence in aggravation and mitigation.

(Doc. No. 135 at 162.)  Moreover, in Wharton, the record reflects the jurors actually experienced significant difficulty in reaching a verdict, as evidenced by their deliberations and numerous notes to the trial judge expressing as much.  See Wharton, 2014 WL 4211102, *21.  Accordingly, the Court remains unpersuaded that Wharton supports Petitioner's assertion of prejudice.

were supported by both physical and testimonial evidence, demonstrating that she was attacked and murdered in her bedroom, after the killers had waited for her to go to sleep.  See Fields v. Woodford, 309 F.3d 1095, 1109 (9th Cir. 2002) (rejecting claim of misconduct where prosecutor's closing argument asked jurors to imagine themselves as the victim, in light of fact that contested comments were supported by the evidence presented at trial and jury was instructed that arguments of counsel were not evidence.)

The record also reflects that the trial court took curative action at several points during the penalty phase proceedings, reminding the jury that questions, or the arguments of counsel, did not constitute evidence.  (See e.g. RT 5849 - "[B]e advised, as I indicated before, that the statements made in argument are not evidence.  They allow each side to focus in on factors and evidence that they wish you to consider, but it is not evidence.  Regardless of who makes the arguments to you, arguments are not evidence."); (RT 5928 - "Statements made by the attorneys are not evidence.")  The trial court promptly handled objections, sustaining one question *sua sponte*, and, as noted above, issuing curative instructions reminding the jurors that questions were not evidence.  (See RT 3975-76.)  Reviewing courts have repeatedly rejected claims of misconduct arising from a prosecutor making derogatory references to a criminal defendant or other improper comments and arguments where the case against the defendant was strong and the jury was clearly instructed that the statements of counsel were not evidence.  See Darden, 477 U.S. at 181-83; see also Comer v. Schriro, 480 F.3d 960, 988-89 (9th Cir. 2007) (holding that prosecutor's remarks referring to the defendant as a "monster" and "filth" and calling him a "reincarnation of the devil" did not constitute a due process violation, reasoning in part that jurors were instructed that arguments of counsel were not evidence and that the case against the defendant was strong), citing Furman v. Wood, 190 F.3d 1002, 1006 (9th Cir. 1999) and Hall v. Whitley, 935 F.2d 164, 165-66 (9th Cir. 1991).

Petitioner disputes the Court's prior conclusion that the trial court's curative instruction mitigated any potential prejudice arising from the prosecutor's comments, in the context of the Group Two Claims.  (Reply at 10-11, citing Doc. No. 135 at 140-44; see also Pet. Brief at 39-40.)  Petitioner argues that Ninth Circuit precedent "holds that such generalized instructions are not sufficient to offset closing argument misconduct."  (Reply at 11, citing United States v. Sanchez, 659 F.3d 1252, 1257-58

1   (9th Cir. 2011; <u>United States v. Weatherspoon</u>, 410 F.3d 1142, 1151 (9th Cir. 2005); <u>United States v.</u>

2   <u>Kerr</u>, 981 F.2d 1050, 1054 (9th Cir. 1992).)  However, the cases cited by Petitioner each involve direct

3   review of a federal conviction, while this Court must review Petitioner's conviction under the "highly

4   deferential" AEDPA standard.  <u>See</u> <u>Sanchez</u>, 659 F.3d at 1259 n. 1.  As the standard of review differs

5   considerably, the cases are not analogous.  In a supplemental memorandum, Petitioner argues that the

6   Ninth Circuit's recent decision in <u>Deck</u> also supports his claim, as the <u>Deck</u> Court affirmed that

7   "improper prosecutorial statements cannot be neutralized by instructions that do not in any way address

8   'the specific statements of the prosecutor.'" <u>Id.</u>, at *10, quoting <u>Weatherspoon</u>, 410 F.3d at 1151.  Yet,

9   in <u>Deck</u>, the claim of error centered on a prosecutor's misstatements of law that the trial court failed to

10  address in instructions to the jury.  <u>Deck</u>, 2014 WL 4800349, at * 9-11.  Meanwhile, Petitioner's case

11  did not involve any such misstatements, but instead concerned allegedly improper comments about

12  Petitioner and questions to witnesses. In any event, the Court remains unpersuaded that the alleged error

13  at issue here had a "substantial and injurious effect or influence in determining the jury's verdict."

14  <u>Brecht</u>, 507 U.S. at 637.

15        In light of the deference required to the state court's conclusion, the strength of the prosecution's

16  case, the lack of evidence that the prosecutor manipulated or misstated the law or the evidence, and the

17  curative instructions issued by the trial court, the Court is unable to conclude that the state supreme

18  court's rejection of this claim was either contrary to, or an unreasonable application of, clearly

19  established federal law.  Accordingly, habeas relief is not warranted on Claim 30.

20        **3.      <u>Claim 51 - Trial Court Erred in the Admission of Evidence of Petitioner's Prior</u>**

21              **<u>Conduct</u>**

22        Petitioner asserts that the trial court wrongly admitted evidence of his past misconduct, including

23  "evidence of uncharged weapons violations in Texas, uncharged weapons violations in California,

24  possession of an alleged 'hit list,' a note written by petitioner asking to be moved to avoid doing harm

25  to co-defendant Darren Popik, a pending armed robbery charge, and other uncharged and

26  unsubstantiated crimes as discussed by Michaels in his two and one-half hour interrogation."  (FAP at

27  226.)

28  ///

a.      **State Court Decision**

The California Supreme Court considered and rejected this claim on appeal in a detailed opinion, reasoning as follows:

1. *Evidence of defendant's claim to be a contract killer*

Most of defendant's taped confession was admitted at the guilt phase, but the court excluded that portion in which defendant claimed that he was a contract killer and had committed 10 to 15 contract killings. The prosecution asked to play the entire recording at the penalty trial. Over defense objection, the judge granted this request.

Before the tape was played to the jury, the judge gave a limiting instruction: Defendant's statements as to possible other homicides were being "offered on the issue of his mental state and motive on the nature and circumstances of the present offense, and not for the truth of whether there were other homicides." The jury was not to consider such evidence "for any purpose except the limited purpose for which it is admitted."

The prosecutor did not argue that defendant had committed other homicides. Instead, he argued that the confession showed one of defendant's motives in killing JoAnn was to enhance his reputation as a ruthless and dangerous person: "[Defendant] needs to have it on the streets that he was a killer. And that's one of the reasons why he cut JoAnn Clemons's throat. So he could feel good about himself, so he could scare people.... So [defendant] sat on a lady's chest and cut her throat so he could pump up his reputation."

Defendant contends that this court's decision in *People v. Phillips* (1985) 41 Cal.3d 29 [222 Cal.Rptr. 127, 711 P.2d 423], compels the conclusion that defendant's statements about his commission of contract killings were not admissible. In *Phillips*, the prosecution presented evidence of four instances in which Phillips had discussed committing other crimes. The evidence was offered under factor (b) of section 190.3, which permits the penalty jury to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." We examined the evidence of each of the four incidents and concluded that one showed solicitation of murder in violation of section 653f. (*Phillips*, at pp. 75-77.) The evidence of the other three instances, however, failed to show the commission of a crime. (*Id.* at pp. 73-75.) They were therefore inadmissible under factor (b), and the trial court's error in admitting that evidence, in connection with other errors, led to a reversal of the penalty judgment in *Phillips*.

We agree with the Attorney General that *Phillips* is distinguishable. The evidence there was offered as proof of a criminal act involving force or violence under factor (b) of section 190.3, without any limiting instruction. The prosecution had argued that Phillips was planning or at least proposing to commit the murders he discussed, and that the evidence showed Phillips's casual attitude toward killing and his readiness to commit murder. (*People v. Phillips*, *supra*, 41 Cal.3d at p. 83.) The evidence in the case before us was offered under section 190.3, factor (a), as part of the circumstances of the charged murder, not under factor (b). The trial court here told the jury it could not consider defendant's confession as proof that he had committed other homicides. The prosecution did not claim defendant had committed any contract killings or planned to do so. The evidence was admitted solely to show defendant's attitude and motive in connection with the charged murder and, so limited, was properly admitted.

Defendant also objects to the admission of a paper that said "hit list," followed by a list of names, that he was carrying when he was arrested. Murder victim JoAnn Clemons's

name was not on the list.

Possession of the list was not a crime, and there was no evidence defendant actually intended to kill anyone on the list, so it was not admissible under section 190.3, factor (b). The trial court, however, admitted the list under section 190.3, factor (a) as an "overall background piece of information," which would help the jury evaluate the nature and circumstances of the murder.

The prosecution does not claim defendant had the list when he killed JoAnn Clemons. Its theory is that the list, like defendant's confession to being a professional hit man and enforcer, shows defendant's motive to establish a reputation as a contract killer. It was admissible for that purpose.

Defendant argues, however, that both the list and the statement in his confession that he was a contract killer should have been excluded as more prejudicial than probative under Evidence Code section 352, which authorizes a trial court in its discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  In reply, the Attorney General argues that section 352 is inapplicable to penalty phase evidence offered under Penal Code section 190.3, factor (a). In *People v. Box* (2000) 23 Cal.4th 1153 [99 Cal.Rptr.2d 69, 5 P.3d 130], however, we concluded that the trial court retains a limited discretion to exclude unduly inflammatory evidence. "[T]he trial court," we said, "lacks discretion to exclude all factor (a) evidence on the ground that it is inflammatory or lacking in probative value." (*Id.* at pp. 1200-1201.) It retains, however, "its traditional discretion to exclude 'particular items of evidence' by which the prosecution seeks to demonstrate either the circumstances of the crime (factor (a)), or violent criminal activity (factor (b)), in a 'manner' that is misleading, cumulative, or unduly inflammatory." (*Id.* at p. 1201.)

The trial court here did not abuse its discretion in admitting the challenged evidence. The prejudicial effect of the evidence was that it might lead the jury to believe that defendant had committed other murders or planned to do so. But in view of the prosecutor's avoidance of any such claim, the absence of any evidence to support it, and the trial court's limiting instruction, it is far more likely that the jurors would recognize the defendant's actions as mere braggadocio. Thus the trial court could reasonably conclude that, as long as it gave limiting instructions, the probative value of the evidence at issue would outweigh its prejudicial effect.

### 2. *Evidence of defendant's possession of weapons*

Factor (b) of section 190.3 permits the introduction of evidence of "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." The prosecution presented evidence that on November 27, 1987, defendant was arrested in Texas for possession of a double-edged dagger with a seven-inch blade and a butcher knife with an eight-inch blade, both of which were illegal under Texas law. On January 23, 1988, he was arrested in California for illegal possession of knives. Finally on August 31, 1988, the day after defendant's robbery of Fuller at Camp Pendleton, defendant was found in a parking lot with a concealed handgun in the glove box. None of these events involved the actual or attempted use of force, or an express threat to use force. The issue here is whether the evidence is admissible as proof of an implied threat.

In a series of cases beginning with *People v. Harris* (1981) 28 Cal.3d 935, 962-963 [171 Cal.Rptr. 679, 623 P.2d 240], and continuing through *People v. Ramirez* (1990) 50 Cal.3d 1158, 1186 [270 Cal.Rptr. 286, 791 P.2d 965], *People v. Tuilaepa* (1992) 4

Cal.4th 569, 589 [15 Cal.Rptr.2d 382, 842 P.2d 1142], and *People v. Williams* (1997) 16 Cal.4th 153, 238 [66 Cal.Rptr.2d 123, 940 P.2d 710], we have held that the possession of a weapon in a custodial setting-where possession of any weapon is illegal-"involve[s] an implied threat of violence even when there is no evidence defendant used or displayed it in a provocative or threatening manner." (*People v. Tuilaepa*, *supra*, 4 Cal.4th at p. 589; *People v. Jackson* (1996) 13 Cal.4th 1164, 1260 [56 Cal.Rptr.2d 49, 920 P.2d 1254] (conc. opn. of Baxter, J.).)

Three cases discuss implied threats under section 190.3, factor (b) in a noncustodial setting. In *People v. Belmontes* (1988) 45 Cal.3d 744 [248 Cal.Rptr. 126, 755 P.2d 310], the prosecution presented evidence that the defendant had slapped his side indicating that "he had a handgun in his waistband, while stating that he had 'all the protection he needed.'" (*Id.* at p. 809.) We held that it was error to admit this evidence: "Although such [conduct] is arguably an 'express or implied threat to use force or violence' (§ 190.3), it was not directed at a particular victim or victims, and did not amount to criminal conduct in violation of a penal statute." (*Ibid.*) Defendant here relies on *Belmontes* to support his contention that the challenged evidence was improperly admitted, but *Belmontes* turned on the fact that the conduct there was not criminal. By contrast, here in each instance defendant's possession was illegal. His possession of knives in Texas was illegal, both because the blades exceeded five inches and because the dagger was double-edged. His possession of knives and a firearm in California were concealed, making the possession illegal under California law. (§ 12020, subd. (a).)

Two other cases have found an implied threat in a noncustodial context. In *People v. Clair* (1992) 2 Cal.4th 629, 676 [7 Cal.Rptr.2d 564, 828 P.2d 705], the defendant carried a knife while committing a burglary, but did not use it. The court held that his action was "an implied threat to use the knife against anyone who might interfere." (*Id.* at p. 677.) In *People v. Garceau* (1993) 6 Cal.4th 140 [24 Cal.Rptr.2d 664, 862 P.2d 664], a search of the residence of the defendant, an ex-felon, turned up a machine gun, a silencer, and concealable handguns. The defendant's possession of these firearms was illegal. We held that the evidence was properly admitted. (*Id.* at pp. 203-204.)

Defendant's possession similarly shows an implied intention to put the weapons to unlawful use. On two occasions the weapons defendant possessed were knives with seven to eight inch blades; in *People v. Ramirez*, *supra*, 50 Cal.3d at pages 1186-1187, we said that "such an implement is a 'classic instrument[] of violence' [citation] that is 'normally used only for criminal purposes.'" Indeed JoAnn Clemons was killed with a similar knife. The concealed firearm found on defendant was the same gun he had used to rob Chad Fuller the previous day.

We conclude that the criminal character of defendant's possession of knives and firearms, and the evidence of defendant's use of those or similar weapons to commit crimes, are sufficient to permit a jury to view his possession as an implied threat of violence. Defendant, of course, was free to and did present evidence to the jury to show that his possession was for the purpose of self-protection, or the protection of someone else, not for criminal violence. (*People v. Ramirez*, *supra*, 50 Cal.3d at p. 1187.)

### 3. *Defendant's pending armed robbery charge*

Defendant argues that the armed robbery charge pending against him at the time of the murder trial, stemming from the August 30, 1988, robbery of Chad Fuller could not be admitted under factor (c) of section 190.3, because that factor is limited to convictions entered before the date of the murder. Defendant is correct as to factor (c). (*People v. Balderas* (1985) 41 Cal.3d 144, 203 [222 Cal.Rptr. 184, 711 P.2d 480].) The evidence was admissible, however, under factor (b) of section 190.3 as proof of a criminal act involving force or violence. (See *People v. Caro* (1988) 46 Cal.3d 1035, 1055-1057 [251

Cal.Rptr. 757, 761 P.2d 680].)

### 4. *The Popik note*

At the penalty phase the prosecution offered as rebuttal evidence a note defendant had given to his attorney during the preliminary hearing. (At the time of the preliminary hearing the case against defendant had not been severed from that against Popik and Paulk.) The note read in part: "Neither of [Popik's] co-defendants are willing to restrain themselves from doing Popik bodily harm if forced to be locked up to him or sit next to him. Popik will be hurt if something can't be worked out."

When the prosecutor initially offered the note, the trial court ruled that it was not admissible under section 190.3, factor (a) or (b). After defendant had presented evidence from his minister, his stepfather, and a psychiatrist that he was not a violent person, the prosecutor again offered the evidence as rebuttal. The trial court admitted it because rebuttal evidence does not have to pertain to a specific aggravating factor. (*In re Ross* (1995) 10 Cal.4th 184, 206-207 [40 Cal.Rptr.2d 544, 892 P.2d 1287].)

Defendant argues that introduction of the note violated the attorney-client privilege. The note was unquestionably a communication from the client to the attorney, and thus falls within the broad privilege established by Evidence Code section 954. The Attorney General relies on the exception to that privilege "if the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit a crime or a fraud." (Evid. Code, § 956.) This exception is inapplicable here. Defendant did not seek advisory counsel's services to commit a crime; he was asking counsel's help to avoid the commission of a crime.

We discussed the application of the attorney-client privilege to threats of future criminal conduct in *People v. Clark* (1990) 50 Cal.3d 583 [268 Cal.Rptr. 399, 789 P.2d 127]. There, the trial court admitted evidence that defendant, when examined by a defense psychiatrist, threatened to kill the victim's brother. (Although the statement was made to a psychiatrist, the attorney-client privilege applied because the psychiatrist had been appointed to assist defense counsel.) (*Id.* at pp. 618-619, fn. 28.) We held that the admission of this evidence violated the attorney-client privilege, although it was not prejudicial. (*Id.* at p. 623.) Clark observed that "[n]o express exception to the attorney-client privilege exists for threats of future criminal conduct" (*id.* at p. 621), and that "[t]he comments of the California Law Revision Commission accompanying these sections suggest that no exception was intended to apply to a statement of intent to commit a crime alone." (*Ibid.*)

Recognizing that existing law might require an attorney to conceal knowledge that the attorney's client was planning to commit a serious crime, the 1993 Legislature enacted section Evidence Code 956.5, which provides that there is no attorney-client privilege "if the lawyer reasonably believes that disclosure of any confidential communication ... is necessary to prevent the client from committing a criminal act that the lawyer believes is likely to result in death or substantial bodily harm." If this statute had been in effect at the time of defendant's trial, the Popik note would have been admissible. Defendant, however, was tried in 1990, three years before Evidence Code section 956.5 took effect. Thus, the trial court erred in ruling that the attorney-client privilege did not protect defendant from the introduction of the Popik note.

The trial court's error was harmless. Although the Popik note shows that defendant was aware of his own violent impulses, it was in fact a successful appeal to defendant's attorney to take action to avert the violence. The jury might even have viewed it as favorable to defendant. It is not reasonably possible that its admission made the

1    difference between a verdict of death and one of life imprisonment without possibility
     of parole. (See *People v. Jackson*, *supra*, 13 Cal.4th at p. 1232; *People v. Brown* (1988)
2    46 Cal.3d 432, 446-449 [250 Cal.Rptr. 604, 758 P.2d 1135].)

3    Michaels, 28 Cal. 4th at 533-38.

4

5         California law provides for the introduction of evidence at the penalty phase, stating in relevant

6    part:

7              In the proceedings on the question of penalty, evidence may be presented by both
          the people and the defendant as to any matter relevant to aggravation, mitigation, and
8         sentence including, but not limited to, the nature and circumstances of the present
          offense, any prior felony conviction or convictions whether or not such conviction or
9         convictions involved a crime of violence, the presence or absence of other criminal
          activity by the defendant which involved the use or attempted use of force or violence
10        or which involved the express or implied threat to use force or violence, and the
          defendant's character, background, history, mental condition and physical condition.
11
              However, no evidence shall be admitted regarding other criminal activity by the
12        defendant which did not involve the use or attempted use of force or violence or which
          did not involve the express or implied threat to use force or violence. As used in this
13        section, criminal activity does not require a conviction.

14        ...

15        In determining the penalty, the trier of fact shall take into account any of the following
          factors if relevant:
16        (a) The circumstances of the crime of which the defendant was convicted in the present
          proceeding and the existence of any special circumstances found to be true pursuant to
17        Section 190.1.

18        (b) The presence or absence of criminal activity by the defendant which involved the use
          or attempted use of force or violence or the express or implied threat to use force or
19        violence.

20        (c) The presence or absence of any prior felony conviction.

21   Cal Penal Code § 190.3.

22        Petitioner asserts that evidence relating to his claims of being a contract killer, reference to the

23   "hit list" found in his possession, prior incidents of weapon possession, the pending charges regarding

24   the robbery of Chad Fuller, and the Popik note were each introduced into evidence at the penalty phase

25   in violation of section 190.3.  As discussed previously, a claim of state law error may warrant habeas

26   relief if "the state court's admission of this evidence violated the petitioner's due process right to a fair

27   trial under the Constitution."  Gordon, 895 F.2d at 613; see also Estelle, 502 U.S. at 70.  A habeas court

28   must determine "whether the admission of the evidence so fatally infected the proceedings as to render

1    them fundamentally unfair." <u>Jammal</u>, 926 F.2d at 919; <u>see also</u> <u>Ortiz-Sandoval</u>, 81 F.3d at 897.  The

2    Court will address Petitioner's contentions in the order they were addressed by the state supreme court.

3    **b.    Petitioner's Claim of Being a Contract Killer and the "Hit List"**

4           In his taped police statement, Petitioner claimed to have been involved in a number of other

5    murders.  The trial judge allowed the recording in evidence at the penalty phase under factor (a), the

6    circumstances of the crime, finding it relevant to Petitioner's mental state and motive with respect to

7    the crimes against the victim, subject to a limiting instruction.  (RT 5063-64.)  The trial court then

8    specifically instructed the jury that the taped statements were only admitted for a limited purpose, as

9    follows:

10           Statements by Mr. Michaels on the tape recording, because you are going to hear the
             tape recording again, as to possible other homicides, is offered on the issue of his mental
11           state and motive on the nature and circumstances of the present offense only, and not for
             the truth of whether there were other homicides.  Do not consider such evidence for any
12           purpose except for the limited purpose for which it is admitted.

13    (RT 5182-83.)  As the state supreme court reasonably concluded, the trial court's ruling was not

14    erroneous.  Petitioner's statements were not introduced as other criminal activity, but were admitted

15    only as to his motive and mental state in committing the crimes against JoAnn Clemons.

16           The California Supreme Court's rejection of Petitioner's claim of error concerning the admission

17    of the "hit list" was similarly reasonable.  Petitioner argues that the list "should have been excluded

18    pursuant to Penal Code § 190.3 (b) for failure to constitute the commission of an actual crime.  In

19    addition, it should also have been excluded pursuant to Evidence Code § 352 in light of the clearly

20    inflammatory nature of the testimony."  (FAP at 231.)  Again, as the Court previously discussed in the

21    Group Two Order, and with respect to Claim 27 above, the "hit list" was not admitted into evidence

22    under factor (b), but pursuant to factor (a), as "an overall background piece of information helping the

23    jury evaluate the nature and the circumstances of the crime before them."  (RT 5326.)  Moreover, the

24    list was admitted in light of the prosecutor's stated intention to argue that "this is a perception of Mr.

25    Michaels rather than that he was actually fully engaged in such operations."  (<u>Id.</u>)  As previously

26    discussed, the prosecutor's arguments to the jury conformed to his stated intention and did not argue that

27    Petitioner had actually planned or committed other homicides.  (<u>See</u> <u>e.g.</u> RT 5883.)  The state court's

28    rejection of this claim was reasonable, as Petitioner fails to demonstrate that the admission of this

1    evidence was in error, much less that it amounted to error of constitutional dimension.

2    **c.    Evidence of Weapon Possession**

3    The prosecution also introduced evidence relating to Petitioner's past arrests in California and

4    Texas on charges of weapon possession, and Petitioner asserts that this prior conduct "should have been

5    excluded because they were uncharged crimes, and there was no evidence that he used force or

6    threatened force or violence." (FAP at 230.)  Petitioner asserts that evidence of these acts amounted to

7    inadmissible character evidence and "served only to prey on the emotions of the jury to lead them to

8    mistrust petitioner and to believe that he was the type of person who would be a danger to society if

9    permitted to live." (Id. at 230-31.)

10   California law specifically provides for the introduction of prior uncharged criminal conduct at

11   capital penalty phase proceedings.  See Cal. Penal Code §190.3(b).  The Ninth Circuit has previously

12   approved the admission of unadjudicated criminal activity at penalty phase proceedings.  See McDowell

13   v. Calderon, 107 F.3d 1351, 1366 (9th Cir. 1997), amended 116 F.3d 364 (9th Cir. 1997), vacated in part

14   by 130 F.3d 833, 835 (9th Cir. 1997) (en banc).  Meanwhile, the Supreme Court has recognized that

15   "[s]entencing courts have not only taken into consideration a defendant's prior convictions, but have

16   also considered a defendant's past criminal behavior, even if no conviction resulted from that behavior."

17   United States v. Nichols, 511 U.S. 738, 747 (1994).  In light of authority to the contrary, Petitioner fails

18   to demonstrate the prior arrests for weapon possession were inadmissible simply because they were

19   uncharged crimes.

20   Moreover, a review of the record reflects that the trial judge and the state supreme court both

21   considered whether the crimes were properly admitted under factor (b) as involving force or violence,

22   or the express or implied threat of force or violence.  The trial judge concluded that under the relevant

23   state law, the incidents of weapon possession were not neutral, that is, each involved an implied threat

24   of force or violence.  (See RT 5074-77, 5079-80, 5084.)  Indeed, as the California Supreme Court

25   reasonably noted, each of Petitioner's incidents involved the illegal possession of a weapon, which

26   distinguished them from Belmontes, a case involving the erroneous admission of an incident of weapon

27   possession that did not constitute a crime under state law.  See Michaels, 28 Cal. 4th at 536, citing

28   People v. Belmontes, 45 Cal. 3d 744, 809 (1988), disapproved of on other grounds by People v. Doolin,

1   45 Cal. 4th 390, 421 (2009).  In the June 1987 incident in Texas, Petitioner was found in possession of

2   two knives, a seven-inch double edged dagger concealed in one boot, and an eight-inch butcher knife

3   in the other boot.  (RT 5263-65.)  The testifying officer stated that Petitioner was arrested for unlawfully

4   carrying a weapon, explaining that knives over five inches are illegal in Texas, as are double-edged

5   blades.  (RT 5266-67.)  With respect to the California arrests, the August 1988 incident involved a gun

6   holster concealed on Petitioner's person and Petitioner's loaded gun concealed in a glove box, along

7   with additional ammunition.  (RT 5221-26.)  In January 1988, Petitioner was arrested when an officer

8   found two visible knife sheaths under his clothing, containing two knives each a total twelve inches in

9   length, each with a blade length of seven to eight inches.  (RT 5238-41.)  Petitioner told the officer that

10  he had the weapons because someone was trying to kill him.  (Id.)

11        In light of the record and the relevant case law, the trial judge did not abuse his discretion in

12  allowing these incidents into evidence, as each involved illegal possession of a concealed weapon and

13  involved an implied threat of force or violence and were therefore properly admitted into evidence under

14  section 190.3(b).  The state supreme court's rejection of this claim on appeal was not objectively

15  unreasonable.  Petitioner's claim of error is without merit.

16                       **d.    Pending Fuller Robbery Charges**

17        Petitioner argues that the robbery charge was pending at the time of trial, and "was thus not a

18  'prior conviction' under Penal Code § 190.3(c)."  (FAP at 232.)  While Petitioner is correct that it was

19  not a prior conviction, the California Supreme Court noted, and a review of the state record confirms,

20  that the trial judge admitted evidence of the Fuller robbery under factor (b), prior criminal activity, not

21  factor (c), prior felony conviction.  The state record reflects that the first robbery was admitted into

22  evidence as "a threat of violence, holding a pistol to one's head in any manner other than a prank, and

23  has - - is an act of violence, which is relevant and may be shown and is criminal activity under either

24  240 of the penal code or 245(a)."  (RT 5083.)  The trial judge found that the second robbery against Mr.

25  Fuller, which occurred a few weeks after the first, "is admissible by virtue of threat of force, articulable

26  crime of 211 of the penal code."  (RT 5084.)  The trial judge instructed the jurors accordingly, indicating

27  that both Fuller robberies were alleged under factor (b).  (RT 5933-35.)  As such, Petitioner's claim of

28  error is without merit.  The California Supreme Court's rejection of this contention on appeal was

1    objectively reasonable.

2              **e.    Popik Note**

3         Finally, Petitioner argues that the trial court erred in admitting a note written by Petitioner to his

4    attorneys containing threats against co-defendant Popik, which prior counsel Duff and Burns had

5    submitted to the judge presiding over the preliminary hearing.  Petitioner asserts that the trial judge

6    should not have admitted the note into evidence at the penalty phase, as it "was not probative of any of

7    the factors listed in Penal Code § 190.3," that "the alleged threat did not itself violate a penal statute,"

8    and argues that "the introduction of the note violated the attorney-client privilege."  (FAP at 232.)

9         With respect to Petitioner's first and second contentions, Respondent is correct in pointing out

10   that the trial court ruled the note inadmissible under either factor (a), (b), (g)[19] or (j)[20], each of which

11   were asserted and argued by the prosecution.  (See RT 5085-90.)  Instead, the note was admitted as

12   rebuttal to the defense's introduction of evidence about Petitioner's non-violent nature.  (See RT 5752-

13   54); see also Michaels, 28 Cal. 4th at 537 ("After defendant had presented evidence from his minister,

14   his stepfather, and a psychiatrist that he was not a violent person, the prosecutor again offered the

15   evidence as rebuttal. The trial court admitted it because rebuttal evidence does not have to pertain to a

16   specific aggravating factor.")

17        With respect to Petitioner's contention that the introduction of the note violated the attorney-

18   client privilege, the state supreme court concluded that the trial court erred in admitting the note into

19   evidence, but found any error to be harmless.  See Michaels, 28 Cal. 4th at 538.  The state court's

20   conclusion was reasonable and is supported by a review of the record.  As previously discussed in the

21   Group One Order with respect to Claim 2 (see Doc. No. 119 at 23), the note was introduced for a limited

22   purpose, in order to rebut the evidence presented by the defense about Petitioner's non-violent nature.

23        Petitioner also argues that the trial court did not allow the defense to properly defend against the

24   note by calling Popik to testify that he had not been threatened by Petitioner.  (FAP at 234.)  However,

25   _____

26        [19] Factor (g) allows for penalty phase evidence concerning: "Whether or not defendant acted under
27   extreme duress or under the substantial domination of another person."  Cal. Penal Code § 190.3(g).

28        [20]  Factor (j) allows for penalty phase evidence concerning: "Whether or not the defendant was an
     accomplice to the offense and his participation in the commission of the offense was relatively minor." Cal. Penal
     Code § 190.3(j).

1    a review of the record reflects that the jury was specifically instructed that "it is not relevant whether

2    or not the note actually ever got communicated to Mr. Popik or not, so do not consider or discuss

3    whether it actually got communicated to Mr. Popik, that's not relevant for you at all." (RT 5768.) The

4    record also reflects that Popik indicated an unwillingness to testify in Petitioner's case. (See RT 5755.)

5           Here, it is clear that the note, and any aggravating evidence of Petitioner's written threat

6    concerning co-defendant Popik was of minimal weight in relation to the other evidence introduced in

7    aggravation. The evidence surrounding the circumstances of the brutal murder of JoAnn Clemons and

8    the related robbery and burglary, as well as the evidence of the Fuller robberies and other prior criminal

9    activity were all of much greater weight than a written note. Moreover, when the trial court listed the

10   alleged criminal activity that had been introduced for the jury's consideration, the note was not among

11   evidence listed. (RT 5933-35.)

12          Thus, in light of the circumstances surrounding the murder and related crimes, as well as the

13   other criminal activity introduced in aggravation, the Court is not persuaded that the admission of the

14   note "so fatally infected the proceedings as to render them fundamentally unfair." Jammal, 926 F.2d

15   at 919; see also Ortiz-Sandoval, 81 F.3d at 897. The California Supreme Court's rejection of this claim

16   on appeal was not contrary to, or an unreasonable application of, clearly established federal law.

17   Petitioner does not merit habeas relief on Claim 51.

18          **4.    Claim 57 - Trial Court Erred in Instructing on Specific Events in Aggravation but**

19                  **not on Specific Events in Mitigation**

20          In this claim, Petitioner asserts that the "trial court erred in instructing on specific events in

21   aggravation but not on specific events in mitigation," which prejudiced the jury towards a death

22   sentence. (FAP at 249.) Petitioner also argues that trial court rejected the majority of the jury

23   instructions proposed by the defense, and that the prejudice "was all the more acute given the court's

24   refusal to include an instruction pinpointing the defense's theory." (Id. at 249-53.)

25          The California Supreme Court considered and rejected this claim on the merits on direct appeal,

26   stating as follows:

27          Defendant asked the court to instruct the jury that, under section 190.3, factor (k), they
            could consider: whether defendant was "emotionally impacted" by his sister's sexual
28          abuse by his father, the rape of his mother, and the rape of his sister; whether defendant
            was "motivationally impacted" by JoAnn's sexual and physical abuse of Christina; and

1  whether defendant was impaired as a result of his overall psychological condition.
   Except for the last matter, the trial court rejected the proffered items as argumentative,
2  but instructed the jury on defendant's overall psychological condition.

3  That ruling was correct. The rejected portion of the proposed instruction assumed facts
   that were not necessarily true-e.g., that defendant's mother and sister were raped-and
4  constituted claims properly presented in argument, not instructions. *People v. Earp*
   (1999) 20 Cal.4th 826, 886 [85 Cal.Rptr.2d 857, 978 P.2d 15], upheld a trial court's
5  refusal to give a similar instruction, noting that because such an instruction "'invite[s]
   the jury to draw inferences favorable to one of the parties from specified items of
6  evidence,' it is considered 'argumentative' and therefore should not be given."

7  Defendant next complains that the trial court gave an instruction, requested by the
   prosecution, that evidence had been introduced of seven prior criminal acts that might
8  have involved force or violence, or the threat of force or violence. The court explained
   to the jury that an act violating multiple statutes constituted a single aggravating act, and
9  that the jury could not consider such an act unless it was convinced that the act was
   proven beyond a reasonable doubt. The court then explained the elements of each of the
10 crimes involved. Defendant asserts that by giving these instructions, while rejecting most
   of the defendant's proposed instructions, the court created a prejudicial imbalance in the
11 jury's consideration of aggravating and mitigating factors.

12 The prosecutor's proposed instructions related to evidence under factor (b) of section
   190.3. Although other aggravating or mitigating factors do not carry a burden of proof,
13 under factor (b) a juror may not consider evidence of the defendant's prior conduct
   unless convinced beyond a reasonable doubt that the conduct occurred and constituted
14 a crime. (*People v. Robertson* (1982) 33 Cal.3d 21, 53-56 [188 Cal.Rptr. 77, 655 P.2d
   279]; *People v. Bittaker* (1989) 48 Cal.3d 1046, 1103 [259 Cal.Rptr. 630, 774 P.2d
15 659].) That determination may require the juror to know the elements of the relevant
   crimes, so in *People v. Davenport* (1985) 41 Cal.3d 247, 281-282 [221 Cal.Rptr. 794,
16 710 P.2d 861], we held that a trial court may instruct on the elements of those crimes
   when either the prosecution or the defense requests such an instruction, or when the
17 court itself determines that the instruction is vital to a proper consideration of the
   evidence. The trial court's instruction here was proper under *Davenport*. Unlike the
18 defense instruction the court rejected, the court's factor (b) instructions did not merely
   highlight evidence, but explained legal principles essential to the juror's evaluation of
19 that evidence.

20 <u>Michaels</u>, 28 Cal. 4th at 538-39.

21     As discussed previously, the Court must determine whether the contested instructions "so

22 infected the entire trial that the resulting conviction violates due process." <u>Kibbe</u>, 431 U.S. at 154,

23 quoting <u>Cupp</u>, 414 U.S. at 147. "'[A] single instruction to a jury may not be judged in artificial

24 isolation, but must be viewed in the context of the overall charge.'" <u>Boyde</u>, 494 U.S. at 378, quoting

25 <u>Cupp</u>, 414 U.S. at 146-147. Even if the trial court is found to have erred, habeas relief remains

26 unavailable unless the error had a "substantial and injurious effect or influence in determining the jury's

27 verdict." <u>Brecht</u>, 507 U.S. at 637.

28     The defense requested additions to the factor (k) instruction with respect to several incidents in

1   Petitioner's past, such as the abuse of his sister, sexual assaults of his mother and sister, and the abuse

2   suffered by Christina at the hands of her mother, and the trial court declined to specifically mention

3   those incidents, stating that they were "too much of a recitation of contested factual issues." (RT 5824.)

4   Instead, the trial court limited the requested modification of the (k) factor to instruct the jury that they

5   could consider any relevant factor in mitigation, including Petitioner's "overall psychological

6   condition," as follows:

7          K, any other circumstance which extenuates the gravity of the crime even though it is
           not a legal excuse for the crime and any sympathetic or other aspect of the defendant's
8          character or record that the defendant offers as a basis for a sentence less than death,
           whether or not related to the offense for which he is on trial, such as whether or not Kurt
9          Michaels was impaired as a result of his overall psychological condition.

10  (RT 5932-33.)

11          The Supreme Court has stated that "the Eighth and the Fourteenth Amendments require that the

12  sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating*

13  *factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that

14  the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604

15  (1978) (plurality) (footnote omitted); see also Eddings v. Oklahoma, 455 U.S. 104, 117 (1982) ("[T]he

16  state courts must consider all relevant mitigating evidence and weigh it against the evidence of the

17  aggravating circumstances.")  Petitioner has not demonstrated that the trial court's failure to give the

18  defense's proposed penalty phase instructions violated his due process rights, because the jury was

19  properly instructed that it could consider any of the evidence proffered by Petitioner in mitigation. See

20  Lockett, 438 U.S. at 608 ("To meet constitutional requirements, a death penalty statute must not

21  preclude consideration of relevant mitigating factors.")

22          Petitioner also fails to demonstrate that the trial court's instructions on the specific prior crimes

23  alleged in aggravation was in error.  He contends that the "forceful instructions on events in aggravation

24  created an imbalance given the brief and nonspecific instruction on events in mitigation." (FAP at 252.)

25  In particular, Petitioner asserts that the trial court's instruction on alleged battery against Christina was

26  "argumentative," that the trial court "drew an inference" by suggesting that the battery had occurred

27  despite the scant evidence supporting it, and that the reference to the battery discredited the defense's

28  theory that the murder was committed to protect Christina from further abuse by her mother. (Id. at 252-

53.)  After reviewing the jury instructions, the Court does not find support for Petitioner's contentions. Instead, it is clear that the instructions clearly outlined the events asserted in aggravation under California Penal Code § 190.3(b), the elements and burden of proof for each of the prior crimes alleged, and included a specific direction that the jurors could not consider these events unless they first found them to be true beyond a reasonable doubt.  (See RT 5931-42.)  Again, the trial court specifically directed the jurors that:

> [Y]ou do not unanimously have to agree on these factors in aggravation, but for - - in order for any one of you to consider any of them or all of them, depending on how you view them, you must be convinced beyond a reasonable doubt that each of those that you do consider was proven beyond a reasonable doubt to you.  And if you don't find that, then you may not consider that particular factor, or any of them, that you don't find were proven to you beyond a reasonable doubt.

(RT 5935.)  Petitioner fails to demonstrate that these instructions were in error.  Upon review, it is clear that the trial court emphasized that each of the prior crimes must be proven beyond a reasonable doubt before the jurors could consider it in aggravation, and the instructions regarding mitigation properly allowed the jurors to consider "any other circumstance that extenuates the gravity of the crime" as well as "any sympathetic or other aspect of the defendant's character or record" offered by the defendant.

Even were the Court to assume the existence of instructional error, the challenged jury instructions must be viewed "in the context of the overall charge," and Petitioner fails to demonstrate that any such error had a "substantial and injurious effect or influence in determining the jury's verdict." Boyde, 494 U.S. at 378, quoting Cupp, 414 U.S. at 417; Brecht, 507 U.S. at 637.  An examination of the jury instructions as a whole reflects that the jurors were properly instructed that they could only consider the clearly outlined acts or evidence in aggravation if the burden of proof was satisfied, while providing that any circumstance or aspect of Petitioner's history or condition offered by the defense could be considered in mitigation.

Ultimately, Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based upon an unreasonable determination of the facts.  As such, Petitioner does not merit habeas relief on Claim 57.

///

1    **5.      Claim 58 - Failure to Instruct that the Jury May Only Find Prior Offenses Offered**

2    **in Aggravation to be True By Unanimous Verdict**

3    Petitioner states that under California Penal Code section 190.3(b), "[u]nlike evidence offered

4    during the guilt phase, evidence of prior violent activity offered during the penalty phase need not be

5    unanimously found true by the fact-finder," and that the "trial court instructed that before a juror could

6    consider any of the alleged criminal acts as an aggravating circumstance in the case, one first must be

7    satisfied beyond a reasonable doubt that Petitioner did in fact commit the criminal act.  The trial court

8    failed to instruct the jury that proper consideration of the aforementioned unadjudicated acts as factors

9    in aggravation required a unanimous finding by the jury that Petitioner had, in fact, committed these

10   offenses."  (FAP at 253.)  Petitioner cites to Apprendi v. New Jersey, 530 U.S. 466 (2000), Ring v.

11   Arizona, 536 U.S. 584 (2002), Blakely v. Washington, 542 U.S. 296 (2004), United States v. Booker,

12   543 U.S. 220 (2005), and Cunningham v. California, 549 U.S. 270 (2007), and argues that those

13   decisions "made it abundantly clear that any facts which would increase a sentence from life

14   imprisonment to death must be proven beyond a reasonable doubt." (FAP at 255.)  Petitioner separately

15   contends that California Penal Code section 190.3 violates the Equal Protection Clause of the Fourteenth

16   Amendment.  (Id.)

17   The California Supreme Court considered and rejected this claim on direct appeal, reasoning as

18   follows:

19       Defendant asserts that California's death penalty law suffers from a number of
         constitutional defects. We have in past decisions rejected each of these contentions.
20       ...

21       The absence of a burden of proof, except for proof of prior criminal acts under section
         190.3, factor (b), does not render the California law unconstitutional. (*People v.
22       Samayoa* (1997) 15 Cal.4th 795, 852-853 [64 Cal.Rptr.2d 400, 938 P.2d 2] [no burden
         to prove death is the appropriate penalty]; *People v. Rodriguez* (1986) 42 Cal.3d 730,
23       777-778 [230 Cal.Rptr. 667, 726 P.2d 113] [no burden of proof for aggravating factors];
         *People v. Alcala* (1992) 4 Cal.4th 742, 802 [15 Cal.Rptr.2d 432, 842 P.2d 1192] [no
24       requirement that aggravating factors been proven beyond a reasonable doubt].) No
         written findings are required. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1232 [47
25       Cal.Rptr.2d 800, 906 P.2d 1068].)

26   Michaels, 28 Cal. 4th at 541-42.

27   In Apprendi, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact

28   that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to

a jury, and proved beyond a reasonable doubt." Id., 530 U.S. at 490.  Meanwhile, "Ring altered the range of permissible methods for determining whether a defendant's conduct is punishable by death, requiring that a jury rather than a judge find the essential facts bearing on punishment," by holding that "'a sentencing judge, sitting without a jury, [may not] find an aggravating circumstance necessary for imposition of the death penalty.'"  Schriro v. Summerlin, 542 U.S. 348, 353 (2004), quoting Ring, 536 U.S. at 609.

Petitioner alleges that the trial court's failure to issue a unanimity instruction with respect to other crimes evidence introduced in penalty phase aggravation violated his constitutional rights. However, he fails to demonstrate that such an instruction is compelled by Supreme Court law.  At the conclusion of the guilt phase of his trial, Petitioner was convicted of first degree murder with four special circumstances. California law provides in relevant part that:

> The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true:
>
> (1) The murder was intentional and carried out for financial gain.
>
> ...
>
> (15) The defendant intentionally killed the victim by means of lying in wait.
>
> ...
>
> (17) The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit, the following felonies:
>
> (A) Robbery in violation of Section 211 or 212.5.
>
> ...
>
> (G) Burglary in the first or second degree in violation of Section 460.

Cal. Penal Code §190.2(a).

Thus, once the guilt phase jury unanimously found at least one of the charged special circumstances to be true beyond a reasonable doubt, the death penalty was within the statutory range of punishments.  See Tuilaepa v. California, 512 U.S. 967, 975 (1994) ("A defendant in California is eligible for the death penalty when the jury finds him guilty of first-degree murder and finds one of the § 190.2 special circumstances true."), citing Ramos, 463 U.S. at 1008.  At the penalty phase, the jury

04cv0122

1  was then allowed to consider the circumstances of the crime and the special circumstances, as found

2  during the guilt phase, along with additional evidence presented in aggravation and mitigation at the

3  penalty phase, in deciding the appropriate punishment.  See Cal. Penal Code § 190.3.  Petitioner fails

4  to demonstrate that this procedure is contrary to Apprendi or its progeny.

5       The additional Supreme Court decisions Petitioner cites also fail to support his contention that

6  jury unanimity is required with respect to other crimes evidence introduced as aggravation.  For

7  instance, in Blakely, the Supreme Court reversed a decision where a defendant's punishment was

8  increased based on judicial findings rather than a jury's conclusions, stating that, "every defendant has

9  the *right* to insist that the prosecutor prove to a jury all facts legally essential to the punishment."  Id.,

10 542 U.S. at 313.  Meanwhile, in Booker, the Supreme Court found that Blakely applied to federal

11 sentencing guidelines, stating that: "we reaffirm our holding in Apprendi: Any fact (other than a prior

12 conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts

13 established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury

14 beyond a reasonable doubt."  Booker, 543 U.S. at 244.  Finally, in Cunningham, the Supreme Court

15 applied Apprendi and its progeny to California's determinate sentencing law ["DSL"], concluding that:

16 "Because the DSL authorizes the judge, not the jury, to find the facts permitting an upper term sentence,

17 the system cannot withstand measurement against our Sixth Amendment precedent." Cunningham, 549

18 U.S. at 293.  Again, the death penalty was the maximum sentence authorized under California law once

19 the *guilt phase* jury found Petitioner guilty and at least one of the special circumstances to be true.  As

20 such, Petitioner fails to persuasively demonstrate that the Apprendi line of cases compel a rule that the

21 *penalty phase* jury must unanimously find each prior crime to be true prior to considering it in

22 aggravation.

23       Petitioner also argues that in non-capital cases, aggravating conduct must be found true by a

24 unanimous jury, which "flies in the fact [sic] of the United States Supreme Court's mandate that

25 procedural protections afforded capital defendants must be more rigorous than those provided non-

26 capital defendants."  (FAP at 255, citing CALJIC 17.50.)  The cited jury instruction is entitled simply

27 "Concluding Instructions" and contains the direction that "[i]n order to reach [a] [verdict][s], all twelve

28 jurors must agree to the decision [and to any finding you have been instructed to include in your

verdict].”  CALJIC 17.50.  A review of the record reflects that Petitioner's jury was issued this same instruction at the conclusion of the guilt phase proceedings.  (CT 1184, RT 5005.)  As such, the Court finds this instruction offers no support for Petitioner's contention.

Accordingly, as Petitioner fails to persuasively demonstrate that clearly established federal law compels the rule he advances, the Court cannot conclude that the California Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, nor that it was based upon an unreasonable determination of the facts.  Petitioner is not entitled to habeas relief on Claim 58.

**6.** **Claim 59 - Unconstitutionally Vague Penalty Phase Instructions on Mitigating Circumstances**

Petitioner asserts that the penalty phase jury instructions discussing mitigation included the words “extreme” and “substantial” which are impermissibly vague and “acts as barriers to the consideration of mitigation in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.” (FAP at 256.)

The California Supreme Court considered and rejected this claim on appeal, reasoning as follows:

> Defendant asserts that California's death penalty law suffers from a number of constitutional defects. We have in past decisions rejected each of these contentions.
>
> ...
>
> We have held that the California law is not unconstitutional because it allows the introduction, as an aggravating consideration, of unadjudicated criminal acts (*People v. Robertson* (1989) 48 Cal.3d 18, 42 [255 Cal.Rptr. 631, 767 P.2d 1109]) and does not require that the jury agree unanimously on whether the defendant committed those crimes (*People v. Alcala* (1992) 4 Cal.4th 742, 809 [15 Cal.Rptr.2d 432, 842 P.2d 1192]). We have rejected contentions that factors (d) and (g) of section 190.3 are unconstitutionally vague, because factor (d) refers to “extreme” mental or emotional disturbance and factor (g) to “extreme” duress. (*People v. Holt* (1997) 15 Cal.4th 619, 698-699 [63 Cal.Rptr.2d 782, 937 P.2d 213] [factor (d)]; *People v. Visciotti* (1992) 2 Cal.4th 1, 75 [5 Cal.Rptr.2d 495, 825 P.2d 388] [factor (g)].) Finally, we do not require a trial court to instruct the jury as to the meaning of “mitigation.” (*People v. Hawkins* (1995) 10 Cal.4th 920, 965 [42 Cal.Rptr.2d 636, 897 P.2d 574].)

Michaels, 28 Cal. 4th at 541-42.

In Blystone v. Pennsylvania, 494 U.S. 299 (1990), the Supreme Court upheld the Pennsylvania capital statute which, like the California capital sentencing scheme, uses the words “extreme” and

"substantial" in its list of potential mitigating factors.  The Supreme Court rejected the contention that "these instructions impermissibly precluded the jury's consideration of lesser degrees of disturbance, impairment, or duress" as the "judge at petitioner's trial made clear to the jury that these were merely items it could consider, and that it was also entitled to consider 'any other mitigating matter concerning the character or record of the defendant, or the circumstances of his offense.'"  Id. at 308; see also Hendricks v. Vasquez, 974 F.2d 1099, 1109 (9th Cir. 1992).  Similarly, at the end of the penalty phase evidence, Petitioner's trial judge instructed the jurors that pursuant to factor (k), they could also consider "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial, such as whether or not Kurt Michaels was impaired as a result of his overall psychological condition;" the judge also issued the factor (k) instruction at the outset of the penalty phase proceedings. (RT 5932-33, 5184.)  In light of this instruction, Petitioner fails to demonstrate that the contested language "act[ed] as barriers" to the jury's consideration of mitigating evidence in violation of his constitutional rights.  See Mills v. Maryland, 486 U.S. 367, 374 (1988) ("It is beyond dispute that in a capital case "'the sentencer [may] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'"), quoting Eddings, 455 U.S. at 110 and Lockett, 438 U.S. at 604 (plurality opinion).  The trial court's instructions did not preclude the jury's consideration of evidence in mitigation.

Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based upon an unreasonable determination of the facts.  Habeas relief is not warranted on Claim 59.

### 7.    Claim 60 - Failure to Adequately Define Mitigation

Petitioner asserts that his jury was instructed pursuant to CALJIC 8.88 that "a mitigating circumstance is any fact, condition or event which as such, does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty," and contends that this "definition of mitigation was insufficient

to properly apprise the jury of the full scope of evidence that must be considered in determining whether life imprisonment without the possibility of parole, rather than death, is the appropriate sentence" which undermined the reliability of Petitioner's death sentence.  (FAP at 256.)

The California Supreme Court considered and rejected this claim on appeal, reasoning as follows:

> Defendant asserts that California's death penalty law suffers from a number of constitutional defects. We have in past decisions rejected each of these contentions.
> ...
> Finally, we do not require a trial court to instruct the jury as to the meaning of "mitigation." (*People v. Hawkins* (1995) 10 Cal.4th 920, 965 [42 Cal.Rptr.2d 636, 897 P.2d 574].)

Michaels, 28 Cal. 4th at 542.

Petitioner notes that the results of several studies indicate that a high percentage of both college-educated individuals as well as California capital jurors incorrectly defined mitigation by improperly focusing on the nature of the crime.  (See FAP at 257.)  Petitioner contends that the "[t]he definition provided to defendant's jury, rather than eradicating the confusion that exists as to the meaning of the term 'mitigation,' reinforced the commonly held belief that mitigating evidence must be directly related to the crime in order for the jury to consider it as a basis for a sentence less than death" and was unconstitutional.  (Id. at 258.)

A review of the record does not support Petitioner's assertions.  The record confirms that Petitioner's jury was instructed pursuant to CALJIC 8.88 at the conclusion of the penalty phase proceedings (see RT 5945, CT 1262), yet also reflect that at the start of the proceedings, the trial court instructed as follows: "There may be evidence of what we call mitigation.  Mitigating circumstances are circumstances about the defendant *or his background* which do not constitute a justification or excuse for the offense in question but may be considered as extenuating or reducing the degree of moral culpability so as to support the imposition of life in prison without the possibility of parole." (RT 5181, CT 1251) (emphasis added.)  It is clear that Petitioner's jury was instructed that mitigation was not limited to evidence directly related to the crime.  Moreover, as noted above in discussion of Claim 59, the trial judge also specifically instructed the jurors that they could consider "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any

sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial, such as whether or not Kurt Michaels was impaired as a result of his overall psychological condition."  (RT 5932-33.)  As the jury was properly instructed that it could consider, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," Petitioner fails to demonstrate that the trial court's instructions were improper or amounted to error of a constitutional dimension. Lockett, 438 U.S. at 604.

As the record does not support Petitioner's contentions, the Court cannot conclude that the California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based upon an unreasonable determination of the facts. Petitioner does not merit habeas relief on Claim 60.

### 8. **Claim 61 - Failure to Instruct on Standards For Finding Aggravation and Mitigating Circumstances**; **Claim 62 - Failure to Instruct on Burden Of Proof**

In Claim 61, Petitioner contends the trial court's instructions to the jury were inadequate because "the jury was provided no guidance on how to determine disputed factual issues raised by the penalty phase evidence."  (FAP at 258.)  In Claim 62, Petitioner contends that the "trial court failed to instruct on any penalty phase burden of proof with respect to the weighing of aggravating and mitigating factors," depriving Petitioner of his constitutional rights.  (FAP at 267.)

The California Supreme Court considered and rejected these claims on appeal, reasoning as follows:

> Defendant asserts that California's death penalty law suffers from a number of constitutional defects. We have in past decisions rejected each of these contentions.
> ...
> The absence of a burden of proof, except for proof of prior criminal acts under section 190.3, factor (b), does not render the California law unconstitutional. (*People v. Samayoa* (1997) 15 Cal.4th 795, 852-853 [64 Cal.Rptr.2d 400, 938 P.2d 2] [no burden to prove death is the appropriate penalty]; *People v. Rodriguez* (1986) 42 Cal.3d 730, 777-778 [230 Cal.Rptr. 667, 726 P.2d 113] [no burden of proof for aggravating factors]; *People v. Alcala* (1992) 4 Cal.4th 742, 802 [15 Cal.Rptr.2d 432, 842 P.2d 1192] [no requirement that aggravating factors been proven beyond a reasonable doubt].) No written findings are required. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1232 [47 Cal.Rptr.2d 800, 906 P.2d 1068].)

1    Michaels, 28 Cal. 4th at 541.

2         Petitioner asserts that recent decisions issued by the Supreme Court and the Ninth Circuit,

3    respectively, in Alleyne v. United States, 570 U.S. ___, 133 S.Ct. 2151 (2013) and Murdaugh v. Ryan,

4    724 F.3d 1104 (9th Cir. 2013), "confirm what has been clear for some time – Mr. Michaels' death

5    sentence must be vacated because the jury was not instructed that it had to find that the aggravating

6    factors outweighed the mitigating factors beyond a reasonable doubt." (Pet. Brief at 42.)  Respondent

7    maintains that Petitioner cannot rely on Murdaugh, which is circuit precedent, to demonstrate that the

8    state supreme court's conclusion was unreasonable, and argues that Alleyne, aside from the fact that it

9    was decided well after Petitioner's conviction was finalized, has no application to Petitioner's case.

10   (Resp. Brief at 40.)  Petitioner argues that Murdaugh is "controlling precedent that this Court is bound

11   to follow," and states that Alleyne merely applies Apprendi and Ring, both of which were decided well

12   before Petitioner's conviction was finalized.  (Reply at 2-3.)

13        As discussed above in Claim 58, in Apprendi, the Supreme Court held that "[o]ther than the fact

14   of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory

15   maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Id., 530 U.S. at 490.

16   Meanwhile, "Ring altered the range of permissible methods for determining whether a defendant's

17   conduct is punishable by death, requiring that a jury rather than a judge find the essential facts bearing

18   on punishment," by holding that "'a sentencing judge, sitting without a jury, [may not] find an

19   aggravating circumstance necessary for imposition of the death penalty.'"  Schriro, 542 U.S. at 353,

20   quoting Ring, 536 U.S. at 609.

21        Clearly established federal law does not compel the result advocated by Petitioner.  The Ninth

22   Circuit's decision in Murdaugh concerned the application of Ring to an Arizona capital sentencing

23   decision in which the judge, not a jury, made the factual findings at the sentencing stage, and reversed

24   the Arizona Supreme Court's finding that any Ring error was harmless in that case.  Murdaugh, 724

25   F.3d at 1121.  In so deciding, the Ninth Circuit discussed the Arizona system prior to Ring, stating that

26   "[i]n Ring II, the Supreme Court described several determinations that had to occur under Arizona law

27   before a defendant became death-eligible, including the judge's determination that 'there are no

28   mitigating circumstances sufficiently substantial to call for leniency.'"  Id. at 1115, quoting Ring, 536

1    U.S. at 593.  The <u>Murdaugh</u> Court stated that "[b]ecause the existence or absence of mitigating

2    circumstances directly affected whether Murdaugh was death eligible under Arizona law, he had a right

3    to have a jury decide those facts." <u>Murdaugh</u>, 724 F.3d at 1117.

4         While the Ninth Circuit held that the weighing decision was the province of the jury, rather than

5    the judge, it did not specifically articulate a reasonable doubt requirement.  Indeed, the <u>Murdaugh</u> Court

6    noted that since the <u>Ring</u> decision, "capital sentencing statutes in all states, with the sole exception of

7    Nebraska, now require juries to consider mitigating evidence, determine the existence or absence of

8    mitigating circumstances, and decide whether death is the appropriate sentence," and cited the California

9    capital statute as being among those which implemented such a system.[21]  <u>Id.</u> at 1116 n. 7.

10        To the extent it can be considered,[22] the Supreme Court's decision in <u>Alleyne</u> is also

11   distinguishable from the claim presented here, as the <u>Alleyne</u> Court held that: "Any fact that, by law,

12   increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond

13   a reasonable doubt.  Mandatory minimum sentences increase the penalty for a crime." <u>Id.</u>, 133 S.Ct.

14   at 2155 (internal citation omitted).  Again, as discussed above in Claim 58, a jury's penalty phase

15   finding that the aggravating factors outweigh the mitigating factors does not "increase" the penalty for

16   a crime, as once a defendant is found guilty of first-degree murder and one or more special

17   circumstances is found to be true at the guilt phase, death is an authorized punishment.  <u>See</u> <u>Tuilaepa</u>,

18   512 U.S. at 975 ("A defendant in California is eligible for the death penalty when the jury finds him

19   guilty of first-degree murder and finds one of the § 190.2 special circumstances true."), citing <u>Ramos</u>,

20   463 U.S. at 1008.

21        While the <u>Alleyne</u> Court found that mandatory minimum sentences increase the punishment for

22   a crime and were therefore an "element" of the crime subject to reasonable doubt requirements, the

23   Supreme Court did not articulate that the same analysis applies to a capital sentencing weighing

24

---

25       [21] The California system has significant differences from the Arizona system at issue in <u>Murdaugh</u>.  As

26   discussed in Claim 58, and again below with respect to <u>Alleyne</u>, in California, the decision on death eligibility
     is made by the jury at the guilt phase.  <u>See</u> <u>Tuilaepa</u>, 512 U.S. at 975, citing <u>Ramos</u>, 463 U.S. at 1008.

27       [22] For the same reasons discussed above in section III.B, to the extent Petitioner may be barred under

28   <u>Teague</u> from relying on the Supreme Court's recent decision in <u>Alleyne</u>, as it was issued after Petitioner's
     conviction was finalized, the Court declines to consider the issue because these claims fail on the merits.  <u>See</u>
     <u>Franklin</u>, 290 F.3d at 1232, citing <u>Lambrix</u>, 520 U.S. at 525.

04cv0122

1    decision.  Indeed, the Supreme Court has specifically upheld the California capital sentencing system

2    despite   a lack of specific instruction on how to weigh the facts found at the penalty phase.  <u>See</u>

3    <u>Tuilaepa</u>, 512 U.S. at 979 ("Once the jury finds that the defendant falls within the legislatively defined

4    category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors

5    to determine whether death is the appropriate punishment."), quoting <u>Ramos</u>, 463 U.S. at 1008; <u>see also</u>

6    <u>Tuilaepa</u>, 512 U.S. at 979 ("A capital sentencer need not be instructed how to weigh any particular fact

7    in the capital sentencing decision.")  The Ninth Circuit has also specifically rejected a similar challenge

8    to the 1977 California capital statute.  <u>See</u> <u>Williams v. Calderon</u>, 52 F.3d 1465, 1485 (9th Cir. 1995)

9    ("Finally, the failure of the statute to require a specific finding that death is beyond a reasonable doubt

10   the appropriate penalty does not render it unconstitutional.")

11        The Court's review is limited to a determination as to whether the California Supreme Court's

12   rejection of this claim on appeal was either contrary to, or an unreasonable application of, clearly

13   established federal law, or was based on an unreasonable determination of the facts.  As Petitioner fails

14   to demonstrate that clearly established federal law, as determined by the United States Supreme Court,

15   requires the instructions asserted by Petitioner, the Court cannot conclude that the state court's rejection

16   of these claims was objectively unreasonable.  Accordingly, Petitioner does not warrant habeas relief

17   on Claims 61 or 62.

18        **9.    <u>Claim 63 - Instruction Including List of Sentencing Factors Failed to Explain</u>**

19        **<u>Which Factors Were Aggravating and Which Were Mitigating; Failed to Exclude</u>**

20        **<u>Irrelevant Mitigating Factors</u>**

21        Petitioner contends that the trial court erred when it "instructed petitioner's jury on the full array

22   of statutory sentencing factors without identifying which were potentially aggravating and which were

23   potentially mitigating," which left the jury without meaningful guidance and allowed them to consider

24   improper factors in aggravation.  (FAP at 268-69.)  He also asserts that "the inclusion of factually

25   irrelevant mitigating factors" violated his constitutional rights because "it permitted the jury to aggravate

26   defendant's sentence on the basis of factors that should have played no role in the sentencing process."

27   (<u>Id.</u> at 269.)

28        The California Supreme Court considered and rejected this claim on appeal, reasoning as

1  follows:

2      Defendant asserts that California's death penalty law suffers from a number of
3      constitutional defects. We have in past decisions rejected each of these contentions.

4      ...

5      We have held that the California law is not unconstitutional because it allows the
       introduction, as an aggravating consideration, of unadjudicated criminal acts (*People v.
6      Robertson* (1989) 48 Cal.3d 18, 42 [255 Cal.Rptr. 631, 767 P.2d 1109]) and does not
       require that the jury agree unanimously on whether the defendant committed those
7      crimes (*People v. Alcala* (1992) 4 Cal.4th 742, 809 [15 Cal.Rptr.2d 432, 842 P.2d
       1192]). We have rejected contentions that factors (d) and (g) of section 190.3 are
8      unconstitutionally vague, because factor (d) refers to "extreme" mental or emotional
       disturbance and factor (g) to "extreme" duress. (*People v. Holt* (1997) 15 Cal.4th 619,
9      698-699 [63 Cal.Rptr.2d 782, 937 P.2d 213] [factor (d)]; *People v. Visciotti* (1992) 2
       Cal.4th 1, 75 [5 Cal.Rptr.2d 495, 825 P.2d 388] [factor (g)].) Finally, we do not require
       a trial court to instruct the jury as to the meaning of "mitigation." (*People v. Hawkins*
10     (1995) 10 Cal.4th 920, 965 [42 Cal.Rptr.2d 636, 897 P.2d 574].)

11  Michaels, 28 Cal. 4th at 541.

12      With respect to Petitioner's claim of error arising from the trial court's failure to specifically

13  identify which factors were aggravating and which were mitigating, clearly established federal law

14  offers no support for this contention.  As previously discussed, the Tuilaepa Court specifically stated

15  that "[a] capital sentencer need not be instructed how to weigh any particular fact in the capital

16  sentencing decision" and upheld the California death penalty statute despite a lack of specific

17  instructions on how to weigh the sentencing factors.  Id., 512 U.S. at 979.  "Once the jury finds that the

18  defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . the

19  jury then is free to consider a myriad of factors to determine whether death is the appropriate

20  punishment." Tuilaepa, 512 U.S. at 979, quoting Ramos, 463 U.S. at 1008; see also Williams, 52 F.3d

21  at 1484 ("The death penalty statute's failure to label aggravating and mitigating factors is

22  constitutional."), citing Harris v. Pulley, 692 F.2d 1189, 1994 (9th Cir. 1982), reversed on other grounds

23  by Pulley v. Harris, 465 U.S. 37, 53-54 (1984).

24      Petitioner additionally contends that the trial court's failure to exclude irrelevant mitigating

25  factors amounted to error of constitutional dimension.  For instance, Petitioner contends that the

26  inclusion of irrelevant factors (e) and (f) allowed the jury to improperly consider these factors in

27  determining, and possibly aggravating, Petitioner's sentence.  (FAP at 269.)  However, the record

28  reflects that Petitioner's jury was instructed both at the outset and conclusion of the penalty phase

proceedings that "the absence of any potential mitigating factor does not constitute an aggravating factor relevant to the jury's penalty determination." (RT 5184-85, 5933.) A jury is presumed to understand and follow the trial court's instructions. <u>Weeks</u>, 528 U.S. at 234; <u>Richardson</u>, 481 U.S. at 211. As such, Petitioner fails to offer support for his assertion that the jury misapprehended the trial court's specific instructions and improperly considered inapplicable factors in determining Petitioner's sentence.

In sum, as Petitioner fails to demonstrate that the state supreme court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, or that it was based upon an unreasonable determination of the facts, habeas relief is unavailable on Claim 63.

**E.    USE OF RESTRAINTS; CLAIMS OF JUROR AND JUDICIAL MISCONDUCT; SUFFICIENCY OF THE EVIDENCE; PROPORTIONALITY OF PETITIONER'S SENTENCE**

**1.    Claim 48 - Use of Restraints in the Presence of the Jury**

In Claim 48, Petitioner contends that he "was denied a fair trial when he was unconstitutionally restrained in the presence and view of the jury, to his prejudice and in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments." (FAP at 211.) Petitioner contends that the trial court erred when it "permitted petitioner to be shackled without a proper showing of need, as required by the United States and California Constitutions," and that trial counsel rendered ineffective assistance in failing to object to the shackling. (<u>Id.</u> at 212.) Petitioner raised this claim as Claim IX in the first state habeas petition, and it was denied on the merits without a statement of reasoning. (Lodgment No. 16.)

A review of the trial record reveals that during pre-trial proceedings, Petitioner alluded to the reason for the use of restraints, stating that, "I have no disciplinary actions up until the time my housing area at Vista and they are not for disciplinary of violence in any nature. The reason I was shaken down in chains is the prior co-defendant did an escape attempt and from that time forward I was shackled." (RT 748.) However, the record also reflects that during trial proceedings, the only reference to restraints was to a "leg brace" worn by Petitioner, as follows:

Mr. Chambers:      Your Honor, the other situation is the logistical problem with Mr. Michaels standing up and moving around the courtroom with his leg brace on.

The Court:      Yes.

| | |
|---|---|
| Mr. Chambers: | If the court would consider having a side bar more in this area than back behind the clerk's desk area, we might be able to alleviate having to have - - asking the jury to leave every time. But there is a problem currently, when he standing up the leg brace locks and we have a situation where he is going to be unwieldy with that. |
| The Court: | Yes.  I envisioned having the side bars over pretty much behind where Mr. Atwell was located. |
| Mr. Brodrick: | Maybe when it comes time for a side bar Mr. Atwell could just step aside and we could have the side bar essentially right where he is located, keep our voices down, Mr. Michaels wouldn't have to move and we could see how that went. |
| The Court: | Yes, I think that is what we will try. |

(RT 4003.)

The Supreme Court has held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." Deck v. Missouri, 544 U.S. 622, 629 (2005).  The Ninth Circuit has indicated that "[i]n order for a defendant to prevail on a claim of this nature, a court must find that the defendant was indeed physically restrained in the presence of the jury, that the shackling was seen by the jury, and that the physical restraint was not justified by state interests.  Then, in order for the unjustified shackling to rise to the level of a constitutional error, the defendant must make a showing that he suffered prejudice as a result."  Ghent v. Woodford, 279 F.3d 1121, 1132 (9th Cir. 2002).  If such error occurred, the habeas court must then determine "whether the error had a 'substantial and injurious effect' on the jury's verdict." Id. at 1132, n. 9, quoting Castillo v. Stainer, 997 F.2d 669, 669 (9th Cir. 1993), and citing Brecht, 507 U.S. at 623.

While there is clear evidence that Petitioner was in a leg brace during the trial proceedings, there is no indication that the jurors ever viewed the restraints or that they were even aware that Petitioner was physically restrained.  The discussion regarding the leg brace reveals only that the brace locked and was "unwieldy" when Petitioner stood and moved around the courtroom, but there is no mention that the restraint was ever visible to the jurors.  Moreover, Petitioner does not appear to contend that the restraints were actually visible, instead asserting that:

> During the course of the trial, it became clear that petitioner had been shackled upon entering the courtroom.  He would not stand up when others in the courtroom did, he

1    could not mill about and mingle with others during breaks, and he stayed in a stationary
2    position throughout the whole of the trial.  It is entirely reasonable to assume that the
     jury knew something was going on, and it is just as reasonable to believe that the jury
3    figured out petitioner was shackled, thus preventing him from moving freely.  The
     shackling ensured that petitioner would be viewed as a prisoner and a convict even
     before any verdict was entered.  The jury was thus prejudiced against him, a prejudice
4    that surely worked against petitioner when the verdict was entered.

5    (FAP at 213.)  Petitioner also argues that the use of such restraints "became particularly apparent when

6    petitioner did not accompany the jury to the view of the apartment building where the capital crime

7    occurred."  (Id.)

8         Petitioner fails to provide any factual support for his contention that the jurors were actually

9    aware of the restraints.  The record only reflects that counsel and court personnel engaged in a

10   discussion and made efforts to avoid alerting the jury to any restraints by holding any necessary side bar

11   discussions near Petitioner so he would not have to move in order to participate in the discussion.  The

12   Ninth Circuit has previously rejected claims of constitutional error in cases where the use of restraints

13   is not actually visible to the jurors.  See Rich v. Calderon, 187 F.3d 1064, 1069 (9th Cir. 1999) ("Our

14   case law is clear: where care is taken to ensure that a defendant's shackling is not visible to the jury in

15   the courtroom, no error results."); see also Williams v. Woodford, 384 F.3d 567, 592 (9th Cir. 2004)

16   ("When the jury never saw the defendant's shackles in the courtroom, we have held that the shackles

17   did not prejudice the defendant's right to a fair trial.").

18        In sum, as there is no evidence that Petitioner's jury ever viewed or were actually aware of the

19   restraints, he fails to demonstrate error arising from the use of restraints at his trial, much less the

20   existence of constitutional error that had a "substantial and injurious effect" on the jury's verdict in his

21   case.  Brecht, 507 U.S. at 637.  Given the lack of factual support for Petitioner's contentions, the Court

22   cannot conclude that the state supreme court's rejection of this claim was contrary to, or an unreasonable

23   application of, clearly established federal law.  Petitioner is not entitled to habeas relief on Claim 48.

24        **2.    Claim 52 - Juror Concealed Personal Information that Presented a Substantial**

25             **Likelihood of Affecting His Decision at Guilt and Penalty Phases**

26        In this claim, Petitioner alleges that his trial "was tainted by juror misconduct due to the

27   concealment of information by one seated juror during voir dire," specifically that "one of the jurors,

28   Juror Michael S. McKenna, had a wife who was going through some difficulties with the Immigration

and Naturalization Service (INS) during the course of the trial" that "included an investigation involving an INS inquiry as to whether their marriage was fraudulent," which he failed to reveal during voir dire. (FAP at 236.)  Petitioner presented this claim to the California Supreme Court in his first state habeas petition, which was rejected on the merits without a statement of reasoning.  (Lodgment No. 16.)

"[T]he right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961).  "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." Smith, 455 U.S. at 217.  "Voir dire examination serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors."  McDonough Power Equipment Inc. v. Greenwood, 464 U.S. 548, 554 (1984).  "[T]o obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." Id. at 556.

Petitioner asserts that "when asked whether any close friends or family had been charged with a crime or arrested, Mr. McKenna intentionally failed to reveal his wife's problem with the INS," and argues that "most persons would consider a potential charge of marital fraud by the INS to constitute an arrest or charge." (FAP at 236-37.)  However, Petitioner fails to demonstrate that Juror McKenna actually lied during voir dire, as the state record does not reflect that there was any pending charge or that there had been any arrest based on marital fraud.  The jury questionnaire asked:

> Have you, any of your close relatives or friends, ever:
> a.    been arrested?
> b.    been charged with a crime?
> c.    been tried for a crime?
> d.    been convicted of, or plead guilty to, a crime?

(CT 1787.)  Juror McKenna checked "no" to all four questions, and wrote "except for a couple of friend [sic] who had DUI's." (Id.)  After trial, investigator Thomas Crompton spoke to one of the trial jurors, Jon Haugen, who told Crompton that "one of the jurors who he thought was named Bob,[23] had married a girl from Ireland and he was having trouble with immigration and that they were going to deport her

---

[23]  Despite Juror Haugen's recollection that the juror with immigration concerns was named Bob, the record reflects that it was Juror Michael McKenna who had an appointment with INS due to the fact his wife was a resident alien.  (RT 3847.)

04cv0122

because they thought she had only married him in an attempt to stay in the country." (Lodgment No. 11c, App. 42 at ¶ 13.)  While the reference to potential deportation proceedings could arguably constitute an arrest or charge, if either event had taken place, again, there is no evidence that McKenna's wife had either been arrested or charged with a crime at the time of the voir dire proceedings.  Thus, given the lack of any concrete support for Petitioner's assertion that the INS situation outlined here constituted either an arrest or pending charge, the Court cannot conclude that Juror McKenna either lied or concealed information during voir dire.  See McDonough, 464 U.S. at 556.

The record also fails to reflect that the Juror McKenna tried to conceal this information from the court.  Indeed, just after the jury was empaneled and the trial was about to commence, Juror McKenna brought the immigration appointment to the trial court's attention and explained his reasons for not noting it earlier, stating:

> I didn't realize that the trial was going to start right away.  I do have - - tomorrow I have an appointment down at the Federal building with the I.N.S.  My wife is a resident alien; we have gotten married, so I have to be there tomorrow at 1 o'clock.  I didn't realize that it was starting right away; otherwise, I would have mentioned it before.  But other than that, I am free for the next couple of months.  I don't have any - -

(RT 3847.)  The record clearly shows that Juror McKenna raised the issue in the context of scheduling, as his appointment conflicted with the calendar of trial proceedings.  Moreover, neither the defense nor the prosecution raised any objection to, or motion relating to, this information, nor did any party contend at that time that there had been any dishonesty during voir dire or misconduct.  Instead, the parties and court simply reached an agreement on an alternate schedule for the court day in question in order to allow the juror to retain his appointment.

This is not a situation where a juror clearly lied or concealed information in order to be seated as a juror, as such a situation could raise questions about the juror's impartiality.  See e.g. Dyer v. Calderon, 151 F.3d 970, 973-83 (9th Cir. 1998) (en banc) (juror who concealed information about her brother being the victim of a homicide, did not reveal that she had been a crime victim on multiple occasions, and did not disclose her husband's criminal history was impliedly biased, as "[a] juror . . . who lies materially and repeatedly in response to legitimate inquiries about her background introduces destructive uncertainties into the process."); Green v. White, 232 F.3d 671, 676-78 (9th Cir. 2000) (juror's lies about prior felony conviction and subsequent behavior "raises serious questions about his

04cv0122

ability to impartially serve on a jury.")  A review of the record also shows that McKenna was forthcoming in voir dire regarding a number of personal issues, including the fact that he had undergone marital counseling, had previously used drugs, and had been a robbery victim.  (See RT 2368-93.) Petitioner fails to demonstrate that Juror McKenna concealed information about an arrest or charge, either purposefully or unintentionally, as there is no evidence in the record that he or his wife had actually been either arrested or charged with anything.  Moreover, even assuming Petitioner was able to establish that Juror McKenna failed to honestly answer the voir dire question about arrests or charges, he fails to show that the earlier disclosure of McKenna's INS proceedings would have provided a basis for a successful challenge for cause.  See McDonough, 464 U.S. at 556.  As such, the claim is without merit.

In sum, given the lack of support for Petitioner's allegations of bias or misconduct, the Court cannot conclude that the state supreme court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law.  Petitioner is not entitled to habeas relief on Claim 52.

### 3. Claim 53 - Trial Court Engaged in Judicial Misconduct that Prejudiced a Juror

In Claim 53, Petitioner contends that his "conviction and sentence were imposed in violation of his right to due process, an impartial jury, an impartial judge, fundamental fairness, and reliable guilt and penalty phase determinations under the state and federal constitution, because the judge who imposed his sentence was apparently and actually biased against him." (FAP at 238.)  Petitioner also contends that he "had a state created liberty interest created by the Code of Judicial Conduct which required the judge to recuse himself when his impartiality was reasonably questioned," and that the trial court's conduct "denied petitioner the benefits of these provisions of state law in the context of a capital case, and that denial constitutes a violation of the right to due process guaranteed by the federal constitution." (Id.)  Petitioner also contends that trial counsel was ineffective for failing to disqualify the trial judge from presiding over and imposing the sentence in Petitioner's case.  (Id.)

Petitioner raised this claim as Claim XIII in the first state habeas petition, but withdrew the claim in the Reply brief.  (See Lodgment No. 11 at 205-07; Lodgment No. 13 at 65.)  Petitioner then presented this claim as Claim 13 in the second state habeas petition.  (Lodgment No. 25.)  The California Supreme Court rejected the claim on the merits and held that it was procedurally barred as untimely, successive,

and because it could have been raised on appeal.  (Lodgment No. 26.)  As discussed in section III.A. above, the Court will adjudicate this claim on the merits despite the state supreme court's imposition of procedural bars.

"[T]he Due Process Clause clearly requires a 'fair trial in a fair tribunal'. . . before a judge with no actual bias against the defendant or interest in the outcome of his particular case." Bracy v. Gramley, 520 U.S. 899, 904 (1997) (internal citation omitted), quoting Withrow v. Larkin, 421 U.S. 35, 46 (1975). A claim of bias "must overcome a presumption of honesty and integrity in those serving as adjudicators." See Withrow, 421 U.S. at 47. "[W]hen a defendant's right to have his case tried by an impartial judge is compromised, there is structural error that requires automatic reversal." Greenway v. Schriro, 653 F.3d 790, 805 (9th Cir. 2011), citing Tumey v. Ohio, 273 U.S. 510, 535 (1927); see also Chapman v. California, 386 U.S. 18, 23 (1967).

"To sustain a claim of [judicial misconduct], there must be an 'extremely high level of interference' by the trial judge which creates 'a pervasive climate of partiality and unfairness.'" Duckett v. Godinez, 67 F.3d 734, 740 (9th Cir. 1995), quoting United States v. De Luca, 692 F.3d 1277, 1282 (9th Cir. 1982).  A reviewing court "must ask whether the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." Duckett, 67 F.3d at 740.

Petitioner states that during trial proceedings, Juror McKenna alerted the court that he had an INS appointment, and the trial judge "worked to bring the day's proceedings to an early close so Juror McKenna could leave."  (FAP at 238.)  Petitioner contends that these actions constituted judicial misconduct, arguing that "[t]he judge's provision of a special favor to one juror prejudiced the juror, by creating a desire to please the judge by returning whatever verdict he thought the judge favored or not wanting to be a holdout and thereby inconvenience the judge."  (Id.)

State habeas investigator Thomas Crompton interviewed several of the trial jurors, and declared as follows:

> Juror, Jon Haugen, said that one of the jurors who he thought was named Bob, had married a girl from Ireland and he was having trouble with immigration and that they were going to deport her because they thought she had only married him in an attempt to stay in the country.  He said Judge Lester made several attempts to contact immigration on behalf of the juror.  The judge also gave the jury the afternoon off so this

juror could take care of the problem with immigration.

(Lodgment No. 11c, App. 42 at ¶ 13.)

At the commencement of the guilt phase proceedings, prior to Juror McKenna raising the scheduling conflict, the trial judge indicated to the jury as a whole that while the court's schedule would generally be from 9 a.m. to 4:30 p.m. with one morning and afternoon break, but also stated:

> On the other hand, that's all variable and flexible depending on your needs and/or if we have a gap in our witnesses or if we are waiting for a witness who may be in a rest room when we call for a witness. Sometimes we have other gaps that I can't project or anticipate. Within those guidelines, that's what I expect our court hearing to be.

(RT 3832.) As discussed in Claim 52, when Juror McKenna brought the appointment to the trial court's attention, McKenna simply stated he had been unaware that the trial would start right away or he would have mentioned the scheduling conflict. (RT 3847.) The record reflects that the trial judge then attempted to contact I.N.S. in an ultimately unsuccessful effort to reschedule the appointment. The trial judge and parties discussed possibilities for handling the scheduling issue, including shutting the trial down that afternoon. The trial court indicated to Juror McKenna that "we have invested a lot of time in you with your individual interview and we don't want to lose a juror this early in the trial, so we are going to have to recess to get you down to Immigration to help your wife become legal in this country." (RT 3938.) Both the prosecution and defense stated they had no objection to working through lunch and recessing early that day. (RT 3941.) The trial judge inquired with the other members of the jury about changing the schedule, working through lunch with breaks, and recessing early, and because none of the other jurors expressed any problem or conflict with that prospect, court recessed that day at 1:30 p.m. (RT 3941-42.) Given the trial court's earlier statement to the jury that the court schedule was "variable and flexible" depending on the scheduling of witnesses, the needs of the jurors, and other unanticipated occurrences, Petitioner fails to demonstrate that the trial judge's actions were misconduct or that they constituted a favor to this juror.

Additionally, reviewing courts have repeatedly found a lack of reversible error in cases involving more extensive contact or exchanges between a trial judge and a juror than the claim at hand. In Johnson v. Bagley, 544 F.3d 592 (6th Cir. 2008), the Sixth Circuit rejected a claim of judicial misconduct where the trial judge gave a juror who had missed her bus a ride home, concluding that

"[w]hile we think it odd, unwise, maybe even improper, for the trial judge to have given the juror a ride, the [state supreme court] did not unreasonably apply federal law in holding that [the defendant] still received a fair trial." Id. at 595-96.  The Sixth Circuit noted that both the juror and judge repeatedly indicated that they did not discuss the case, and that the trial judge's actions were characterized as "a common act of courtesy." Id.  In Wellons v. Warden, Georgia Diagnostic and Classification Prison, 695 F.3d 1202 (11th Cir. 2012), the Eleventh Circuit rejected a claim of juror, bailiff and judicial misconduct in a case where the judge briefly encountered the jurors at a restaurant and several jurors gave inappropriately shaped chocolates as a gift to the trial judge and bailiff at the end of the trial.  Id. at 1209-11.  As the trial judge "was only a passive recipient of a gag gift," that "the record does not indicate that the Judge showed any partiality during the brief encounter at the restaurant," and that the judge "did not give the jurors any indication as to how this case should be decided," the circuit court rejected the claim of bias.  Id. at 1211-12.  Again, at Petitioner's trial, the now objected-to incident occurred on the record and involved a simple scheduling change agreed upon by all parties and the other members of the jury.  It did not involve any ex parte contact,  exchange, or other incident that would normally give rise to a claim of this sort.  Also, the defense failed to raise any concerns about the propriety of the event until the first state habeas petition, where the claim was first raised, then withdrawn.

Finally, Petitioner fails to provide any support for his assertion that the trial judge ever gave any indication that he favored one verdict over another, such that the juror in question could attempt to return a verdict to that end.  In fact, the trial record contradicts Petitioner's contention in this regard, as during concluding instructions, the trial judge directed the jurors that they were to form their own conclusions, and they were not to draw any conclusions from the trial court's rulings or actions, as follows:

> I have not intended by anything I have said or done or any questions I may have asked or by any rulings I have made to intimate or suggest that what you should find to be the facts or that I believe or disbelieve any witness.  If anything I have done or said has seemed to so indicate, you will disregard it and form your own conclusion.

(RT 4930.)  The trial judge reiterated that same instruction at the conclusion of the penalty phase proceedings.  (RT 5943.)  As previously noted, a jury is presumed to understand and follow the trial

court's instructions.  <u>Weeks</u>, 528 U.S. at 234; <u>Richardson</u>, 481 U.S. at 211.  Thus, even were the Court to find that the trial judge's actions were in error, it is clear that the trial judge instructed the jurors to arrive at their verdicts based only upon the evidence heard in court, and not on anything said or done by the judge.  In light of this presumption, and the lack of any evidence that the jurors failed to understand or follow the trial court's explicit instructions in this regard, Petitioner fails to demonstrate that "the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution."  <u>Duckett</u>, 67 F.3d at 740.  Petitioner fails to demonstrate that this claim has merit.  Additionally, given the lack of merit, even were the Court to assume that Petitioner was entitled to the effective assistance of advisory counsel, he fails to demonstrate that the lack of objection constituted prejudicially deficient performance.  <u>See</u> <u>Baumann v. United States</u>, 692 F.2d 565, 572 (9th Cir. 1982) ("The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel."); <u>see also</u> <u>Boag v. Raines</u>, 769 F.2d 1341, 1344 (9th Cir. 1985).

Accordingly, the Court cannot conclude that the California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law. Petitioner does not warrant habeas relief on Claim 53.

## 4.    Claim 64 - The Evidence Did not Support the Lying-In-Wait Special Circumstance

Petitioner alleges that the "evidence presented at trial did not establish petitioner's actions as the type of lying-in-wait behavior the special circumstance was designed to punish by death," because in his case there was "no immediate connection between petitioner's concealment and the killing," and the "victim was not taken by surprise by a sudden emergence from concealment."  (FAP at 270.)  Instead, Petitioner asserts that "the pre-incident concealment served merely as a scouting and meeting area, the killing occurred at a completely distinct time and place."  (<u>Id.</u>)  Petitioner also contends that the trial court erred in denying Petitioner's April 18, 1989 motion alleging there was insufficient evidence to support the lying in wait special circumstance.  (<u>Id.</u> at 270, citing CT 99-114.)

The California Supreme Court rejected this claim on direct appeal, reasoning as follows:

> The jury found that defendant "intentionally killed the victim while lying in wait." (§ 190.2, former subd. (a)(15), added by Prop. 7, § 6, as approved by voters, Gen. Elec. (Nov. 7, 1978).) The voters passed an initiative measure that subsequently amended subdivision (a)(15) by changing "*while*" lying in wait to "*by means of*" lying in wait. (Stats. 1998, ch. 629, enacted as Prop. 18, approved by voters, Prim. Elec. (Mar. 7, 2000) eff. Mar. 8, 2000.) This special circumstance requires proof of "an intentional murder,

committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage." (*People v. Morales* (1989) 48 Cal.3d 527, 557 [257 Cal.Rptr. 64, 770 P.2d 244]; see *People v. Sims* (1993) 5 Cal.4th 405, 432 [20 Cal.Rptr.2d 537, 853 P.2d 992].) Here, defendant and Popik waited outside JoAnn Clemons's apartment for two to three hours, concealed from view by bushes that separated their hiding place from the building's parking lot. They were waiting for two reasons. One was to delay their entry until JoAnn's apartment lights went out, when she would presumably be asleep. As defendant explained in his confession, "[w]e wanted her asleep" because then the killing would be a "little less noisy." The other reason for waiting was that Paulk had not yet arrived in the getaway car. When defendant and Popik saw the apartment lights go out, they continued to wait for Paulk. After Paulk arrived a half-hour to an hour later, defendant and Popik set out for JoAnn's apartment. Waiting and watching until a victim falls asleep before attacking is a typical scenario of a murder by means of lying in wait. (See *People v. Hardy* (1992) 2 Cal.4th 86, 163-164 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People v. Ruiz* (1988) 44 Cal.3d 589, 615 [244 Cal.Rptr. 200, 749 P.2d 854]; *People v. McDermand* (1984) 162 Cal.App.3d 770, 784 [211 Cal.Rptr. 773].)

Defendant distinguishes the cited cases by noting that they concern lying in wait as proof of first degree murder, not as proof of a special circumstance. According to defendant, the special circumstance of lying in wait has an immediacy requirement. (See *Houston v. Roe* (9th Cir. 1999) 177 F.3d 901, 907; *Domino v. Superior Court* (1982) 129 Cal.App.3d 1000, 1011 [181 Cal.Rptr. 486].) That requirement is set out in CALJIC No. 8.81.15, which was given to the jury in this case: "For a killing to be perpetrated while lying in wait, both the concealment and watchful waiting as well as the killing must occur in the same time period, or in an uninterrupted attack commencing no later than the moment concealment ends. If there is a clear interruption separating the period of lying in wait from the period during which the killing takes place, so that there is neither an immediate killing nor a continuous flow of uninterrupted lethal events, the special circumstance is not proved."[FN5] Defendant maintains that the facts here show a "cognizable interruption" (*People v. Morales*, *supra*, 48 Cal.3d at p. 558) between the period of concealment and watchful waiting and the killing.

> [FN5] The instruction is based on *People v. Morales*, *supra*, 48 Cal.3d at pages 554-559. After section 190.2, subdivision (a)(15) was amended, the Committee on Standard Jury Instructions replaced CALJIC No. 8.81.15 with a new instruction. The Use Note to the new instruction states that CALJIC No. 8.81.15 should still be used for murders that occurred before March 7, 2000.

If the only interruption was the time required for defendant and Popik to emerge from their hiding place, cross the apartment building's parking lot, and enter the victim's apartment, that interruption would not preclude application of the special circumstance of lying in wait. The victim's death would have followed in a continuous flow from the concealment and watchful waiting. The special circumstance of lying in wait does not require that the defendant strike his blow from the place of concealment. (*People v. Hardy*, *supra*, 2 Cal.4th 86, 164.)

That defendant and Popik waited a half-hour or more after the victim's apartment lights went out, until Paulk arrived in the getaway car, does not preclude the special circumstance of lying in wait. "As long as the murder is immediately preceded by lying in wait, the defendant need not strike at the first available opportunity, but may wait to maximize his position of advantage before taking the victim by surprise." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1145 [17 Cal.Rptr.2d 375, 847 P.2d 55].) Whether defendant waited the half-hour or more to make sure JoAnn was asleep, as the Attorney

1    General contends, or to make sure his escape car was available, as defendant said in his
2    confession, is immaterial, since the victim was killed in an uninterrupted flow of events
     from the time defendant and Popik emerged from their hiding place.

3    Michaels, 28 Cal. 4th at 516-17.

4        In reviewing a claim of insufficient evidence, "the relevant question is whether, after viewing

5    the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found

6    the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319

7    (1979).  In other words, "the applicant is entitled to habeas corpus relief if it is found that upon the

8    record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a

9    reasonable doubt." Id. at 324.  A habeas court must begin with  "explicit reference to the substantive

10   elements of the criminal offense as defined by state law." Chein v. Shumsky, 373 F.3d 978, 983 (9th

11   Cir. 2004), quoting Jackson, 443 U.S. at 324 n.16.  Moreover, as this petition is governed by AEDPA,

12   in order to merit relief, Petitioner must also demonstrate that the state court's adjudication of his claim

13   involved an objectively unreasonable application of Jackson.  See Juan H. v. Allen, 408 F.3d 1262, 1274

14   (9th Cir. 2005) ("After AEDPA, we apply the standards of Jackson with an additional layer of

15   deference."): see also Coleman v. Johnson, 132 S.Ct 2060, 2062 (2012) (per curiam) ("We have made

16   clear that Jackson claims face a high bar in federal habeas proceedings because they are subject to two

17   layers of judicial deference.")

18       Under California law, "[t]he lying-in-wait special circumstance requires proof of 'an intentional

19   murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial

20   period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise

21   attack on an unsuspecting victim from a position of advantage.'" People v. Jurado, 38 Cal. 4th 72, 119

22   (2006), quoting People v. Morales, 48 Cal. 3d 527, 557 (1989).  Here, Petitioner challenges the

23   sufficiency of evidence with respect to the immediacy requirement, and argues that there was "no

24   immediate connection between petitioner's concealment and the killing," which occurred at two

25   different times and places.  (FAP at 270.)  Petitioner's jury was instructed that "[i]f there was a clear

26   interruption separating the period by lying in wait from the period during which the murder takes place,

27   so that there is neither an immediate killing nor a continuous flow of the uninterrupted lethal events, the

28   special circumstance is not proved."  (CT 1155.)

04cv0122

Petitioner initially told police that he and Popik waited for Paulk to return with the car before entering the apartment in order to ensure that they had a ride away from the scene. (CT 2338-39.) But when Petitioner was asked whether that was the sole reason for waiting, he replied it was not, as follows:

> Allen:        So that's the only reason you wait because you wanted to ensure you had a ride.
>
> Michaels:     No, we wanted her asleep.
>
> Allen:        Why did you want her asleep?
>
> Michaels:     A little less noisy.  Unfortunately, shit happened.

(CT 2339.) Petitioner also admitted that once they entered the building, they encountered a couple and walked past the victim's apartment in order to disguise their destination, and that he kept his back to the people so they could not see him.  (CT 2342.)  After entering the victim's apartment using the key, he locked it behind them and made efforts to remain concealed, as follows:

> Allen:        What did you do then?
>
> Michaels:     Pointed the door out.  I looked to the bedroom; it was closed, or partly open, something like that.  General area.  Pointed it.  Put certain things down on the couch that would make noise that were on my person; a wallet with a chain on it. . . all kinds of other shit.  Went to the bedroom, and everything fucking broke loose.
>
> Allen:        What do you mean, broke loose?
>
> Michaels:     As far as she woke up.
>
> Allen:        There was a lot of stuff she had on the floor, at the foot of the bed.
>
> Michaels:     Um-huh.  You couldn't see it.
>
> Allen:        You didn't turn the light on or anything?
>
> Michaels:     Uh uh.  The whole point was not to wake her.

(CT 2344.)

The jury could have reasonably concluded from the available evidence that Petitioner and Popik's movement from the lot outside the apartment complex to the victim's apartment, while not resulting in an "immediate killing," did not constitute a "clear interruption" of lethal events, as the emergence from hiding and movement to the victim's building was followed, within minutes, by the unlawful entry to her apartment and the murder itself.  As the state court reasonably concluded:

04cv0122

1       If the only interruption was the time required for defendant and Popik to emerge from
2  their hiding place, cross the apartment building's parking lot, and enter the victim's
   apartment, that interruption would not preclude application of the special circumstance
3  of lying in wait.

4  _Michaels_, 28 Cal. 4th at 517.

5       During the entire time Petitioner and Popik waited across the lot for the victim to go to sleep,

6  made their way to the apartment building, entered the victim's apartment, and entered the bedroom to

7  attack her, the evidence reflects that they took pains to remain quiet and conceal their purpose from the

8  victim and those they happened to encounter in the apartment complex.  Petitioner also acknowledges

9  that he removed items on his person that were likely to make noise and wake the victim, as he aimed

10 for her to remain asleep and unaware of his intentions.  The evidence reflects that Petitioner and Popik

11 concealed their purpose, engaged in a "substantial period of watching and waiting for an opportune time

12 to act," and "immediately thereafter," crossed the lot to enter the victim's apartment intending to engage

13 in a "surprise attack on an unsuspecting victim from a position of advantage."  See _Jurado_, 38 Cal. 4th

14 at 119, quoting _Morales_, 48 Cal. 3d at 557.  The minutes that elapsed between their concealment in the

15 construction lot and their entry to the victim's bedroom did not obviate the applicability of the lying in

16 wait special circumstance, as the evidence presented at trial would allow a reasonable trier of fact to

17 conclude that the flow of events was not interrupted, as the attack began shortly after their emergence

18 from the construction lot and entry to the apartment.  See _People v. Ceja_, 4 Cal. 4th 1134, 1145 (1993)

19 ("The precise period of time is also not critical.  As long as the murder is immediately preceded by lying

20 in wait, the defendant need not strike at the first available opportunity, but may wait to maximize his

21 position of advantage before taking his victim by surprise.")

22      Here, after viewing the evidence, as required, "in the light most favorable to the prosecution,"

23 it is clear that the evidence was sufficient for the jury to find the lying in wait special circumstance to

24 be true beyond a reasonable doubt.  See _Jackson_, 443 U.S. at 319.  As such, the trial court did not err

25 in rejecting Petitioner's pre-trial motion to dismiss the lying in wait special circumstance.  The state

26 court's rejection of this claim did not involve an objectively unreasonable application of _Jackson_, nor

27 was it based upon an unreasonable determination of the facts.  See _Juan H._, 408 F.3d at 1274.

28 Accordingly, Petitioner does not merit habeas relief on Claim 64.

1    **5.      Claim 65 - The Evidence Did Not Support Robbery and Burglary Special**
2    **Circumstance**

3    Petitioner asserts that the application of these special circumstances to his case is "improper"

4    because "Petitioner was not motivated to kill Clemons to further a burglary or robbery. Rather, he

5    believed he needed to kill her to free Christina from a life of abuse and, he thought, to save Christina

6    from impending death." (FAP at 274.) Petitioner also asserts that "insufficient evidence was presented

7    to support the underlying substantive crimes of robbery and burglary" and contends that the trial court

8    erred in denying Petitioner's pre-trial motion to dismiss these allegations. (Id. at 274-75.)

9    Petitioner raised this claim on direct appeal, which the California Supreme Court rejected in a

10   reasoned opinion, as follows:

11   Before the murder occurred, defendant told four people (Mark Herbert, Joseph Paulk,
     Kimberly Pratt, and Velinda Davis) that he was going to "tax" someone in Escondido.
12   He told Pratt he was going to get jewelry from an old lady, and that Pratt should meet
     him in a bar at closing time if she wanted a good deal. He offered Herbert $5,000 to
13   participate, and promised Popik his choice of items from the Clemons's apartment.

14   The murder scene showed signs of a robbery-furs were spread on the couch, and a purse
     was found with its contents dumped out. When Popik was arrested, he had a Walkman
15   radio and three sets of earrings from the apartment. Defendant in his confession said that
     he took nothing from the apartment. He later remarked to Kimberly Buckhalter that he
16   had furs and jewelry she might want. There is, however, no evidence that anything was
     missing from the apartment other than the items found with Popik.
17
     The evidence of burglary and robbery is uncontested. Defendant recruited Popik by
18   promising him that he could have his choice of property from JoAnn's apartment.
     Defendant opened the apartment door for Popik, and the two together subdued and killed
19   JoAnn. Popik was later arrested with property taken from JoAnn. On these facts, it is
     clear that Popik is guilty of burglary and robbery, and that defendant was his accomplice.
20
     The prosecution, however, did not try the case on a theory that defendant was an
21   accomplice to Popik's burglary and robbery. Neither does the Attorney General defend
     the verdict on such a theory here. Instead, he maintains that the defendant entered the
22   apartment and killed JoAnn with the intention of stealing her property, but was
     interrupted when the police arrived and escaped without taking anything. (See *People
23   v. Zapien* (1993) 4 Cal.4th 929, 984 [17 Cal.Rptr.2d 122, 846 P.2d 704], upholding a
     special circumstance finding based on robbery although the defendant fled without
24   taking any property.)

25   Defendant said his reason for killing JoAnn was to protect Christina, his girlfriend, from
     abuse by her mother, JoAnn. The Attorney General agrees that this was one reason, but
26   argues that defendant had a separate, independent felonious purpose-to steal her
     property. Such a concurrent intent will support the felony-murder special circumstance.
27   (*People v. Zapien, supra*, 4 Cal.4th at p. 984; *People v. Bonin* (1989) 47 Cal.3d 808,
     850-851 [254 Cal.Rptr. 298, 765 P.2d 460]; *People v. Murtishaw* (1981) 29 Cal.3d 733,
28   752, fn. 13 [175 Cal.Rptr. 738, 631 P.2d 446].) Defendant here responds that even if he

- 128 -                                              04cv0122

planned a robbery, the robbery was merely incidental to the murder. (See *People v. Green* (1980) 27 Cal.3d 1, 60-61 [164 Cal.Rptr. 1, 609 P.2d 468] [robbery to conceal identity of murder victim and thus facilitate killer's escape]; *People v. Thompson* (1980) 27 Cal.3d 303, 323-325 [165 Cal.Rptr. 289, 611 P.2d 883] [threat of robbery to conceal that a defendant's goal was murder-after the killing the defendant left without taking the property the victim had given him].) He claims that he had no motive to steal from JoAnn other than to reward his accomplices, because once he had killed JoAnn, Christina, his girlfriend, would inherit JoAnn's property and could simply enter the apartment and take whatever she wanted.

The question whether the burglary and robbery in this case were "merely incidental" to the murder was submitted to the jury under proper instructions, so the issue is simply whether substantial evidence supports the jury's verdict. We conclude that it does. Defendant is in effect arguing that we should believe his confession, in which he said his only motive was to protect Christina, and should disregard as boasting the comments he made before and after the murder. Defense witnesses described defendant as given to boasting to protect his image, but the jury could conclude otherwise and could infer from the evidence that defendant had an independent, if secondary, purpose of taking property from JoAnn.

Michaels, 28 Cal. 4th at 517-19.

Here, Petitioner contends that the robbery and burglary themselves were merely incidental to the murder, as Petitioner's actual motivation for the murder was to protect Christina from further abuse. However, the jury was properly instructed on the elements of these special circumstances, as follows:

To find that the special circumstance, referred to in these instructions as murder in the commission of robbery or attempted commission of a robbery or burglary, is true, it must be proved:

One, That murder was committed while the defendant was engaged in the commission of a robbery or attempted robbery or a burglary; and,

Two, The murder was committed in order to carry out or advance the commission of the crime of robbery or burglary, or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the robbery or burglary was merely incidental to the commission of the murder.

However, if the defendant acts with concurrent goals during the commission of the murder, such as with both an intent to kill and a separate intent to commit a robbery or burglary, this does not mean the separate felonious purpose was incidental to the commission of the murder. A finding that the defendant had an independent intent to kill does not preclude a finding that he also acted with the intent to carry out or advance an independent felonious purpose.

(RT 4921; see also CT 1157, CALJIC 8.81.17.)

As the state court reasonably concluded from the evidence presented at trial, a rational trier of fact could have found that Petitioner committed the murder with an independent intent to take property from the victim. While there was evidence that the victim's abuse of Christina was a motive for the

murder, there was also substantial evidence supporting the robbery and burglary special circumstances. In the days prior to the crime, Petitioner asked Mark Hebert to accompany him to Escondido to do a "tax," which Hebert understood to mean collecting money owed, usually through the use of force. (RT 3888-94.) Petitioner told Hebert that he expected to receive $5000 total and that Hebert would receive a third. (Id.) On September 30, 1988, the day before the murder, Petitioner told Kimberly Platt that he planned to tax an old lady in Escondido for her jewelry, and that Platt could meet him at bar closing the next evening and choose the items she wanted and he would give her a good deal. (RT 3909-14.) On October 1, 1988, Petitioner told his roommate Velinda Davis that they were planning to go to Escondido to make some money, would attend a knife and sword show, and planned to tax someone. (RT 3931-32.) Just after the murder, Officer Clark stopped and detained co-defendant Darren Popik and found a walkman and women's jewelry in Popik's possession. (RT 4123-35.) The walkman was later identified as belonging to the victim. (RT 4227-33.) Moreover, Petitioner's statement to police contained numerous admissions supporting both the burglary and robbery special circumstances, as Petitioner acknowledged that he entered JoAnn Clemons' apartment with a key procured from Christina, that he recruited Popik by promising him items from the victim's apartment, and that Paulk was only aware they were committing a robbery. (CT 2333-34, 2366, 2336.) Petitioner expressly admitted to the police that Popik accompanied him to the victim's apartment, and after his arrest, he had the follow exchange with Detective Gaylor:

> Gaylor:      What was he [Popik] going to get out of this?
>
> Michaels:    Whatever was in the house.
>
> Gaylor:      Is that basically why he went?  Was going to get something out of the house?
>
> Michaels:    Um-huh.

(CT 2335.)   Petitioner also had the following exchange with Detective Allen regarding Popik's anticipated proceeds from the crimes:

> Allen:       He, Daz,[24] also says he was supposed to get a certain amount of money

---

[24] Witness Mark Hebert testified at trial that Darren Popik's nickname was "Daz." (RT 3888.) In an earlier portion of the police statement, Allen states that the police arrested "Daz Popik" on the night of the murders. (CT 2326.) During the police statement, Petitioner repeatedly uses the name Daz when referring to

between this amount and that amount to uh just only act as lookout and
that you were the one that was actually going to do the killing.

Michaels:     No he was, he was supposed to get whatever was in the house.

Allen:        Pardon me?

Michaels:     He was supposed to get whatever was in the house.  That's why he kept
going through the fucking closet.

(CT 2366.)  Petitioner also stated that the police arrived on the scene after only a few minutes and that

they had to quickly flee the apartment building.  (CT 2333.)

Petitioner argues that his actions that evening point only to a motive to kill, not a motive to steal,

and highlights the fact that the only items removed from the apartment were found with Popik, and not

Petitioner.  He also notes that several valuable items, including additional pieces of jewelry, a coin

collection, money, and two fur coats were left in the apartment.  (FAP at 276, citing RT 4154, 4471-73,

4480, 4517.)  However, the Supreme Court explicitly states that "a federal habeas corpus court faced

with a record of historical facts that supports conflicting inferences must presume- even if it does not

affirmatively appear in the record- that the trier of fact resolved any such conflicts in favor of the

prosecution, and must defer to that resolution."  Jackson, 443 U.S. at 326.  As such, the jury could have

reasonably concluded that it was the police's prompt arrival at the scene that interrupted the completion

of the robbery.

In sum, given Petitioner's statements to friends and acquaintances of his plans to "tax" a lady

in Escondido that evening, that he admitted recruiting Popik by promising him the contents of the

victim's home, and his offer to sell jewelry to Kimberly Platt, it is clear to this Court that the evidence

was sufficient for the jury to have found the elements of the robbery and burglary special circumstances

proven true beyond a reasonable doubt.  See Jackson, 443 U.S. at 319 ("[T]he relevant question is

whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of

fact could have found the essential elements of the crime beyond a reasonable doubt.")  Accordingly,

the trial court did not err in rejecting Petitioner's pre-trial motion to dismiss these special circumstances.

The state court's rejection of this claim did not involve an objectively unreasonable application

Popik.  (CT 2331, 2333-34.)

1   of Jackson, nor was it based upon an unreasonable determination of the facts.  See Juan H., 408 F.3d

2   at 1274.  Petitioner does not merit habeas relief on Claim 65.

3         **6.**      **Claim 66 - The Evidence Did Not Support Financial Gain Special Circumstance**

4         Petitioner asserts that "the evidence established that Michaels received no financial gain and that

5   financial gain was not in any way a consideration for the murder."  (FAP at 278.)  Petitioner also asserts

6   that the prosecutor "presented insufficient evidence to support the underlying substantive crimes relating

7   to financial gain," that "the trial court erred in denying petitioner's California Penal Code § 995 motion

8   based on insufficiency of the evidence," and argues that "because the robbery and burglary special

9   circumstance allegation were found true, the financial gain allegation which resulted from essentially

10  the same conduct used to establish robbery and burglary, resulted in multiple punishment for the same

11  conduct."  (Id.)

12        Petitioner raised this claim on direct appeal, which the California Supreme Court rejected in a

13  reasoned decision, as follows:

> Substantial evidence supports the special circumstance finding of murder for financial gain. (§ 190.2, subd. (a)(1).) Before JoAnn's murder, Velinda Davis heard defendant tell Christina, "Now we can knock off the old lady." Christina replied "And then we can get the money." Defendant told codefendant Popik that JoAnn had insurance coverage of $100,000, and that the money would help Christina and him to get a new start, and would provide Christina with money "to do good." After the murder Christina told the police that defendant said he thought her mother had insurance. After his confession to the police, when Detective Gaylor asked defendant if the life insurance policy was a secondary benefit of killing JoAnn, defendant agreed. Defendant said Christina had told him about JoAnn's insurance policy, and that she was interested in going to a mechanics school in Phoenix and needed $9,000.
>
> A killing for the purpose of obtaining life insurance benefits, as contrasted with a killing during a burglary or robbery, falls squarely within the scope of the financial gain special circumstance. To avoid any overlap with burglary or robbery special circumstances, we have construed the financial gain special circumstance to apply "only when the victim's death is the consideration for, or an essential prerequisite to, the financial gain sought by the defendant." (*People v. Bigelow* (1984) 37 Cal.3d 731, 751 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723].) Obtaining life insurance benefits falls within this description, because the death of the insured is an essential prerequisite for the financial gain. (See *People v. Hardy*, *supra*, 2 Cal.4th 86; *Lewis v. Witik* (C.D.Cal. 1996) 927 F.Supp. 1288.)
>
> Defendant argues that his primary purpose in killing JoAnn was to protect Christina from abuse by JoAnn, but the financial gain special circumstance applies even if the gain is only a secondary purpose. (*People v. Noguera* (1992) 4 Cal.4th 599, 635 [15 Cal.Rptr.2d 400, 842 P.2d 1160].) Neither does it matter that no financial gain was realized because the insurer refused to pay the benefits to Christina, the beneficiary of JoAnn's life insurance policy, because Christina was involved in JoAnn's murder. (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1025 [254 Cal.Rptr. 586, 766 P.2d 1].) Finally, it does

- 132 -

04cv0122

not matter that Christina, not defendant, would be the direct recipient of the financial gain. Although some cases in which the defendant was the direct recipient have used language that spoke of the special circumstance as applying when the defendant expected to obtain financial gain (e.g., *People v. Howard* (1988) 44 Cal.3d 375, 409 [243 Cal.Rptr. 842, 749 P.2d 279]) the statute is not so limited, but speaks of intentional murder "carried out for financial gain." (§ 190.2, subd. (a)(1).) There is no reason why it should not apply to an intentional murder carried out for the financial gain of a third person.

Michaels, 28 Cal. 4th at 519-20.

The jury was specifically instructed that in order to find true the financial gain special circumstance, it must find that:

Either:

(1)     The murder was intentional;

(2)     It was carried out for financial gain of the defendant or another, and the victim's death is the consideration for, or a prerequisite to, the financial gain sought by the defendant;

(3)     The defendant believed the death of the victim would result in the desired financial gain to defendant or another.

Or the defendant intentionally induces, solicits, or hires a third person to commit or aid and abet in the commission of the murder for the third person's own financial gain, and this third person actually commits or aids and abets the commission of the murder for such financial gain, regardless of whether the defendant himself expects or receives financial gain for the murder.

(CT 1154, CALJIC 8.81.1.)

Petitioner contends that financial gain was not the motive for the murder, and that the murder was committed to protect Christina from her mother. (FAP at 278.) However, similar to the discussion with respect to Claim 65 above, it is clear that there was also sufficient evidence presented at trial that allowed the jury to reasonably find that financial gain was an additional and independent motive for the murder. For instance, Petitioner's roommate Velinda Davis overheard Petitioner talking with Christina days before the murder, and heard Petitioner making a statement about knocking off an old lady, and Christina replying that "then we can get the money," after which they laughed and hugged. (RT 3943-45.) Petitioner acknowledged to police that he told Popik that Christina's mother had $100,000 in insurance, and stated that while he did not actually know the amount, he assumed she was insured. (RT 2351-52.) Petitioner initially denied to the police that he killed the victim for the insurance money. (RT 2353.) However, Detective Gaylor testified that Petitioner admitted in a later conversation that a

secondary benefit of killing JoAnn Clemons was the life insurance money.  (RT 4372-74.)  Petitioner said Christina had told him about her mother's policy, and stated that she wanted to attend a mechanic's school in Phoenix which cost $9,000.  (RT 4374.)  In his initial police statement, Petitioner also admitted that he recruited Popik's assistance by promising him a portion of insurance proceeds, in addition to whatever was found in the victim's residence, but also stated that he told Popik about the insurance money just to get him to go along.  (CT 2366.)

Petitioner argues that the record fails to demonstrate that Petitioner himself "sought or expected any financial gain as a result of the death of Clemons," and notes that "no claim was ever made against the insurance policy following Clemons [sic] death."  (FAP at 280.)  Yet the record clearly reflects that Velinda Davis testified she overheard Petitioner say something about knocking off an old lady, to which Christina replied "then we can get the money."  (RT 3943-45.)  While Christina, and not Petitioner, was the intended beneficiary of the victim's insurance policy, the jury could have reasonably concluded that Petitioner, as Christina's boyfriend, expected to realize a financial benefit from the insurance proceeds, particularly in light of Christina's statement to Petitioner that "we can get the money."  Additionally, it is of no consequence that Petitioner failed to realize an actual financial gain from the murder, as California law recognizes that "[p]roof of actual pecuniary benefit to the defendant from the victim's death is neither necessary nor sufficient to establish the financial-gain special circumstance."  People v. Edelbacher, 47 Cal. 3d 983, 1025 (1989).

There was substantial evidence presented at trial supporting the financial gain special circumstance, such as the statements Davis overheard, as well as Petitioner's own admission that life insurance was a motive for the murder.  Moreover, given that the Court must evaluate the evidence in the light most favorable to the prosecution, it appears clear that Petitioner's jury could have reasonably found the elements of the financial gain special circumstance to be true beyond a reasonable doubt.  See Jackson, 443 U.S. at 319 ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.")  Accordingly, the trial court did not err in rejecting Petitioner's pre-trial motion to dismiss the financial gain special circumstance.

As a related matter, Petitioner asserts that the financial gain special circumstance improperly

overlaps with the robbery and burglary special circumstances, "resulting in multiple punishments for the same conduct." (FAP at 281.) However, as detailed in the direct appeal opinion, it is clear that the state supreme court carefully considered this issue and rejected it, noting that "[t]o avoid any overlap with burglary or robbery special circumstances, we have construed the financial gain special circumstance to apply 'only when the victim's death is the consideration for, or an essential prerequisite to, the financial gain sought by the defendant,'" and reasoning that in Petitioner's case, "[o]btaining life insurance benefits falls within this description, because the death of the insured is an essential prerequisite for the financial gain." <u>Michaels</u>, 28 Cal. 4th at 519. The state court's resolution of this issue was reasonable.

In sum, Petitioner fails to demonstrate that the state court's rejection of this claim involved an objectively unreasonable application of <u>Jackson</u>, nor that it was based upon an unreasonable determination of the facts. <u>See</u> <u>Juan H.</u>, 408 F.3d at 1274. Accordingly, Petitioner does not merit habeas relief on Claim 66.

### 7.     Claim 67 - Petitioner's Death Sentence is Unconstitutional Because it is Based Upon Inaccurate and Unreliable Evidence

Petitioner asserts that the "cumulative effect of the state's penalty phase misconduct and trial counsel's ineffective assistance of counsel, as alleged throughout this petition, is to render Petitioner's sentence wholly unreliable" in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. (FAP at 281.) Petitioner asserts that his sentence was "based largely on evidence that does not meet the constitutional requirement of heightened reliability for capital cases, and was materially inaccurate," and that "[a]s a result of the inaccurate and unreliable information which was provided to the jury, petitioner's death sentence is based upon material misinformation." (Id. at 282.) Petitioner presented this claim to the California Supreme Court in his first state habeas petition, where it was denied on the merits without a statement of reasoning. (Lodgment No. 16.)

Specifically, Petitioner argues that the prosecutor relied upon: (1) a false theory that Petitioner was the actual killer, (2) Petitioner's confession, which was unreliable and obtained in violation of his constitutional rights, and (3) inadmissible penalty phase evidence regarding Petitioner's prior acts. (FAP at 282.) Petitioner also argues that the jury was deprived of "significant and exculpatory

1   information" due to trial court error and the ineffective assistance of counsel, and asserts that the state

2   used inconsistent and impermissible charging criteria.  (Id. at 282-83.)

3        Upon review of these contentions, it appears that Petitioner has reiterated alleged constitutional

4   violations which have been raised and rejected in either prior orders, or elsewhere in the instant order.

5   First, to the extent Petitioner is claiming actual innocence, by asserting that the prosecution "promoted

6   a false theory that petitioner was the actual killer," (see FAP at 282), that contention was addressed and

7   rejected by the Court in Claim 54, as part of the Group Two Order.  (See Doc. No. 135 at 148-51.)

8   Similarly, Petitioner's assertion that the charging decision was faulty has been addressed, and rejected,

9   by the Court in Claim 73, infra.  In the discussion of Claims 1 and 45, supra, the Court considered and

10  rejected Petitioner's claim of constitutional error arising from the admission of his confession at trial.

11  Similarly, Petitioner's contention that the trial court allowed the introduction of inadmissible evidence

12  at the penalty phase proceedings concerning his prior acts was addressed, and rejected, in Claims 27 and

13  51 of this Order, supra.  As each of these contentions have been rejected either in prior orders, or

14  elsewhere in this Order, Petitioner fails to offer persuasive evidence supporting this claim.

15       Moreover, Petitioner fails to specifically identify any exculpatory information that was not

16  provided to the jury, nor does he explain how it would have impacted the jury's decision in his case.

17  Relatedly, the Court previously rejected several claims alleging ineffective assistance of advisory

18  counsel in the Group Two Order (see e.g. Claims 15, 21, 23, 36-44, Doc. No. 135 at 51-57, 72-82, 98-

19  163), and rejected several claims alleging trial court error in the instant Order.  (See e.g. Claims 22, 45,

20  49-51, supra.)  Petitioner fails to persuasively explain how those alleged errors rendered his sentence

21  unreliable.  Finally, to the extent this claim can be construed as alleging cumulative error, Petitioner has

22  already raised a separate cumulative error claim, adjudicated later in this Order.  (See Claim 76, infra.)

23       In light of the fact that the Court has rejected each of the contentions comprising this claim,

24  either in the Group Two Order or elsewhere in the instant Order, Petitioner fails to demonstrate that the

25  California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application

26  of, clearly established federal law.  Petitioner is not entitled to habeas relief on Claim 67.

27  ///

28  ///

**8.      Claim 71 - Execution Would be Disproportionate Punishment for Petitioner's Culpability**

Petitioner contends that his conviction and death sentence were imposed unlawfully and unconstitutionally "because the sentencing jury never considered principles of individual proportionality, and the sentencing court erred in rejecting petitioner's claim that his sentence of death was disproportionate to his individual culpability for the crimes for which he was found guilty." (FAP at 304.) Petitioner presented this claim to the California Supreme Court in his first state habeas petition and the state supreme court rejected the claim on the merits without a statement of reasoning. (Lodgment No. 16.)

Petitioner asserts that the lack of individual proportionality review in his case has rendered his conviction and sentence unreliable and disproportionate to his culpability.  Specifically, Petitioner contends that:

> Because of petitioner's multiple mental deficits and childhood abuse, as well as the fact that he likely was not the actual killer (contrary to the prosecution's representation), as well as the fact that his participation did not include an intent to kill, or reckless indifference to human life, the execution of petitioner would be disproportionate to his culpability in this case.  [¶]  One of petitioner's co-defendants, Darren Popik, received a sentence of life without the possibility of parole.  The other, Christina Clemons, received a sentence of seven years in the California Youth Authority, even though the evidence presented at trial indicated that she masterminded her mother's death, and indeed, gave the order to kill.

(FAP at 306.)

Under the Eighth Amendment, "a criminal sentence must be proportionate to the crime for which the defendant has been convicted." Solem v. Helm, 463 U.S. 277, 290 (1983); see also California v. Brown, 479 U.S. 538, 545 (1987) ("[P]unishment should be directly related to the personal culpability of the criminal defendant.") (O'Connor, J., concurring).  Specifically, the Supreme Court has stated that "[c]apital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" Roper v. Simmons, 543 U.S. 551, 568 (2005), citing Atkins v. Virginia, 536 U.S. 304, 319 (2002).  Certain classes of individuals, due to their diminished culpability, have been declared exempt from the death penalty.  See Roper, 543 U.S. at 571 ("Retribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by

1  reason of youth and immaturity."); Hall v. Florida, 572 U.S. ___, 134 S.Ct. 1986, 1992 (May 27, 2014)

2  ("No legitimate penological purpose is served by executing a person with intellectual disability."), citing

3  Atkins, 536 U.S. at 317, 320.

4      The Supreme Court has also held that certain crimes are exempt from capital punishment, for

5  instance, crimes that did not result in the death of the victim, or those where the defendant's

6  participation was minor and the defendant did not manifest an intent, or attempt, to kill.  See e.g.

7  Kennedy v. Louisiana, 554 U.S. 407, 437 (2008) ("As it relates to crimes against individuals, though,

8  the death penalty should not be expanded to instances where the victim's life was not taken."); Enmund

9  v. Florida, 458 U.S. 782, 797 (1982) (death sentence violated Eighth Amendment where the defendant

10  "aid[ed] and abet[ted] a felony in the course of which a murder is committed by others but who does

11  not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.")

12      Petitioner contends that his mental deficits, past abuse, the fact that he "likely" was not the actual

13  killer, and lack of intent renders his death sentence disproportionate to his culpability.  These

14  contentions are not supported by the record.  For instance, evidence of Petitioner's mental state,

15  including potential organic brain damage and assorted mental heath issues, was presented to the jury

16  at the penalty phase.  The jury also heard evidence of Petitioner's past abuse, including witnessing his

17  father molest his sister and the family repeatedly moving to avoid contact with Petitioner's father.

18  Nonetheless, the jury returned a verdict of death. As for Petitioner's argument that he was not the actual

19  killer and did not possess the requisite intent, a review of the record clearly refutes this contention.

20  Petitioner provided the police with a detailed statement outlining his involvement in planning and

21  carrying out the murder of JoAnn Clemons, including recruiting the assistance of co-defendant Popik

22  to carry out the murder and Joseph Paulk to serve as getaway driver.  Petitioner obtained keys to the

23  victim's apartment in advance, spent time trying out disguises, and on the evening of the murder, waited

24  for hours in a lot near the victim's apartment for her to go to sleep before entering and killing her.

25  Petitioner made statements to acquaintances both before and after the murder, stating his intention to

26  rob or "tax" a lady for her money and jewelry and offering to sell the items obtained.  Petitioner also

27  admitted to police that he was the one who inflicted the fatal wounds to the victim's neck.  There was

28  also evidence that Petitioner recruited Popik's assistance by promising him portions of the robbery

04cv0122

proceeds, and a portion of the proceeds from the victim's insurance policy.  Petitioner was not only found guilty of first-degree murder, but the jurors found true four special circumstances. Given the circumstances of the crime and the factors presented at the penalty phase, both in aggravation and mitigation, the Court cannot conclude that this is a situation where the punishment was disproportionate to culpability.

Petitioner also argues that had the jury considered intracase proportionality, the jury would likely have imposed a sentence of less than death in this case, pointing to the sentences imposed on the other individuals involved in this case.  For instance, Petitioner notes that co-defendant Popik was sentenced to life in prison without the possibility of parole and Christina Clemons was sentenced to seven years in the California Youth Authority.  Yet Petitioner fails to provide any authority that would have supported the admission of this evidence.  See Beardslee v. Woodford, 358 F.3d 560, 579-81 (9th Cir. 2004) (rejecting claim that trial court erred in excluding evidence of co-defendants' non-capital sentences in determination of defendant's punishment).  As stated above, clearly established law requires individual proportionality, that is, "a criminal sentence must be proportionate to the crime for which the defendant has been convicted."  Solem, 463 U.S. at 290.

Moreover, the evidence introduced at trial demonstrated that Petitioner was the primary actor in the events surrounding the murder of JoAnn Clemons, as he recruited Popik's and Paulk's assistance, obtained the key, and planned and carried out the murder, including slitting the victim's throat.  As the trial court reasonably concluded in sentencing Petitioner to death:

> [T]he defendant was given several opportunities to change his mind and avoid killing JoAnn Clemons.  His enlisted assistant and aider and abetter, Mr. Darren Popik, balked at beginning the attack on JoAnn Clemons and tried to leave the bedroom.  Mr. Michaels physically pushed Mr. Popik back into the bedroom so that Mr. Popik could assist in keeping JoAnn Clemons quiet. [¶] After JoAnn Clemons awoke and screamed, Mr. Michaels again could have desisted from further activity.  After she began struggling and the first knife broke, Mr. Michaels could have well stopped the fatal attack.  Instead, Mr. Michaels had Mr. Popik retrieve another knife for him from the kitchen area of JoAnn Clemons' apartment, after which Mr. Michaels cut the victim's throat.

(RT 5963.) The trial court emphasized: "Again, Mr. Michaels induced and hired Mr. Popik to assist him with promises of loot and a potential cut." (RT 5964.) The trial judge stated that Petitioner "was clearly the leader who hired Mr. Popik to assist him, as well as hiring Mr. Paulk as the getaway driver, also. Mr. Michaels was several years senior to Christina Clemons.  And, based on the evidence, was not

04cv0122

dominated by Christina Clemons." (RT 5967.)  The trial court noted that Popik was serving life in prison and Paulk was serving 16 years for their involvement, stating that both had been "enlisted into Mr. Michaels' death squad." (RT 5976.)  Moreover, Christina Clemons was a minor at the time of the murder, pleaded guilty to a lesser degree of murder, and was sentenced to serve time in the California Youth Authority as a result of her involvement.  (See Lodgment No. 11a, App. 5 at ¶ 1.)  Given Christina's age, seventeen, at the time of the murder and her involvement in the planning rather than the commission, the Court is not persuaded that a comparison of her sentence, even if allowed, would have resulted in the imposition of a lesser sentence in Petitioner's case.

In sum, based on an independent review of the record, Petitioner fails to demonstrate that the sentence imposed in his case was disproportionate to his culpability.  He also fails to demonstrate that the California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law.  Petitioner is not entitled to habeas relief on Claim 71.

### 9.   Claim 72 - Petitioner's Sentence Was Based on Inaccurate and Unreliable Evidence and Is Disproportionate, Thus Execution would Violate Eighth Amendment

Petitioner asserts that his death sentence was "unlawfully and unconstitutionally imposed in violation of his rights to due process and freedom from cruel and unusual punishments under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution, because it was based on inaccurate, unreliable evidence and is disproportionate to his culpability." (FAP at 306.) Petitioner also asserts that the jury was not apprised of all of the evidence concerning Petitioner's role in the charged crimes, the evidence relating to Petitioner's background and character, or the evidence relating to the uncharged criminal acts, such as evidence that Petitioner was under the influence of drugs during the robbery of Chad Fuller.  (Id. at 308-09.) Petitioner presented this claim to the California Supreme Court in his first state habeas petition, and the state supreme court rejected the claim on the merits without a statement of reasoning.  (Lodgment No. 16.)

Upon review of the claim, Petitioner appears to reiterate and combine the contentions raised and rejected by the Court in Claims 67 and 71 of the instant Order, supra, as well as restating arguments previously raised and rejected in the Group Two Order (notably Claims 38-44). (See Doc. No. 135 at 105-48.) As discussed with respect to these prior claims, Petitioner fails to demonstrate that the asserted

1   errors or deficiencies rendered his sentence unreliable or disproportionate to his culpability.[25]

2          As such, Petitioner fails to demonstrate that the California Supreme Court's rejection of this

3   claim was either contrary to, or an unreasonable application of, clearly established federal law.  Habeas

4   relief is not warranted on Claim 72.

5   **F.      CLAIMS REGARDING CALIFORNIA'S DEATH PENALTY STATUTE**

6          **1.      Claim 68 - California's Death Penalty Scheme Fails to Narrow the Class of Death-**

7                  **Eligible Defendants**

8          Petitioner asserts that "the capital punishment system under which petitioner was charged, tried

9   and sentenced fails rationally to narrow the class of death-eligible defendants; leads to arbitrary and

10  capricious sentencing; and treats similarly situated defendants differently" in violation of the Fifth,

11  Eighth, and Fourteenth Amendments.  (FAP at 283.)

12         The California Supreme Court considered and rejected this claim on direct appeal as follows:

13     Defendant asserts that California's death penalty law suffers from a number of
       constitutional defects. We have in past decisions rejected each of these contentions.
14
       He first argues that section 190.3 does not sufficiently narrow the class of murderers
15     eligible for the death penalty. (See *Zant v. Stephens* (1983) 462 U.S. 862, 887-888 [103
       S.Ct. 2733, 2748-2749, 77 L.Ed.2d 235]; *People v. Bacigalupo* (1993) 6 Cal.4th 457,
16     462-463 [24 Cal.Rptr.2d 808, 862 P.2d 808].) As in *People v. Wader* (1993) 5 Cal.4th
       610, 669 [20 Cal.Rptr.2d 788, 854 P.2d 80], "defendant has not demonstrated on this
17     record, or through sources of which we might take judicial notice, that his claims are
       empirically accurate, or that, if they were correct, this would require the invalidation of
18     the death penalty law." Section 190.2, which sets out the special circumstances, on its
       face provides some criteria that may narrow the class of death-eligible persons. Contrary
19     to defendant's contention, we cannot simply deduce from the language and structure of
       section 190.2 and the cases interpreting that section that this narrowing is
20     constitutionally inadequate.

21  Michaels, 28 Cal. 4th at 541.  Petitioner also raised this claim in the first state habeas petition and the

22  state supreme court denied the claim on the merits.  (Lodgment No. 16.)

23         In order to comport with constitutional standards, the aggravating circumstances in a State's

24  death penalty statute must "genuinely narrow the class of persons eligible for the death penalty and must

25  reasonably justify the imposition of a more severe sentence on the defendant compared to others found

26  _____

27      [25] At oral arguments with respect to Claims 67, 71 and 72, Petitioner argued that evidence of plea
    negotiations demonstrated that this was a close case.  Petitioner previously raised this argument with respect
28  to the Group Two claims and the Court addressed it in the Group Two Order.  (See Doc. No. 135 at 161 n.30.)  For
    the reasons previously discussed, this argument is unpersuasive.

guilty of murder." <u>Zant v. Stephens</u>, 462 U.S. 862, 877 (1983).  Petitioner argues that "[t]he vice of the California scheme is not that any one of the special circumstances taken alone is unconstitutional - - each arguably identifies a subclass of all first degree murderers more deserving of harsher punishment than other members of the class.  The vice is that, taken together, the special circumstances cover virtually all first degree murders, and thus, they perform no narrowing function at all."  (FAP at 294.) Petitioner offers a lengthy and multi-faceted argument in support of his contention that the California death penalty statute fails to properly narrow the class of death-eligible defendants.  For instance, Petitioner argues that statements in the ballot proposition arguments make clear that the legislative intent of the 1978 capital statute was to ensure that it applied to all murders.  (<u>See id.</u> at 286.)  He asserts that the actual language of the statute, particularly the felony murder rule, has expanded the potential application of the death penalty to a large amount of murders.  (<u>Id.</u> at 289-91, 297-302.)  Petitioner also offers statistics in support of his contention.  (<u>Id.</u> at 292-93.)

However, Petitioner fails to demonstrate that the state supreme court's rejection of this claim was objectively unreasonable, as the Ninth Circuit has explicitly rejected this contention on several occasions.  In <u>Karis v. Calderon</u>, 283 F.3d 1117 (9th Cir. 2002), the Ninth Circuit specifically rejected a constitutional challenge to California's capital sentencing statute, concluding that:

> With regard to this claim, we reject Karis' argument that the scheme does not adequately narrow the class of persons eligible for the death penalty. The California statute satisfies the narrowing requirement set forth in <u>Zant v. Stephens</u>, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). The special circumstances in California apply to a subclass of defendants convicted of murder and are not unconstitutionally vague. <u>See id.</u> at 972, 103 S.Ct. 2733. The selection requirement is also satisfied by an individualized determination on the basis of the character of the individual and the circumstances of the crime. <u>See id.</u> California has identified a subclass of defendants deserving of death and by doing so, it has "narrowed in a meaningful way the category of defendants upon whom capital punishment may be imposed." <u>Arave v. Creech</u>, 507 U.S. 463, 476, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993).

<u>Karis</u>, 283 F.3d at 1141 n. 11; <u>see also</u> <u>Mayfield v. Woodford</u>, 270 F.3d 915, 924 (9th Cir. 2001) ("A reasonable jurist could not debate, therefore, that the 1978 California statute, which narrowed the class of death-eligible defendants at both the guilt and penalty phases, was constitutional.")

Petitioner fails to show that the state supreme court's denial of Claim 68 was either contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, Petitioner is not entitled to habeas relief on Claim 68.

04cv0122

2.        **Claim 69 - California's Death Penalty Scheme Fails to Require Written Findings**

Petitioner contends that the "failure to require written findings by the jury listing the aggravating factors it found to be true, deprived defendant of his due process and Eighth Amendment rights to meaningful appellate review of his case."  (FAP at 303.)

a.        **Teague analysis**

Respondent maintains that there is no constitutional requirement for written jury findings, and as such, "this claim is barred by the non-retroactivity rule of Teague v. Lane, 489 U.S. at 288, 299-301, because it would require the creation and application of a new constitutional rule: that the jurors were constitutionally required to make written findings of the evidence upon which they relied in imposing the death penalty."  (Ans. at 132-33.)

Pursuant to Teague, habeas relief is generally unavailable if based "on a rule announced after [a petitioner's] conviction and sentence became final."  Caspari, 510 U.S. at 389.  "If, however, the decision did not announce a new rule, it is necessary to inquire whether granting the relief sought would create a new rule because the prior decision is applied in a novel setting, thereby extending the precedent."  Stringer, 503 U.S. at 228, citing Butler v. McKellar, 494 U.S. 407, 414-15 (1990).

Where a state affords the right to appeal a conviction, it must provide an indigent defendant with a record of the trial proceedings sufficient to enable an "adequate and effective appellate review."  See Griffin v. Illinois, 351 U.S. 12, 20 (1956); see also Mayer v. City of Chicago, 404 U.S. 189, 195 (1971) ("[T]he State must provide a full verbatim record where that is necessary to assure the indigent as effective an appeal as would be available to the defendant with resources to pay his own way.")  Yet, with respect to the specific claim of error, the Ninth Circuit has held that the California death penalty statute "need not require written jury findings in order to be constitutional."  Williams, 52 F.3d at 1484-85, citing Harris, 692 F.3d at1195-96, reversed on other grounds by Harris, 465 U.S. at 53-54.

In light of this authority stating that written jury findings are not constitutionally required, it appears evident that the rule Petitioner seeks is not compelled by the existing Supreme Court precedent affording a petitioner an adequate appellate record, and is governed by Teague.  Granting habeas relief on this claim would create a new rule of federal criminal procedure, one whose "result was not dictated by precedent existing at the time defendant's conviction became final."  Teague, 489 U.S. at 301; see

04cv0122

also <u>Stringer</u>, 503 U.S. at 228.  Additionally, the Court finds that Petitioner's proposed rule does not satisfy either exception to <u>Teague</u>.  <u>See</u> <u>Teague</u>, 489 U.S. at 307.  However, even if the Court were to assume this claim would not be barred under <u>Teague</u>, it is also without merit for the reasons set forth below.

### b.    <u>Merits</u>

The California Supreme Court rejected this claim on direct appeal, reasoning as follows:

> Defendant asserts that California's death penalty law suffers from a number of constitutional defects. We have in past decisions rejected each of these contentions.
>
> ....
>
> No written findings are required. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1232 [47 Cal.Rptr.2d 800, 906 P.2d 1068].)

<u>Michaels</u>, 28 Cal. 4th at 541.

Again, as noted above, the Ninth Circuit has explicitly rejected the contention that the California capital sentencing statute is unconstitutional because it does not require written findings.  <u>See</u> <u>Williams</u>, 52 F.3d at 1484-85.  Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based upon an unreasonable determination of the facts.  Petitioner does not merit habeas relief on Claim 69.

### 3.    <u>Claim 70 - California's Death Penalty Scheme Fails to Incorporate Intracase and Intercase Proportionality Review</u>

Petitioner alleges that the "lack of any requirement of intracase and intercase proportionality and of any meaningful undertaking of such review in this case at the time of trial or on appeal" violates his rights to equal protection, right against the arbitrary and capricious imposition of the death penalty, heightened reliability requirements for capital case sentencing, and right to meaningful appellate review, under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (FAP at 304.)

Petitioner raised this claim on direct appeal, which the California Supreme Court rejected in a reasoned decision, stating:

> Defendant asserts that California's death penalty law suffers from a number of constitutional defects. We have in past decisions rejected each of these contentions.
>
> ...

04cv0122

Neither the federal Constitution nor state law requires intercase proportionality review. (*Pulley v. Harris* (1984) 465 U.S. 37 [104 S.Ct. 871, 79 L.Ed.2d 29]; *Bacigalupo I*, *supra*, 1 Cal.4th at p. 151.) Defendant here does not contend on appeal that the death penalty is disproportionate to his individual culpability. (See *Bacigalupo I*, *supra*, at p. 152.)

*Michaels*, 28 Cal. 4th at 541.

The <u>Harris</u> Court held that comparative proportionality review of death sentences is not constitutionally required and upheld California's death penalty statute despite the lack of such review. See <u>id.</u>, 465 U.S. at 42-51; <u>see also</u> <u>Allen v. Woodford</u>, 395 F.3d 979, 1018 (9th Cir. 2005) (holding that neither due process, equal protection, nor the Eighth Amendment require proportionality review in capital sentencing).

Given that this contention has been firmly rejected by both the United States Supreme Court and the Ninth Circuit, the Court cannot conclude that the state supreme court's denial of Claim 70 was either contrary to, or an unreasonable application of, clearly established federal law, or based on an unreasonable determination of the facts.  Petitioner is not entitled to habeas relief on this claim.

**4.    Claim 73 - Unbounded Prosecutorial Discretion Renders California's Death Penalty Statute Unconstitutional**

Petitioner contends that the "arbitrary and wanton prosecutorial discretion allowed by the California scheme-in charging, prosecuting and submitting a case to the jury as a capital crime-merely compounds, in application, the disastrous effects of vagueness and arbitrariness inherent on the face of the California statutory scheme." (FAP at 310.) Petitioner raised this contention on direct appeal as part of Claim XXV, which was entitled, "Many Features Of This State's Capital Sentencing Scheme, As Interpreted By This Court And Applied At Defendant's Trial, Violate The United States Constitution." (Lodgment No. 1 at 345-57.)  Under the heading "Constitutional Challenges to the California Death Penalty Law," the California Supreme Court stated that, "Defendant asserts that California's death penalty law suffers from a number of constitutional defects.  We have in past decisions rejected each of these contentions."  <u>Michaels</u>, 28 Cal. 4th at 541-42.  While the state supreme court did not specifically mention the prosecutorial discretion contention in its rejection of Claim XXV on direct appeal, Supreme Court authority instructs that "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was

adjudicated on the merits- but that presumption can in some limited circumstances be rebutted." Johnson v. Williams, 568 U.S. ___, 133 S. Ct. 1088, 1096 (2013).  Accordingly, section 2254 applies where, as here, the presumption that the claim was adjudicated on the merits has not been rebutted.

Petitioner argues that "the prosecutor in each county has complete discretion as to whether to seek a sentence of death in any particular case," and generally contends that "[t]here can be no doubt that under this statutory scheme, some offenders will be chosen as candidates for the death penalty by one prosecutor, while other offenders with similar qualifications in different counties will not be singled out for the ultimate penalty."  (FAP at 310.)

The Supreme Court has on numerous occasions affirmed that prosecutorial discretion in pursuing capital charges does not, in and of itself, violate constitutional guarantees concerning equal protection, due process, or cruel and unusual punishment.  See Jurek v. Texas, 428 U.S. 262, 274 (1976); Proffitt v. Florida, 428 U.S. 242, 254 (1976); Gregg v. Georgia, 428 U.S. 153, 199-200 (1976).  The California Supreme Court has repeatedly applied these holdings to capital cases in this state.  See e.g. People v. Williams, 16 Cal. 4th 153, 278 (1997), quoting People v. Keenan, 46 Cal. 3d 478, 505 (1988) ("[P]rosecutorial discretion to select those eligible cases in which the death penalty would actually be sought does not in and of itself evidence an arbitrary and capricious capital punishment system or offend principles of equal protection, due process, or cruel and/or unusual punishment."), citing Jurek, 428 U.S. at 274, Proffitt, 428 U.S. at 254, Gregg, 428 U.S. at 199-200.

As such, Petitioner fails to demonstrate that the California Supreme Court's denial of this claim on appeal was either contrary to, or an unreasonable application of, clearly established federal law. Petitioner does not merit relief on Claim 73.

### 5.   Claim 75 - Use of Lethal Injection in California is Cruel and Unusual

Petitioner argues that his "sentence of death is illegal and unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution, because execution by lethal injection, the method by which the State of California plans to execute him, violates the prohibition against cruel and unusual punishment."  (FAP at 313.)  Petitioner raised this claim in the first state habeas petition, and the California Supreme Court rejected it on the merits for failure to state a prima facie case for relief. (See Lodgment Nos. 11, 16.)  Respondent contends that the claim is premature and argues that relief is

1  also precluded by section 2254(d).  (Ans. at 139-40.)

2      Petitioner asserts that "[d]espite several attempts, the CDCR [California Department of

3  Corrections and Rehabilitation] has failed to develop and promulgate a valid lethal injection protocol,

4  as required under the California Administrative Procedure Act (APA), Gov't Code section 11340 et

5  seq." (Pet. Brief at 45.)  Petitioner also asserts that "the CDCR is currently enjoined 'from carrying out

6  the execution of any condemned inmate by lethal injection unless and until new regulations governing

7  lethal injection execution are promulgated in compliance with the APA.'  Sims v. Cal. Dep't of

8  Corrections & Rehabilitation, 216 Cal. App. 4th 1059, 1084 (2013)." (Id.)  Petitioner requests this

9  Court either vacate his death sentence or stay the instant habeas action until the state of California

10  adopts a lethal injection protocol, and then consider this claim.  (Id. at 47.)

11      Petitioner is correct that California's execution procedures and protocol remain the subject of

12  continuing litigation in both the state and federal courts and that the California Department of

13  Corrections has been enjoined from proceeding with an execution subject to the promulgation of new

14  regulations that satisfy state requirements.  See e.g., Sims, 216 Cal. App. 4th at 1063-67; Morales v.

15  Cate, 2012 WL 5878383, at *3 (N.D. Cal. 2012) ("California at this juncture lacks a lethal-injection

16  protocol that is valid under state law."); Morales v. Cate, 623 F.3d 828, 831 (9th Cir. 2010); Morales

17  v. Tilton, 465 F.Supp.2d 972, 981 (N.D. Cal. 2006) (prior three-drug execution protocol was found to

18  "result[] in an undue and unnecessary risk of an Eighth Amendment violation.")

19      At the present time, the state of California does not appear to have a current execution protocol.

20  Moreover, even if California had a current protocol, Petitioner does not have a pending or scheduled

21  execution date, and it is therefore unclear that such a protocol would govern Petitioner's case.  In both

22  the briefing and at oral argument, Petitioner asserted that the Court should stay the habeas proceedings

23  until there is a protocol in place and then allow Petitioner to challenge that protocol.  (See Pet. Brief at

24  47.)  However, Petitioner fails to demonstrate that this issue is either ripe for review or that a stay is

25  warranted.  In light of the procedural posture of Petitioner's claim and the continuing changes in this

26  area of law, the Court agrees with Respondent that this claim is premature.  Accordingly, Claim 75 is

27  denied without prejudice as premature.

28  ///

1  **G.    PREVIOUSLY DEFERRED CLAIMS**

2      **1.    Claim 76 - Cumulative Error**

3      In this claim, Petitioner alleges that the cumulative effect of advisory counsel's ineffectiveness

4  and other errors, such as trial court errors and prosecutorial misconduct, require his conviction and death

5  sentence be vacated.  (FAP at 322-23.)  This claim was denied on the merits by the California Supreme

6  Court without a statement of reasoning.

7      In the Group Two Order, the Court previously reasoned that because "this claim is predicated

8  on alleged errors and defects asserted throughout the federal Petition, the resolution of each of the 76

9  other claims in the petition will necessarily impact the merits review of the instant claim," and deferred

10 consideration of Claim 76 until after the Court had resolved the remainder of the claims in the federal

11 Petition.  (Doc. No. 135 at 166.)

12     It is possible that "[t]he cumulative effect of multiple errors can violate due process even where

13 no single error rises to the level of a constitutional violation or would independently warrant reversal."

14 Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007), citing Chambers v. Mississippi, 410 U.S. 284, 290

15 n.3 (1973).  However, even considering Petitioner's allegations cumulatively, such as the trial court's

16 acknowledged error in giving the necessity instruction and Petitioner's related allegations, asserted error

17 concerning the admission of the Popik note, and the claimed instances of misconduct, Petitioner still

18 fails to show that his constitutional rights were violated.

19     Thus, based on an independent review of the state record, the Court cannot conclude that the

20 California Supreme Court's rejection of this claim was an objectively unreasonable application of

21 clearly established federal law.  Claim 76 does not merit habeas relief.

22     **2.    Claim 77 - Ineffective Assistance of Appellate Counsel**

23     In Claim 77, Petitioner asserts that appellate counsel was ineffective in failing to investigate,

24 prepare and raise numerous issues on appeal.  (FAP at 323-24.)  The state supreme court rejected this

25 claim on state habeas review without a reasoned decision.

26     "[A] criminal defendant has a right to effective assistance of counsel on a first appeal as of

27 right."  Ohio Adult Parole Authority v. Woodard, 523 U.S. 272, 284 (1998), citing Evitts v. Lucey, 469

28 U.S. 387, 394-96 (1985).  Yet, "appellate counsel has no constitutional obligation to raise every non-

frivolous issue requested by the defendant." <u>Miller v. Keeney</u>, 882 F.2d 1428, 1434 n.10 (9th Cir. 1989), citing <u>Jones v. Barnes</u>, 463 U.S. 645, 751-54 (1983). "In many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy." <u>Miller</u>, 882 F.2d at 1434.

In the Petition and in the Group Two briefing, Petitioner did not specifically identify the claims appellate counsel failed to raise, instead simply stating that "[s]hould the Court determine that any claims herein were not adequately presented on appeal or by way of Petitioner's previous state habeas, Petitioner submits that such failure was as the result of the above unconstitutional deprivation of effective assistance of appellate counsel. There was no tactical justification for appellate counsel's conduct which resulted in prejudice to Petitioner." (FAP at 324; Doc. No. 97 at 72.) As noted in the Group Two Order, attorneys Karen Landau and Harry Caldwell, who represented Petitioner on both direct appeal and in his first state habeas petition, submitted declarations to the California Supreme Court in support of the second state habeas petition. (<u>See</u> Lodgment No. 25, Exhs. 3, 4.) Each declaration contained the following statement:

> I am aware that the amended petition raises the following claims: (1) ineffective assistance of counsel due to violation of the attorney-client privilege; (2) ineffective assistance of counsel for incompetently entering a plea of not guilty by reason of insanity; (3) ineffective assistance of counsel in presenting a motion to relieve co-counsel for failing to advise the trial court that co-counsel was not providing competent representation; (4) failure to obtain a valid waiver of the right to counsel for failure to inquire into Mr. Michaels' mental health and use of psychotropic drugs and controlled substances; (5) ineffective assistance of counsel for failing to advise Mr. Michaels against representing himself and encouraging him to represent himself; (6) ineffective assistance of counsel for failing to present a diminished actuality defense; (7) ineffective assistance of counsel for failing to request a jury instruction on diminished actuality; (8) ineffective assistance of counsel for failing to present exculpatory and mitigating evidence, particularly the testimony of Wendell Clemons, the ex-husband of the victim; (9) trial court error for giving an improper limiting instruction and ineffective assistance of counsel for failing to challenge the instruction; (10) ineffective assistance of counsel for giving inadequate opening and closing statements at the penalty phase of the trial; (11) prosecutorial misconduct, including prosecutorial arguments that Mr. Michaels was in favor of the death penalty and should be viewed as a "thirteenth juror," and arguments that Mr. Michaels' poverty was a motive for the crime; (12) ineffective assistance of counsel for conducting inadequate voir dire; (13) improper admission of an unedited videotape of the crime scene; and (14) ineffective assistance of appellate counsel.

(Ex. 3 at ¶ 3, Ex. 4 at ¶ 3.)

Ms. Landau and Mr. Caldwell each indicate that "any failure to raise these claims on direct

1    appeal or in the original habeas corpus petition filed with the Court was not the result of a strategic

2    decision," but instead was due to a "failure to 'spot' the issues."  (Ex. 3 at ¶ 4, Ex. 4 at ¶ 4.)

3        Given that each of these enumerated claims were later raised in the second state habeas petition

4    and the instant Petition and both the California Supreme Court and this Court found that Petitioner was

5    not entitled to habeas relief on any of these claims, appellate counsels' failure to raise the claims on

6    appeal cannot be considered ineffective.  This is because Petitioner fails to demonstrate that appellate

7    counsels' performance was deficient in failing to present the claims or that "there is a reasonable

8    probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

9    different."  Strickland v. Washington, 466 U.S. 668, 694 (1984); see also Baumann, 692 F.2d at 572

10   ("The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel.")

11   Petitioner's contention that appellate counsel rendered prejudicially ineffective assistance is without

12   merit.

13       Accordingly, the California Supreme Court's rejection of this claim was neither contrary to, nor

14   an unreasonable application of, clearly established federal law.  Petitioner does not merit habeas relief

15   on Claim 77.

16   **VI.  EVIDENTIARY HEARING OR DISCOVERY**

17       In the Group Three briefs, Petitioner has not made a specific request for evidentiary hearing or

18   other evidentiary development.  Yet, in an abundance of caution, and for the same reasons previously

19   discussed in the Court's Orders on the Group One and Two Claims (see Doc. Nos. 119, 135), Petitioner

20   has not shown an entitlement to federal habeas relief on any of the Group Three Claims and does not

21   warrant an evidentiary hearing or discovery on these claims.  See e.g. Sully v. Ayers, 724 F.3d 1057,

22   1075 (9th Cir. 2013) ("[A]n evidentiary hearing is pointless once the district court has determined that

23   § 2254(d) precludes habeas relief."); Kemp v. Ryan, 638 F.3d 1245, 1260 (9th Cir. 2011) ("Because

24   Kemp is not entitled to an evidentiary hearing, the district court did not err in denying his request for

25   discovery, as well as his request for a hearing . . . because the district court was not authorized to hold

26   an evidentiary hearing on Kemp's deliberate elicitation claim, obtaining discovery on that claim would

27   have been futile.").  Accordingly, the Court **DENIES** an evidentiary hearing, discovery, or other

28   evidentiary development on the Group Three Claims.

## VII.   CERTIFICATE OF APPEALABILITY

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") amended 28 U.S.C. § 2253 to require a "certificate of appealability" for § 2254 cases on a claim-specific basis.  Specifically, section 2253(c) provides:

(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

The Supreme Court has elaborated on the application of this requirement, stating that "[w]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy section 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000); see also Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) ("Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that Petitioner will not prevail.")

The Supreme Court has also stated that a claim may also warrant a certificate of appealability when the "questions are adequate to deserve encouragement to proceed further."  Barefoot v. Estelle, 463 U.S. 880, 893 n. 4 (1983) (citation omitted), superseded on other grounds by 28 U.S.C. § 2253(c)(2). Mindful of the "relatively low" threshold for granting a certificate of appealability, Jennings v. Woodford, 290 F.3d 1006, 1010 (9th Cir. 2002), and that "the petitioner need not show that he should prevail on the merits," Lambright v. Stewart, 220 F.3d 1022, 1025 (9th Cir. 2000), quoting Barefoot, 463 U.S. at 893 n.4, the Court finds Claims 1, 24, 30, 45 and 46 suitable for a COA.

## VII.   CONCLUSION

For the reasons discussed above, Respondent's request to dismiss Claims 22, 27, 30, 49-50, and 53 on procedural grounds is **DENIED**.  Claims 1, 19, 22, 24, 27-31, 45-53, 55-73, and 76-77 are

1  **DENIED** on the merits.  Claim 75 is **DENIED** without prejudice as premature.  The Court will, in the

2  final judgment, **GRANT** a Certificate of Appealability ("COA") on Claims 1, 24, 30, 45 and 46 and

3  **DENY** a Certificate of Appealability on Claims 19, 22, 27-29, 31, 47-53, 55-56, 57-73, and 75-77.

4  **IT IS SO ORDERED.**

5  Dated: December 12, 2014

6  **JOHN A. HOUSTON**
   United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

04cv0122